IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | ) | No. 8:18CV329 |
| COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| ANDREW DEUSCHLE, | ) | |
| | ) | |
| Plaintiff Intervenor, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WERNER ENTERPRISES, INC., | ) | |
| | ) | Omaha, Nebraska |
| Defendant. | ) | August 14, 2020 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUSAN M. BAZIS
UNITED STATES MAGISTRATE JUDGE

TRANSCRIBER:                    Ms. Rogene S. Schroder, RDR, CRR
                                111 South 18th Plaza
                                Suite 3129
                                Omaha, NE 68102
                                (402) 661-7383

Proceedings recorded by electronic sound recording, transcript
produced with computer.

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2    FOR THE PLAINTIFF:        Mr. Grant R. Doty
                                Ms. Meredith S. Berwick
 3                              Equal Employment Opportunity
                                 Commission
 4                              1222 Spruce Street, Room 8.100
                                St. Louis, MO 63103
 5
      FOR THE PLAINTIFF
 6    INTERVENOR:               Mr. Brian East
                                Disability Rights Texas
 7                              2222 West Braker Lane
                                Austin, TX 78758
 8
      FOR THE DEFENDANT:        Mr. Brandon J. Crainer
 9                              Ms. Elizabeth A. Culhane
                                Fraser Stryker Law Firm
10                              409 South 17th Street
                                Suite 500, Energy Plaza
11                              Omaha, NE 68102

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (At 1:00 p.m. on August 14, 2020; with counsel present

2     telephonically:)

3          THE COURT:  All right.  We are on the record in 8 --

4     8:18CV329, EEOC versus Werner Enterprises.

5          Will the attorney for the plaintiff please enter their

6     appearance for the record.

7          MR. DOTY:  Yes, Your Honor.  This is Grant Doty for

8     Plaintiff EEOC and also Meredith Berwick is on the line.

9          THE COURT:  Thank you.

10         And for the intervenor?

11         MR. EAST:  Brian East for the intervenor.

12         THE COURT:  And for Werner Enterprises.

13         MR. CRAINER:  Judge, Brandon Crainer and Elizabeth

14    Culhane for Werner.

15         THE COURT:  All right.  Thank you.

16         All right.  Now, we are here in regards to a discovery

17    dispute.  It is somewhat -- well, it is related to the

18    discovery dispute that we had at the end of April in regards

19    to -- I believe it was the routing comment documents that were

20    lately disclosed and then some issues about searches and terms

21    that were used to do those searches.

22         So, obviously, the Court issued an order and part of the

23    Court's concern I think back in April is what was being

24    requested.  We didn't really know whether that was appropriate

25    or not or reasonable due to EEOC not having the information

1   that came in late and what was requested.

2        So it is my understanding kind of where we are is that

3   Werner did supplement discovery, as the Court ordered, that --

4   or at least responded to -- to additional discovery and did

5   provide the search terms and the databases that were searched

6   for the discovery that was produced in the spring of 2019

7   due -- due to the fact of the additional discovery of that --

8   the RCDs.

9        And then EEOC was going to assess what they had and if the

10  parties needed to meet and confer, and obviously, once EEOC has

11  all of their discovery, then they could determine who they

12  wanted to depose.

13       And based on the information that the EEOC received from

14  Werner has, I guess, precipitated where we are now and the

15  issues that the EEOC has with the information that was provided

16  by Werner and then is -- is asking based on that for, I guess,

17  certain things.  For example, to expand search terms and things

18  of that nature.

19       So, I guess it would be my thought probably the best way

20  to do that is to start with the EEOC's issues.  I know Werner

21  has some issues as well, some discovery issues, and we'll do

22  those after we do the EEOC's but to go through the EEOC's

23  statement that was sent to the Court and just address them as

24  they are and, of course, I've read each party's statements.

25       So, starting with -- I'm on page 2 of the EEOC's document

which indicates the remaining unresolved issues and proposed

remedy.  So issue number one really comes down to, as I

understand the plaintiff's argument, that there were three

search terms that were used, that you within your complaint

obviously have challenged the policies and practices of Werner

Enterprises and, therefore, believe that additional search

terms should have been used initially, and you're asking that

those be used now.

One question I have -- and I don't know if I've asked this

in the last hearing we had but before we go any farther, it at

least makes some sense to me that initially before Werner did

anything that there would have been a conversation between the

parties as to the type of databases that Werner has, which ones

they plan to search, why they want to -- why they feel that's

where the majority of documents would be and then a discussion

between the parties and an agreement on search terms, but I'm

assume -- I don't want to assume but I'm assuming that didn't

happen because if it did, I'm not sure we would be here.  I

think we would have been here on that issue.

So, Mr. Doty, did any of those conversations ever take

place?

MR. DOTY:  I'm sorry, you broke up there.

THE COURT:  Sorry.

MR. DOTY:  I (static noise) did any of those --

THE COURT:  Sorry.  Go ahead.

1          MR. DOTY:  So as you -- as you know, Your Honor, I --

2   I -- Miss Emily Keatley started this lawsuit, and she's now

3   left the EEOC so I -- I can't represent what --

4          THE COURT:  Okay.

5          MR. DOTY:  -- she may or may not have discussed.

6   I -- I don't believe that there was a discussion where specific

7   search terms were required.

8      I know our request for ESI search had three very detailed

9   pages of types of data and metadata that would be requested,

10  but I did not see anything on search terms or -- or databases.

11         THE COURT:  Mr. Crainer or Culhane, did any of those

12  conversations ever take place to your knowledge?

13         MR. CRAINER:  Judge, no, we did not have a

14  conversation before we did our search in discovery.

15         THE COURT:  Okay.  All right.  Just -- just wanted to

16  know that.

17     All right.  So, Mr. Doty, as to -- and the reasons why you

18  want those additional search terms are provided in -- in

19  paragraph labeled number 1 under heading C of your --

20         MR. DOTY:  Yes, Judge.

21         THE COURT:  -- statement.

22     Is there anything else you want to add in regards to that?

23         MR. DOTY:  No.  I mean, I -- I think, you know,

24  they -- Werner did respond to your order 140 from that April

25  conference that we had which they then revealed the search

1    terms and we had no idea that they were as narrow as they were,

2    and -- and -- and reading the -- the -- their position

3    statement, you know, they I think mischaracterizes very

4    narrowly as a lawsuit just regarding Mr. Robinson and

5    Mr. Deuschle and this case certainly goes beyond that.

6         And -- and we -- we think that those search terms as well

7    as a search -- and the next one are somewhat related.  Searches

8    of additional databases would have been expected and -- and

9    would have produced documents.

10         THE COURT:  Okay.  Mr. Crainer, do you want to

11   respond?  And, obviously, I've --

12         MR. CRAINER:  Sure.

13         THE COURT:  Go ahead.

14         MR. CRAINER:  Yes, yes.  Thank you, Your Honor.  With

15   regard to focusing just here on -- on number 1 here and -- and

16   the scope of the search, I -- I don't think that Mr. Doty's

17   characterization of what we searched is -- is accurate in the

18   letter and also in this paragraph.

19         When the applicants interact with Werner, their

20   interaction -- their interaction is housed with Werner's -- in

21   Werner's recruiting database for emails and we searched the

22   recruiting base consistent with the search capabilities of our

23   internal system.

24         We have a recruiting application that allows us to search

25   by their social security number or their name, and we conducted

1    a search by either of those two search terms, and we cannot

2    otherwise search the database.  And we were able to produce and

3    we did produce everything from that database for each of the

4    drivers.

5          We also searched -- in addition to -- to just the

6    recruiting database, we also searched the emails and we

7    searched using the name and email of -- of Deuschle and the

8    name of -- Mr. Deuschle and the name of Mr. Robinson.

9          After -- after we searched those, we -- we were able to

10   produce the information that we were able to find with those

11   searches.  You know, a lot of -- of what's being contested here

12   in -- with -- with regard to paragraph one here is that there

13   aren't these general search terms being used.  Well, in our

14   databases, our databases don't permit searches like that.

15   It's -- it's (indiscernible) on the search capabilities.

16         And then also for searching other information, not every

17   request requires an ESI search and not every place with storage

18   is capable of an ESI search.  For example, request number 18

19   that is addressed here, it asks if we have any documents

20   related to a hearing standard, and we identified what our

21   hearing standard was and responded we don't otherwise have any

22   documents of a hearing standard.  We don't -- there's --

23   there's -- there's no ESI search that needs to be done.

24         When there are other requests that are being asked of

25   Werner such as provide copies of your handbook, provide

personnel policies, provide simulator training documents, those

are known documents that we can ascertain and we know the

location and you go in there and you find where that document

is and you extract that document and you produce it in the

case.

You don't need to engage into an ESI search to -- to find

those documents.  We don't have to search hearing exemption or

FMCSA exemption, sign language to get a lot of the documents

that are being asked for in their request of production.

With the discussion that we've had with counsel over the

past couple months about additional searching, we agreed that

we would -- or at least we offered to do additional --

additional searching.  We searched another database, the HR

identity database in this case, that just produced two lines of

data that state these are applicants that applied here and

they're now -- well, it doesn't state that.  It just states

that they've been registered into the system, and -- and

we've -- we've gone forward and -- and offered some additional

search terms that we're willing to do that our system is

capable of doing.

Of course, we haven't had any further discussion in

response to that last email that I had sent on July 17th.  So

what we've -- we've done what -- what we're able to do with

the -- the searching that we have.

And what's important, I think, to note is that a lot of

these terms, there's, I don't know, 15 or so terms that -- that are being suggested, and I don't see how there's any relation to the audit trail data and why these terms are being suggested based on what the audit trail data reveals.

The -- the whole thing that started this dispute, Judge, goes back to the audit trail data.

THE COURT:  Right.

MR. CRAINER:  And -- and that is, you know, listed pages of information that shows the -- electronic fingerprints I think is how it's been described in court -- the electronic fingerprints that show people accessing an application and it provides limited comments and information about the -- the applicants.

None of these terms that are suggested down here were revealed in the audit trail data so that doesn't mean we'll -- you know, once we got this audit trail data we saw all these terms being used and now we need to search these elsewhere. None of these comes out of there: cochlear implant, death waiver, FMCSA exemption.

So I'm not seeing how there's been any explanation from the EEOC as to why these additional searches need to be done based on the audit trail data.  That's why we're here.  It's solely because of the audit trail data, and if the audit trail data is being used as a springboard for doing more discovery, there has to be some type of relation there and that showing

1    just hasn't been made, Judge.

2        So --

3            THE COURT:  Well, here's --

4            MR. CRAINER:  -- (indiscernible) --

5            THE COURT:  -- here's the -- here's -- here's the

6    issue and then I'll let the -- you can respond and then I'll

7    let the plaintiff respond because I want to make sure that

8    we're all on the same page.

9        I realize this all started with the audit trail data, but

10   what that showed was and what the question was and what the

11   concern was from the plaintiff is that you did not do an

12   appropriate search for relevant documents, and this is what

13   brought that to their attention.

14       And it is that issue that gets you into the 30(b)(6) of

15   taking a deposition of somebody as to what you did and how you

16   did it and those sorts of things.  And so when we had that

17   April hearing, they wanted me to order Werner to do a bunch of

18   things and to take a 30(b)(6) in regards to that and enter an

19   order, which I don't have in front of me right this second, but

20   to order Werner to do a lot of things in order to determine

21   whether you had produced the documents that you were required

22   to produce in discovery.

23       And I, on the other hand, because I did not -- because of

24   the cost that it could be to do that, at that time it was

25   unclear because I didn't know what the search terms were

1    whether Werner had searched and done what was required based on

2    the previous questions of discovery as well as the complaint in

3    this particular case.

4         So the audit trail data got us to our last hearing but

5    then I've been, for lack of a better word, doing it in pieces

6    rather than just ordering everything because at that point I

7    could not tell or did I know for sure until what was produced

8    in the additional discovery that was requested whether what

9    needed to be produced was produced based on Werner's search.

10        What we have now is that what Werner did is they searched

11   basically the defendant's name and an email address.  That's

12   it.  There was nothing else in regards to hearing, hard of

13   hearing, loss of hearing, et cetera which clearly this case

14   goes to Werner's policies and practices regarding

15   hearing-impaired truck drivers.

16        So I appreciate that, yeah, it was the additional

17   discovery of this audit trail data, but to say that we're

18   limited to that is not where we are is my recollection of

19   what -- what I ordered because I'm doing it in pieces because I

20   didn't know what there was or what would be appropriate to

21   order Werner to do because we didn't have that information

22   which we now do, and that's why I think we're having these

23   discussions.

24        So, Mr. Crainer, do you dispute or want to clarify that

25   that's really the issue -- the issues that came out of the

1  April 2020 hearing that we had or telephone conference that we

2  had?

3      MR. CRAINER:  Sure.  Well, as -- as -- as I

4  understand it, we -- from that conference -- after that

5  conference it was -- it was decided that we would reveal the

6  search terms that were used which we did.  We sent a letter to

7  counsel, they disagreed that we gave enough information so we

8  sent another letter to counsel identifying the terms that were

9  used, identifying the search capabilities of the system and why

10  we searched what we searched, and then also why we didn't

11  necessarily need to use ESI to search for -- for other

12  information.

13      So that was one part of what came out of that hearing, and

14  then the second part that came out of it was they had asked --

15  served discovery requests on what information was contained in

16  the audit trail data.

17      THE COURT:  Right.

18      MR. CRAINER:  They served interrogatories and they

19  served requests for production in both -- both cases.  They

20  asked about -- about -- there's -- there's 328 lines in

21  Robinson they asked about and asked us to explain what that is

22  and there are 48 lines in Deuschle's audit trail data that they

23  asked about.

24      We responded to each line item and stated whether there

25  are any documents for each line item.  In every instance where

there was a document, we produced that document and we cited

the Bates stamp where it was produced because it had already --

it had already been produced in the case.

So the -- the documents that are being referenced in that

audit trail data, we already explained through their production

and were able to cite where those were.  In instances where

there was no document or nothing to search or nothing to find

from the audit trail data, we -- we explained what that was.

I know the EEOC takes -- takes issue with some of the

terminology that's used in the audit trail data like item and

message and, unfortunately, that's -- that doesn't refer to an

actual document.  This is an application that was created by

Werner's IT department several years ago.  The programmers

chose to designate certain categories and actions as -- as they

saw fit, and we explained that in our discovery responses why

there aren't any other documents to -- to produce, much less

search for because it's not referencing a -- a specific

document.

I know later on the EEOC takes issue that it's not under

oath but of course, it was an RFP so it -- it wasn't done under

oath.  If there's an interrogatory, we would certainly give the

exact same response.

So what -- what came out of -- of -- of that conference is

those two tracks; disclosing to them the search terms that were

done and disclosing where we got certain information and why

1  ESI didn't have to be done because we knew where the certain

2  target information was; and then also we searched -- we -- we

3  responded to the written discovery requests.

4      So that's -- that's my understanding of where we're at

5  and -- and -- and how we've come to, I guess, the -- the -- the

6  current situation, and I'm not -- where -- where my

7  disagreement lies with doing these additional terms, searching

8  these additional terms is that what request or production

9  specifically -- where has it been explained what request

10 requires these additional searches and what the EEOC believes

11 is missing or believes should have been searched based on -- on

12 what's been disclosed, and -- and -- and I don't think that's

13 been established, Judge.

14      THE COURT:  Well, can you explain -- and I realize

15 you didn't start this case -- is there some reason that some of

16 these terms weren't searched when this is what this case is all

17 about?

18      MR. CRAINER:  Sure.  Judge, with -- so with regard to

19 the applications, the -- the recruiting application that we

20 have, it's -- it's just limited in how we can search.  We can't

21 search a -- a -- a term like deaf or hard of hearing in there.

22 So that's -- that's one reason.

23      And as for other requests, requests that ask for our

24 handbooks that -- you know, provide us all handbooks that you

25 have that apply to drivers.  Well, we didn't do a search for,

1    you know, all -- all the policies are -- that are contained in

2    that handbook because we know where that handbook is so we went

3    and we grabbed the handbook from 2015, '16, '17, '18 and -- and

4    we produced them so there wouldn't be a need to do a search.

5         So that's why some of these search terms aren't necessary,

6    if any of them, because it's not -- it -- the request didn't

7    ask for those documents that required us to do an ESI.

8              THE COURT:  Well, just looking at number 1 -- and I

9    agree.  I mean, if you have a handbook, you know where to go

10   and find that.  You don't need to necessarily do an ESI search

11   for that.  I get that.  But even within number 1, one of what

12   they have requested is all documents concerning the hiring,

13   training, employing and/or safety of drivers who are deaf, hard

14   of hearing and/or possess a hearing exemption, and it's saying

15   all documents.

16        So hypothetically you could have whatever your policy is

17   in regards to that, but then are there emails or anything else

18   in regards to people who are hard of hearing or situations --

19   I'm just using that as an example.  So it would seem to me

20   hypothetically that within the email database that that -- that

21   those terms maybe should be searched.  Thoughts, comments?

22             MR. CRAINER:  Judge, on -- on that I -- what we've

23   done in producing our responses, we -- we produced all the --

24   the documents that we believed to be relevant to that, all

25   documents concerning hiring and training, and then when you're

1     looking at some of these terms, Werner has over -- as of 2018

2     12,400 employees.  The search of the emails is -- is a global

3     search of all emails, and if -- if we search a term like deaf

4     or hard of hearing or hearing, the amount of results that are

5     likely to come up, I -- I -- I -- I just think would -- would

6     be an astronomical number and then --

7                THE COURT:  Why --

8                MR. CRAINER:  -- in terms of (indiscernible) --

9                THE COURT:  Let me ask you that.  Why do you say

10    that?  Because hard of hearing or deaf, as I understand it, you

11    don't have any drivers who are deaf.  I don't know if you have

12    any that are hard of hearing.  I don't know that you have any

13    employees that are so I guess I -- I'm not sure there would be

14    thousands of emails.  I don't know.

15                MR. CRAINER:  Well, Judge, we -- we do and we've

16    disclosed in this case we do have drivers that are hard of

17    hearing.  We -- we've recently disclosed another one or at

18    least that has an exemption and -- and we also have non-driving

19    employees that have some form of -- of hearing disability so I

20    know those certainly exist.

21         You know, one -- one of the things that's targeted here

22    is -- is asking about FMCSA exemptions and -- and how Werner --

23    what documents that Werner has regarding applicants that have

24    an FMCSA exemption and how that's been handled and addressed.

25                Well, in this case the EEOC and Intervenor asked us to

search a list of 4- to 500 names -- actually -- well, I think
it might have been up to 700, but we've searched several
hundred names of people that are on the FMCSA exemption list.
So we went through and instead of just searching FMCSA or
exemption or waiver, we asked can you give us the names of
everyone on that list.

We then searched everyone on that list and then we
produced all the documents from people that had applied to
Werner that we were able to find in our system.  So there's --
there's other ways of going around that information and -- and
we've gone and done that for the EEOC and intervenor and
produced that information.

THE COURT:  Okay.  And tell me -- and before I get
back to the plaintiff -- what -- so for example in the
recruiting database, as I understand what you're saying is it's
very limited as to what searches you can do.  Is that what
you're saying?

MR. CRAINER:  Correct.  There's -- there's two ways
to do it.  You can search by social security number and -- and
name.

THE COURT:  Okay.  Well, and while we're on this
subject, because one of the other things that the EEOC is
asking is for Werner to identify all of their databases and
they may have said by name but it makes sense in what you --
Werner has said is that we give you the name and you're not

1    going to know what that means, but it sounds like you have

2    different databases for different things such as recruiting or

3    safety or email, whatever, and that -- so if -- I -- I guess my

4    question is -- and I get it.

5         If -- if I'm going to order -- order that you don't have

6    to do anything else, then why do you need to give the

7    databases.  I get that.  But if we -- but if I am going to rule

8    and say they get something, what is the issue with identifying

9    the databases because as you've said it does not make sense to

10   search 400 or I think you said you had -- in your submission

11   like 400 databases, and it doesn't seem to me that there's

12   going to be anything in, you know, account receivables, if

13   that's a database.  There's not going to be anything in that in

14   relationship to this case potentially.

15        So in order to ease and to make sure and I guess for

16   EEOC's understanding of what you've searched and which

17   databases you've searched and -- I mean, unless they know the

18   databases, they don't -- you don't know or they could not

19   question whether the information they're looking for is

20   somewhere other than what you have searched.

21        So that's my que- -- so that's my other question to you as

22   to listing the databases.

23             MR. CRAINER:  Sure.  So there -- there's a -- there's

24   a couple things to that, Judge.  First, we've -- we've -- we've

25   represented to them that these drivers had limited interaction

1    as just applicants.  They never got past the applicant stage.

2    And we've said their interaction would have been in the

3    recruiting database.

4        We said the other application -- or the other databases

5    would be the HR identity database which that literally just is

6    an internal thing that shows that they had been added to the

7    system, that the driver name is added to the system.  There's

8    just two simple lines.

9        We -- and then we've offered to similarly search the

10   safety database and -- and that would be -- potentially be one

11   of the other database because there was a safety -- there's an

12   individual, Jaime Maus, that works for Werner that was involved

13   with one of the cases so we agreed, okay, we would search

14   the -- the safety database.

15       Giving a list of all the databases, as -- as -- as you

16   recognize, they wouldn't even be able to -- to tell the name

17   from some of them because some of the names are a couple

18   letters, an abbreviation, that it's not clear from it -- you

19   know, recruiting is quite clear but other ones don't have such

20   a clear description of what the database is.  So that would

21   then require us -- which I don't think is required under the

22   rules -- to then create a document that goes through each of

23   these databases and defines then or describes what the database

24   is, and I don't think that's necessary.

25       And -- and, again, the stated need for why they need the

1    database is so they can develop search terms, but as we've seen

2    here at the end of number 1, there's, I don't know, around 15

3    to 20 search terms that they were able to identify, they've

4    previously been able to identify search terms in our

5    correspondence as of the last couple months, and -- and I -- I

6    don't think that they need the databases to start coming up

7    with search terms.

8         If there's an interrogatory that they ask that said, you

9    know, where -- where are these databases or what databases

10   would -- would contain information that would be held if you

11   have an applicant, we're able to answer that and we can answer

12   it's the HR identity, it's the recruiting database.  Those

13   would have been the databases.  I -- I don't think we need to

14   get into the other databases.

15             THE COURT:  Okay.  Mr. Doty, you want to respond?

16             MR. DOTY:  Yeah, there's a few things I'd like to

17   respond to.  On the last point that Mr. Crainer made which is

18   they offered to look in the safety database because of this

19   particular person, Miss Jaime Maus, who we deposed both as an

20   individual and as part of the 30(b)(6), and we would like to --

21   you know, to redepose her.

22        Their offer to search the database was limited to a single

23   term and that is the social security number, singular, just the

24   social security number of those two people.  And we do know

25   that Miss Maus did what -- what I think Werner has

1     characterized as the interactive process with Mr. Robinson when

2     Mr. Robinson applied and sought to be employed and they said,

3     well, we want to see if we can train you and had a -- had a

4     meeting with them.

5         If you think about just -- they're not even willing to

6     search Mr. Deuschle and Mr. Robinson's name within that safety

7     database or hearing within the safety database.  They're

8     willing to search, you know, the social security number.

9         And I just think if you just sort of listen to this

10     discussion, you know, which has now been going on for 30

11     minutes, this is the problem that we've had in our -- our --

12     our discussions with -- with -- with Werner to try to reach an

13     agreement on this.

14         We -- we do not take Mr. Crainer or in the last conference

15     Miss Culhane's assertions regarding what can or can't be done

16     with these databases like, you know, these terms can't be

17     searched, we can only do names and social security numbers, we

18     do not take those unquestionably and -- and we don't think the

19     Court should either.

20         You know, they've represented other things regarding

21     the -- the -- the routing -- the routing slip which we've now

22     learned are not true.  And I'm not saying that Miss Culhane --

23     Miss Culhane and -- and Mr. Crainer are -- are lying to us, but

24     they're just not the people who can answer these questions.

25         And our reason for wanting to know the databases is all

along so that we don't have to search 400 databases.  I mean,
you know, Mr. East was on -- on this conversation where we
said, well, just tell us the databases so that we don't have to
search 400.  We don't need to search your inventory of trucks
or your income or your -- you know, your budget issues.

We just want to know which ones might be implicated so
that we can ask -- search these, say, 15 terms that we have
listed in number 1 in a way that's very focused, and -- and --
and we've -- we've identified a couple here.

I mean, we now think safety's probably something that
should have been searched and hasn't been.  Training should
have been searched but -- but -- but hasn't been.  And we now
know that there's the -- the legal database, the -- the
in-house legal counsel which I know is one of our subsequent
issues.

And that's the only reason we want to know these databases
is so that we can say to them, you're right, we don't need --
we don't need to search 380 of them but we do want to search
these 20 because they're implicated, and I think their failure
to provide those -- that thing is -- is -- is -- really it
harms them because I think the correct order in the absence of
them identifying what those 400 are is a order from you saying
then search all of them.  Fine, if you're not going to tell us
what they are, then you just search all of these databases for
all of these very relevant terms that are relevant for the

1    EEOC's lawsuit.  So that's our -- that's our position.

2         THE COURT:  All right.  And, Mr. Doty, back to one of

3    the questions that I asked the EEOC which has to do --

4    obviously, this all started with the production of the audit

5    trail data that occurred and the -- the phone conversation that

6    we had in April, but it is -- is it your recollection that what

7    I did is instead of doing what you asked me to do and order

8    everything you wanted, I did it in stages and we needed to know

9    the search terms because we didn't know -- 'cause it was

10   possible if they searched everything, then there isn't anything

11   else and there wasn't anything else to do.

12        MR. DOTY:  That's correct.  No, we -- we see this

13   really -- and why -- the way we characterized this, we only

14   want what we are entitled to and asked for back in March of

15   2019.

16        THE COURT:  Okay.

17        MR. DOTY:  And -- and we didn't learn that -- the

18   inadequacy of that particular search until your order --

19        THE COURT:  Right.

20        MR. DOTY:  -- in April which ordered them to produce

21   their search terms, and now we've realized how inadequate they

22   were and we should have got those.  And for this court to make

23   an -- a reasonable decision on the merits, we need to have the

24   facts and we -- we now -- we now know we don't have those facts

25   because of what we think was an inadequate ESI search by -- by

1    Werner.

2            THE COURT:  All right.  Before I get to the search

3    terms on number 1, on the end of number 2, it looks like what

4    you're asking is that they should be ordered to do an ESI

5    search of other databases where documents regarding training,

6    employing and/or safety as well as documents about drivers who

7    are deaf, hard of hearing and exemptions may reside.

8        Does anybody want to say anything on that?  I don't know

9    that we talked about that specifically.

10            MR. CRAINER:  Judge, well, with -- with regard to

11   doing a keyword search, the -- the -- the databases aren't

12   capable of doing keyword searches.  So (inaudible) --

13            THE COURT:  So how do you find anything in the

14   databases then?  How do you find something then?

15            MR. CRAINER:  It's -- it's -- it's stored using their

16   social security number or their name.  And going back to the

17   safety database discussion, we offered either name or social

18   security but that's because that's what it's limited to.  These

19   databases are -- are -- are limited in their searching

20   capability.

21            THE COURT:  Well, so let me ask you --

22            MR. CRAINER:  They're not --

23            THE COURT:  Hold -- hold on.  So let me ask you a

24   question.  So obviously you're being sued, you're being sued

25   about policies and practices dealing with -- I mean, obviously,

1   these drivers but then your policy and practice in general on

2   how you deal with people who are hard of hearing and deaf.

3       So let's say hypothetically you have the recruiting

4   database which would provide information as to individuals who

5   maybe had applied who were deaf, hard of hearing and you didn't

6   hire them, and maybe that's all the information that's --

7   that's in there, but clearly they would be entitled to that

8   information in regards to this case in order to see how you're

9   handling the hiring or not hiring of people with -- as truck

10  drivers who have hearing impairment issues.

11      So it does not seem to me that you can just say we can't

12  search it because they're entitled to that information and you

13  have an obligation to provide it.  So how do you get it then?

14          MR. CRAINER:  Judge, it's -- it's doing a different

15  search that we did by searching the names of FMCSA exemption

16  holders and -- and that's what we produced.

17      So if you're looking for documents about the hiring and

18  firing of -- of -- of drivers that are deaf or have a hearing

19  exemption, we did that search by extracting the list that -- a

20  list was provided to us from the Federal Register that

21  identified all the exemption holders.

22      And be- -- because our system is limited, we said, okay,

23  if you give us that list, we'll search the names.  And we

24  searched names and then we produced all those documents that

25  showed if there were -- if they applied and if -- if it was

accepted or denied, and we -- we were able to give the

information in that way.  So they -- the EEOC and the

intervenor have that information.

And then with regard to the -- the policies, we produced

the hiring guidelines that we have.  We produced several

versions --

THE COURT:  Sure.

MR. CRAINER:  -- of hiring guidelines.  Those --

those, in fact, were even used during depositions so we've --

we've -- we've given those documents over already.

MR. DOTY:  Your Honor, just -- I -- I -- I believe

Mr. Crainer is only talking about the recruiting database and

the ability to search the names and social security numbers

'cause we have discussed in our conferences about searching

other terms in other databases, and they're not so limited.

And, again, the Court should not take Mr. Crainer's

representations here.  Again, I absolutely a hundred percent

believe -- and -- and -- and to the extent that this Court has

a question about it, I believe the 30(b)(6) deposition can

go -- can address this issue and we can ask the tech -- the

technological people whether or not a term such as deaf

exemption can be searched in other databases.  I -- I -- I'd

absolutely be shocked if the answer was no.  I mean, this is --

this is -- this is 2020.

And I -- and I hope, you know, that Mr. Crainer's

1    representation about the recruiting database which may have --

2    because it's about individuals and the search of those

3    individuals' social security and names is not the same thing

4    for the safety database, and it's not the same thing for the

5    training database, and it's not the same thing for the legal

6    database.

7        I mean, you tell me the people in the -- the in-house

8    legal counsel can only search for documents by social security

9    and name.  That's just not true.  Absolutely patently false.

10        THE COURT:  Mr. Crainer -- and obviously, I had

11    referenced the -- the recruiting database.  What about the

12    other databases?  I mean, are you -- 'cause it -- you seem to

13    imply that some are limited and I don't know if others aren't

14    but...

15        MR. CRAINER:  Sure, Judge.  As -- as an initial

16    matter, I -- I take exception to the fact that the integrity

17    of -- of both myself and -- and Miss Culhane are being

18    challenged here and -- and for some reason that we've been

19    untruthful in this case which certainly is -- is -- is not the

20    case whatsoever.

21        With regard to the -- the databases, there -- so Mr. Doty

22    is -- is -- is identifying databases that don't exist.  And in

23    talking about databases and search capabilities, we -- with

24    regard to the recruiting database, the -- the safety database

25    and the state of the -- the other 400 databases, those are --

1   are -- are limited in -- in what can be searched.

2       With regard to where other documents are -- are obtained,

3   you know, when we're looking and grabbing handbooks and we're

4   getting those from our legal counsel, she's getting those

5   from -- from her file folder so that's -- that's where that

6   information's being obtained.  It's the benefits information.

7   That's -- that's how that information's being obtained.

8       There's -- I don't see the need for doing an ESI search

9   for those when we're -- we're already obtaining those documents

10  and producing those documents.

11          THE COURT:  Well, and here's what I would say.  I

12  don't -- I mean, if they're asking for a handbook and you've

13  produced that handbook, I'm not concerned with you going in and

14  doing an ESI search for that unless -- I mean, Mr. Doty, do you

15  find that to be necessary for some reason?

16          MR. DOTY:  No.  No.  When we ask for a specific

17  document, that's -- that is correct.  But when we say we want

18  all documents regarding hearing, they can't just produce a -- a

19  statement that says see this Federal Register entry.  We expect

20  a search.

21          THE COURT:  Well, and so it appears to the Court and

22  as Mr. Doty has stated, we're dealing with the request for

23  discovery that occurred in March of 2019 and what was

24  requested.  That based on the nature of this suit and those

25  requested, the -- the search terms that Werner has used were

1   not sufficient so additional search terms need to be done.

2       My --  So -- and -- and I'll be honest, I don't know that

3   these -- that the parties can agree.  I do not think that --

4   I'm going to say two things so just sit tight.  That the -- the

5   request of EEOC and what they were requesting for those search

6   terms I do not think are out of line.

7       My only concern is it sounds like some of these databases

8   are, for lack of a better word, I'm going to say old because I

9   do think we're in 2020.  It's a little hard for me to imagine

10  that they can't be searched in some way but maybe it's limited

11  and it's based on the way that it was done and -- and it just

12  hasn't been updated.  I don't know.

13      So having said that, you know, for example, when you do

14  search terms and trying to have dashes, sometimes that doesn't

15  work, etc.  So I -- I -- I -- I do think there needs to be some

16  communication as to what the databases capabilities are which

17  get me back to whether a 30(b)(6) with the people that can

18  answer questions about the databases and what can be searched

19  and what cannot be searched should be done prior to the

20  searches being done.

21      So I want you all to think about that because we need to

22  think how -- how to time frame this.  So I think additional

23  search terms need to be done.  I do think -- and -- and that

24  kind of goes to number 2 'cause that talks about the databases

25  regarding other documents so -- and -- and there may be -- and

1    I don't disagree that there may be other databases to be

2    searched but here's where we are.

3        I don't know what they are.  And I realize Werner doesn't

4    see the need for it, but it is as Mr. Doty just stated.  I'm

5    going to order you to search the databases with these

6    additional terms, and if the plaintiffs don't know what the

7    databases are, then everything's going to have to be searched

8    which makes no sense, to be quite honest, so it seems to me

9    that Werner needs to identify the databases, the type of

10   documents that are within that database so then EEO- -- that

11   the plaintiff can indicate which databases they think need to

12   be searched for those documents.

13       Obviously, if there's an argument about that, then I'm

14   going to hear from you and we'll talk again in regards to that,

15   but that at this point in this litigation is the only way to

16   determine whether the appropriate databases have been searched

17   in regards to the search terms necessary to find the documents

18   that the plaintiffs are entitled to based on their requests for

19   discovery.

20           MR. DOTY:  Thank you, Your Honor.

21           THE COURT:  So I think that takes care of 1, 2 and 3.

22       Four has to do with in-house counsel's electronic file.

23   I'll be honest with you.  I'm not -- I could not exactly follow

24   this.  I'm not sure -- so I need EEOC -- I know that there

25   are -- that there were some requests and that's a response.

1    So I guess, Mr. Doty, can you explain this a little bit

2    more to me and exactly what you want and why you want it.

3        MR. DOTY:  Yes, Your Honor.

4    So in the letter that Mr. Crainer sent us on June 1st, and

5    that is Exhibit 3 to what we sent you --

6        THE COURT:  Mm-hmm.

7        MR. DOTY:  -- and that lists all of the database and

8    search terms that they give, they do identify a -- a number

9    of (indiscernible) --

10       THE COURT:  In-house files?

11       MR. DOTY:  Right.  In the location column that they

12   found the documents in the in-house counsel file.  So it's

13   our -- our -- our understanding and belief that when these two

14   charging parties filed a claim with the EEOC that legal counsel

15   goes and collects all the documents that are relevant here

16   and -- and puts -- and then move -- either -- either moves them

17   or copies them to the in-house counsel file.

18       And so we think that is a -- a -- a very simple way to get

19   documents to which we are entitled.  We're not seeking

20   privileged documents but we also don't believe that the mere

21   residing on the in-house counsel file makes a document

22   privileged, and so we think -- you know, this case is -- these

23   cases are old, and we think that the -- the timeliness of the

24   charge and the fact that in-house counsel would have collected

25   this information and put it in their in-house counsel file

1    is -- is something the Court should order them to do.

2        Search and then when -- when any of these documents come

3    up, you know, either produce them 'cause they're not privileged

4    or make a privilege log on why they can't produce them.

5                THE COURT:  Mr. Crainer.

6                MR. DOTY:  So (inaudible).

7                THE COURT:  Sorry.  Oh, I'm sorry, Mr. Doty.  Are you

8    not -- sorry.

9                MR. DOTY:  No, no, I -- I'm done.  No, I'm done, Your

10   Honor.

11               THE COURT:  Okay.  Mr. Crainer.

12               MR. CRAINER:  Judge, I'm -- I'm not entirely sure on

13   what Mr. Doty is asking for us to search and -- and what needs

14   to be searched in in-house counsel's file.  One -- you know,

15   one of the things that they asked for was all -- you know, the

16   communication with the EEOC so we -- we produced that

17   information.

18       You know, they've asked about, you know, what our position

19   statement was and we produced that so I -- I'm not clear on

20   what we need to search in our in-house counsel's file.

21               MR. DOTY:  The same --

22               THE COURT:  Well --

23               MR. DOTY:  The same -- the same terms.  The same

24   terms that we're seeking: deaf, hard of hearing, hearing

25   exemption.  I mean, EEOC -- EEOC raised this issue of the need

1    for -- for Werner to train deaf drivers to comply with the ADA.

2    That was raised -- I mean -- I mean, it was raised during the

3    investigation and conciliation so we believe those documents

4    probably do reside there.

5        We're not asking them to make extra documents.  We just

6    think this is -- that this is a collection place where they've

7    put them and -- and that they should be -- search the exact

8    same terms.

9           THE COURT:  Well, but --

10         MR. DOTY:  (Indiscernible.)

11         THE COURT:  Hold on, hold on, hold on.  What you

12    originally asked for was just them to search the term of

13    Deuschle and Robinson -- I don't know if I'm saying that right,

14    Deuschle -- but Deuschle and Robinson, and they -- because what

15    you were asking for or the reference to in-house counsel's

16    electronic file is all documents that refer to the EEOC charge

17    of Deuschle and then Robinson so -- for an example, and then it

18    says, you know, see May 6th letter and additionally Werner's

19    in-house counsel's electronic file.

20        So I guess first -- so it seems -- because here's --

21    here's the situation.  It is in-house counsel.  I completely

22    understand that does not make everything privilege, but if

23    you're going outside the two defendants in this case for

24    in-house counsel, then I think we're in a different area, and

25    this court is not comfortable ordering a blanket, oh, just

1    search deaf and you can get everything out of in-house counsel

2    on anything he or she has ever done.  That's a different issue

3    than -- than they've indicated these are where the documents

4    are.

5        And then I guess my one question to Werner is in your

6    response it says:  See May 6th letter and additionally Werner's

7    in-house counsel files, and -- and, obviously, that's the

8    location where those came from.  So I'm assuming you were just

9    listing this is where we found this information, not, oh, we've

10   produced this whole file to you already, right?  Or...

11           MR. CRAINER:  Exactly, Judge.  And -- and they asked

12   for where the location was where we got it and that's exactly

13   where we were able to obtain the information from.

14           THE COURT:  So to clarify from EEOC, for this issue,

15   are you at this point just looking for the Court to order a

16   search for -- in in-house counsel of the term Deuschle and

17   Robinson and not all of the other search terms that we

18   previously talked about?

19           MR. DOTY:  Well, we -- we were thinking -- we were

20   thinking all -- all of the terms.  And our -- yeah, and our --

21   and our position has been that their complaint is that it's a

22   wide search to search these other databases, and our view was

23   one way to help narrow it down, in addition to doing maybe

24   training and the safety database, is -- is also search the

25   in-house counsel database and see what documents come out

1   because the assumption is, is that these documents may have

2   been collected so that -- it was our attempt to make the search

3   less burdensome.

4         THE COURT:  Well, that -- that may be in the end, but

5   let me ask a question of Werner.  Do you know if the search for

6   Robinson and Deuschle have been done as to in-house counsel and

7   whatever documents that are not privileged have been disclosed

8   and those that are privileged that a privilege log has been

9   done?

10        MR. CRAINER:  Yes, Judge, certainly.  That -- that --

11   that is the case.  And, you know, in-house counsel has

12   whatever -- however she -- she -- she's kept her file on -- on

13   each one for Robinson and -- and Deuschle and we've produced

14   those documents and any documents that weren't produced were

15   noted on a privilege log.

16        MS. CULHANE:  And, obviously, Judge, with the

17   exception that communications that we have had with in-house

18   counsel since this lawsuit started are not included on the

19   privilege log.

20        THE COURT:  Right.

21        MS. CULHANE:  (Indiscernible.)

22        THE COURT:  And has EEOC gotten a privilege log from

23   Werner?

24        MR. CRAINER:  Yes.

25        THE COURT:  Okay.

1          MR. DOTY: Have we? Okay.

2          THE COURT: Okay.

3          MR. DOTY: I -- I -- I'm not sure. I mean, I -- I'll

4 have to look. I don't -- I don't doubt what they've said but

5 I -- I don't recollect it right now.

6          THE COURT: Okay. All right. As to number 4, at

7 this time -- and I'm not saying EEOC cannot come back depending

8 on what they find but as of right now, I'm not going to grant

9 4. And you can double-check the privilege log -- EEOC, you can

10 double-check the privilege log.

11     If you have a concern based on looking at that that maybe

12 things have not been produced out of the in-house counsel's

13 file, we can talk about that further at a -- at a different

14 time, and depending on the information that you receive from

15 the searches that are going to be conducted -- well, I'll just

16 tell you, I have great concerns of doing a blanket search of

17 in-house counsel of all of their files, and I realize that this

18 goes beyond just these two defendants but I'm not ready to go

19 there yet depending -- but -- now -- but what I will say is

20 depending on what is found or discovered in any of the other

21 searches that occur, then that may be something we have to talk

22 about down the road but at this point I'm not -- I'm -- I'm

23 going to deny 4 at this time.

24     All right. Number 5, and I think, Mr. Crainer, you

25 already mentioned this or...

1    As I understand it, these items and messages that were on

2  the RCD is -- the -- for lack of a better word, when somebody

3  makes an entry and let's say the file goes to someone else or

4  does something, that's the entry that is made but there's no

5  document attached to it.

6    Is that -- do I have a correct understanding of that?

7    MR. CRAINER:  Exactly.  Exactly, Judge.  It's -- it's

8  just an electronic fingerprint that just shows action being

9  taken.

10    THE COURT:  And I -- and I take it that the plaintiff

11  is concerned of whether that's accurate or not and, therefore,

12  within the 30(b)(6) you want to talk about it and find out?

13    MR. DOTY:  Yes, Your Honor.  Yeah.  An example would

14  be -- and -- and I -- I don't have a specific line that I can

15  show you but one of the things they talk about is that, you

16  know, the message on an item is -- is -- is just something that

17  happens when someone logs onto the system and does something

18  with that file, and yet, we found in one of the two that there

19  were, like, 15 entry lines before that point meaning --

20    THE COURT:  Right.

21    MR. DOTY:  -- if -- if what they say is accurate,

22  and, again, it's not under oath that we're getting these

23  responses, these are responses for requests for production, and

24  we'd like to have someone who's an expert that we can put under

25  oath and ask.  If that's the case, then why -- why wasn't an

1    item created, you know, 15 entries ago when the first action

2    was taken.  So there -- there's just questions.

3        And we're not asking the Court to resolve those questions.

4    We just need the correct place to do that if -- not in sort of,

5    you know, dueling position statements --

6            THE COURT:  Right.

7            MR. DOTY:  -- with the Court.  Let's -- let's --

8    let's depose the expert who can tell us that, yeah --

9            THE COURT:  Does Werner have a --

10           MR. DOTY:  -- (indiscernible).

11           THE COURT:  -- problem with that?

12           MR. CRAINER:  Yes, Judge.  We -- we have no general

13   issue with the subject matter being discussed.  We just haven't

14   received a 30(b)(6) notice -- a 30(b)(6) notice that -- that

15   designates the topics.

16           THE COURT:  Okay.  Which then goes into -- so based

17   on everything that's happened, I think 5 and that request to do

18   that would be appropriate to find out whether there's

19   documents, not documents and kind of what all of that means.

20       But then 6 goes back to their original 30(b)(6) topics

21   which when we discussed this back in, I believe, April, I was

22   concerned whether all of those items were relevant and some may

23   not have been, and, again, it was a situation we didn't know

24   kind of what and how the searches were conducted.

25       So now that we know that, it's my understanding that you

1  have cut this down to basically five topics which is items 6, 7

2  and 8 and then -- so 6, charging parties' applications to

3  defendant's employment, defendant's communications with

4  charging parties.  Is that -- am I on the right document?

5          MR. DOTY:  Yes -- yes, Your Honor, you are.

6          THE COURT:  Okay.  And then defendant's refusal to

7  hire the charging party.  So 6, 7 and 8 and then 39 and 40.

8      So does Werner have any problem with the 30(b)(6) on those

9  five topics plus the RCD and talking about that and what those

10  messages -- whether there's documentation along the lines with

11  those messages and what those items and messages mean?

12          MR. CRAINER:  Certainly, Judge.  With -- with regard

13  to the topics that are being identified or reidentified in the

14  30(b)(6), 6, 7, 8, 39 and 40, those were already explored in

15  the prior 30(b)(6) depositions with documents that were already

16  produced that, you know, provided the information that the

17  audit trail data already shows, and the audit trail data, which

18  is being used as a springboard to -- to review these topics,

19  the audit trail data doesn't speak to Deuschle's and Robinson's

20  application and -- and refusing to hire them and those tacks.

21      I mean, there's -- there's -- there's no relation between

22  what is shown in the audit trail data and -- and what's being

23  reexplored again that has already been taken care of in a

24  30(b)(6) deposition.

25      I mean, there were I think upwards of -- of -- of 12 hours

of -- of 30(b)(6) deposition or -- or just depositions on these

topics already.

THE COURT:  Well, as to 6, 7 and 8, have -- has there

been a 30(b)(6) in regards to those already and, if so, why do

you want to do it again?

MR. DOTY:  Well, Your Honor, the issue is that we now

have the audit trail data.  For example, in the 30(b)(6)

deposition, we asked Miss Maus, who was one of their designees,

and we asked Mr. Hollenbeck, who was the other designee, about,

you know, their -- just for example their particular role in --

in -- in analyzing the application or their communications.

Miss Maus talked to Mr. Robinson.  There would be the

communication.  And they -- they gave us their answers.  But

had we had the routing comment document, we could have then

said, well, you have this extra entry where you didn't talk

about the day -- the next day when you did something on the

file, and we -- how -- you know, 12 hours -- the problem is --

they're absolutely right.

We did 12 hours of depositions that frankly were a waste

of time because they didn't give us the documents that we could

have used to make it very efficient in saying, okay, great, you

talked to Mr. Deuschle on this day, why did you take this

action the following day, and -- and now they're basically

saying, well, you've explored it, I know you didn't have all

the data when you did explore it, but your time's up.

1    And so these five topics are all precisely on topic with

2    what their routing -- routing comment document provides.

3            MS. CULHANE:  Judge, this is Liz Culhane.

4            MR. DOTY:  Every one of them.

5            MS. CULHANE:  I apologize.  Judge, could I respond

6    real briefly?  This is Liz Culhane.

7            THE COURT:  You may.

8            MS. CULHANE:  Thank you.

9    Judge, for example, topic number 6 that Mr. Doty has

10   identified as one he wants to redo talks about the

11   applications -- Werner's applications that were filled out by

12   Mr. Deuschle and Mr. Robinson.  We do not understand how

13   anything that is contained in these couple hundred lines of

14   audit trail data which comprises in total 16 pages, the vast

15   majority of which is -- occurred after this as redacted just

16   entries, you know, like updated to server, you know.  We don't

17   understand how anything in the audit trail data bears on the

18   contents of Werner's written applications, topic 6, okay?

19   Topics 39 or 40 talks about Werner's retention policies

20   for its HR -- I think it's HR documents like applications.  We

21   don't understand how anything in the contents of the audit

22   trail data, which just shows who touched Mr. Deuschle's online

23   file and when, bears on the retention policies for Werner's HR

24   department.

25   So other than the fact that he's -- he said that he can go

line by line through the audit trail data and say, you know,

why was Mr. Deuschle's application uploaded to Werner's

internal server at this date, we don't understand how the

contents of that data actually bears on the topics that he's

identified, all of which were already the subject of a

deposition.

And -- and to Mis- -- you know, it's kind of incredible to

me that a deposition that is 12 hours long, now Mr. Doty takes

the position that that was worthless based on a -- a couple of

pages of data that was produced later when as we talked about

at the last hearing, the vast majority of the information in

that document and almost all the people identified in there

other than a few admins were identified before those depos were

taken and -- and were discussed at length with the Werner

witnesses.

So we do not agree that the deposition topics that he's

identified have -- have any relation to the audit trail data

and require the Court to reopen testimony on those topics.

MR. DOTY:  Yes.  Look at 39.  The topic is the

systems that Defendants use to create, duplicate, maintain and

store information on their applicants and employees including

search capabilities.  That is the audit trail data.

We couldn't even ask them a question about it.  I mean,

how do they track it?  Well, the answer we now know is they

have this audit trail data that lists specifically what was

1    done during the entire application process.  That's topic 39.

2         And if we can't open that up again -- we -- we couldn't

3    ask -- we didn't ask a single question about the audit trail

4    data because we didn't know it existed.  And 40, the retention

5    policy for those documents.

6         And so one of the things that we've raised in that issue

7    of the -- the -- the audit trail data is -- it says, you know,

8    document uploaded.  Okay.  So we want to know where is that

9    document uploaded and where could we as the EEOC point the --

10   Werner to -- to produce it, and if the answer is, well, yeah,

11   you know, we actually upload it but we delete it after two

12   years, that's the retention policy, and, again, we couldn't ask

13   those questions 'cause we didn't have the audit trail data in

14   front of us.

15        These are five very narrowly focused that put -- are

16   exactly on point with the audit trail data.

17             THE COURT:  And I -- I think you are entitled to do

18   the 30(b)(6) on the audit trail data.  I think you're entitled

19   to that and 39 and 40 as it relates to that I think you should

20   be able to do.

21        Now, my question, though, is coming back to 6, 7 and 8

22   explain to me how that would relate to the audit trail data.

23             MR. DOTY:  Well, the audit trail data, Your Honor,

24   says what individuals kind of touched the file and took certain

25   actions.

1          THE COURT:  Right.

2          MR. DOTY:  And -- and throughout those documents

3    include reference to Mr. Hollenbeck and Mrs. -- Miss Maus.

4    They're -- they're referenced in -- in both of those routing

5    comment documents for Robinson and Deuschle, and when we were

6    asking them questions about what they did at their various

7    times relative -- you know, it was a timeline.

8          I mean, you can see the audit trail data's a marvelous,

9    useful timeline that not only guides what they did with this

10   file and who touched it and who it was passed to and those are

11   questions that we couldn't -- we couldn't ask.

12         And I think our first memo that we did back in April

13   before this laid out a lot of our concerns that we -- we share.

14   We share -- we didn't -- we didn't feel the need to sort of

15   recite them again here today --

16         THE COURT:  Right.

17         MR. DOTY:  -- but I think 6, 7, 8 are -- are

18   precisely on point 'cause the -- the audit trail data only

19   takes from the time that they have the -- the timeline starts

20   with the application and it ends with -- largely with their

21   rejection, and then everything after that is -- has to do with

22   the litigation and it's been redacted, but it -- it -- it

23   covers the precise timeline of the application so there's --

24   there's 6 and 7 and 8.  I mean, it says we sent an email to him

25   on this particular day.

1     I mean, one of the things, if you recall, was that he

2   was -- Mr. Deuschle was rejected at one point, and there was

3   this question of he had sent to supplement his file a copy of

4   his FMCSA exemption, and Werner has maintained throughout this

5   entire thing that they never got it, we never got it, and it

6   was sent certified mail, and Mr. Deuschle got a certified

7   return that it was, in fact, received on or about I'm going to

8   say May 10th.  Mr. East can jump in.

9     There are four entries on May 10th where Mr. Hollenbeck

10   opened something, opened a document and then uploaded

11   something, and you can see -- you can see exactly when he did

12   it on May 10th, the day that -- that certified mail says they

13   received it, and they have denied it and -- and he denied it in

14   his deposition, if I recall correctly, and we should be able to

15   say to him, you deny that you received anything from him, then

16   what were you doing -- what were these four entries that you

17   did on that exact same day.  Then let's see what he says --

18             THE COURT:  Ms. Culhane --

19             MR. DOTY:  -- see what his answer is.

20             THE COURT:  -- do you want to respond to that?

21             MS. CULHANE:  Sure, Judge.  A couple of things.  One,

22   I deposed Mr. Deuschle and -- and I asked him if he sent the

23   waiver, and I showed him the documents that we received, and he

24   admitted that he must not have sent the waiver to Werner so I

25   would just say that for -- for the record.

    But, two, I -- I still don't understand topic 6, charging
parties' applications to defendants for employment.  I don't
understand how anything in the audit trail data bears upon the
contents of the application.  The applications say what they
say, the applications have been produced in this lawsuit years
ago.

    I don't see how topic 6 has anything to do with anything
that is in the audit trail data and I didn't -- I respectfully
didn't understand Mr. Doty to give an explanation specific to
that point.

    With respect to number 7, which talks about communications
with the charging parties, there have been emails that have
been produced and our -- our witnesses were deposed about them
extensively, including Ms. Maus and Mr. Hollenbeck were deposed
about their communications with the charging parties.

    Mr. Doty has not pointed to anything in the audit trail
data that I understand that would add anything to that
discussion.

            MR. DOTY:  I just --

            MS. CULHANE:  (Indiscernible) --

            MR. DOTY:  -- (indiscernible) --

            THE COURT:  Hold on.  Hold on.  One at a time.

            MR. DOTY:  Okay.

            THE COURT:  Let her finish.

    Go ahead.

1    MS. CULHANE:  Thank you.

2        The --  Topic number 8 talks about Werner's refusal to

3    hire the charging parties, including the reasons for those

4    decisions.  There's nothing about the reasons for Werner's

5    decisions that I've seen in the audit trail data and our

6    witnesses were subjected to numerous hours of deposition on

7    that topic.

8        To the extent he -- he's citing the fact that it has to do

9    with the identity of individuals who played a role in making,

10   reviewing or supporting that decision, all of those individuals

11   were identified long before the depositions.  The only people

12   who were in the audit trail data that were not identified until

13   the audit trail data came up were essentially admin, I mean,

14   people who did things like upload documents to the system.

15       So I don't think that that warrants reopening a Rule

16   30(b)(6) deposition to address that topic based on a few,

17   couple lines of data when our people have sat for hours of

18   depositions on those topics.

19           THE COURT:  Mr. --

20           MR. EAST:  Judge, this is Brian East for the

21   intervenor.  I just wanted to correct one point.  Mr. Deuschle

22   is clear that he sent a document that referenced his waiver,

23   his FMCSA waiver, to Werner by certified mail and so it's

24   misleading to suggest that he didn't send it to them.

25           THE COURT:  Okay.  Mr. Doty, did you want to say

1    something?

2         MR. DOTY:  No.  I was just going to say but, you

3    know, that's the communication with them, and I think had we

4    had that document at the 30(b)(6) deposition, we could have

5    challenged Mr. Hollenbeck's credibility, his motive.  You know,

6    why -- why would you say that you didn't get it when, in fact,

7    you did something here on May 10th.

8         THE COURT:  Well, here's -- here's the issue and I

9    guess how I see this and am going to rule.  There's no question

10   that the plaintiff and intervenor did not have this document at

11   the time of the depositions and they should have.  So if there

12   are questions that relate to that document with the witnesses,

13   then they're going to be entitled to retake the deposition as

14   it relates to that.  This is not an opening to rehash other

15   issues.

16        So what that means is -- and I understand, Ms. Culhane,

17   potentially what you are saying in that, okay, number 6,

18   charging parties' application to defendants for employment.

19   I -- so the question is, now, the data trail document very well

20   may show that these different parties dealt with it and it went

21   through this -- this channel and you can see it through the

22   data trail document -- am I saying -- yeah -- or the audit

23   trail document to show that that's what occurred, and if that's

24   in the data trail document, then they're entitled to ask

25   questions on that.

1      Now, Defendant's communication with charging parties,

2  depends on what you mean by communication and if there's

3  information in the -- in the -- the audit trail document that

4  is different or in addition to what has already been testified

5  to as to the communication and how that was done, then they're

6  entitled to talk about that and do depositions of individuals

7  in regards to that.

8      Now, Defendant's refusal to hire the charging parties.  I

9  don't think the audit trail documents have anything to do with

10  that and, Mr. Doty, you can correct me if I'm wrong but I don't

11  know how they would, quite honestly, includ-  --

12         MR. DOTY:  Well, Judge --

13         THE COURT:  -- including the reasons for the

14  decision.  None of that's in the audit trail, right?  I mean,

15  now, there may be a document that was sent in regards to that

16  and that's fine, I think you can talk about that but the

17  reason -- the reason for not hiring is not going to be in the

18  audit trail.

19         MR. DOTY:  Well, except -- so, Your Honor, it --

20  it's -- it's sort of the Sherlock Holmes the dog that doesn't

21  bark.  I mean, their position from the EEOC's investigation on

22  forward has been that they didn't hire Andrew Deuschle -- use

23  him as an example -- is because he did not attend a -- a

24  Werner-approved truck driving school, and Mr. East can correct

25  me if I'm wrong here.

So that position was because he didn't attend the Werner-approved truck driving school, we didn't hire him. That was one of our reasons. Well, what the audit trail data says very clear is -- is that -- and, again, I'm not looking at the date but there's a date that it says they change -- they -- they recognized they made a mistake and then changed the -- the school code for his school, and we should be able to ask them about that.

The other thing they said is, well, he didn't --

Well, Brian, do you -- do you want to chime in about what the audit -- you probably have a better understanding of it.

MR. EAST: No. Go ahead, Grant. I -- I don't. I'll defer to you.

MR. DOTY: Yeah, so --

MR. EAST: I (indiscernible) more about the school codes.

MR. DOTY: Yeah. So one is the school code and then the second thing is, is that they said that Mr. Deuschle wrongly applied for a -- what's -- what's -- what would be the intermediate truck driving position, not a new truck driver and not an experienced truck driver but sort of the middle level truck driving position.

And because he wasn't qualified, he hadn't driven six months, he really should have been applying for the new truck driver training position, and there's an audit trail data entry

1  for Mr. Hollenbeck where he says, I'm passing this one to you

2  because he's really not a -- a middle truck driver, he's --

3  he's a -- he's a -- a trainee.  That's where he -- he's going

4  to come as a trainee.

5      So they didn't reject him because of that.  They did the

6  right thing which is they moved him to the other category and

7  so their claim from the EEOC investigation that he applied for

8  the wrong position and wasn't qualified is pretext.

9      And so even though it doesn't say we rejected him for this

10  reason, we know what they claim to be their rejection and we

11  would have been able to ask them, If you claimed it was that,

12  why did you, in fact, pass it on to Miss So-and-so to say it's

13  a trainee position.  So completely relevant and I think the

14  audit trail data is spot on.

15          MS. CULHANE:  Judge, can I respond briefly?

16          THE COURT:  Sure.

17          MS. CULHANE:  On the school issue, I -- I -- I take

18  issue with Mr. Doty's summary of what's been alleged in this

19  lawsuit.  Back at the time of the EEOC investigation, when the

20  initial response was prepared, in-house counsel was provided

21  with some incorrect information about the school code and

22  provided that information to EEOC and thereafter clarified in

23  writing to the EEOC that that was not a reason and she had

24  provided incorrect information.

25      So the school code is, in my view, a red herring.  It was

1  a mistake that was made by -- by in-house counsel a long time

2  ago back before this went to suit and it was -- and the EEOC

3  was advised of that mistake a long time ago before this went to

4  suit.

5      With respect to the issue about his experience, I mean,

6  all of this stuff was already discussed.  There was lengthy

7  depositions taken on the issue of his experience and what

8  experience you have to have to be a student driver versus a

9  qualified driver.  I mean, all these issues that Mr. Doty is

10 bringing up as the alleged pretext were debated ad infinitum

11 with our witnesses during over 12 hours of depositions in

12 January, and to me, redoing those topics based on a few lines

13 of data, the vast majority of which say things like driver item

14 merged to system, don't have anything to do with these topics,

15 and -- and it just seems like this is an attempt to redo a lot

16 of work that's already been done here.

17     So from my perspective --

18         MR. DOTY:  Your Honor --

19         MS. CULHANE:  -- Your Honor was exactly correct.  The

20 topic 8, our decision -- the decisions made by Werner with

21 respect to their applications, the -- the audit trail data

22 doesn't speak to that and there's no point in redoing

23 deposition topics on those.

24         MR. DOTY:  Your Honor, I'm not -- I'm not

25 (indiscernible) the second point where Ms. Culhane commented

1    that we discussed the issue ad infinitum regarding the --

2    the -- the -- the job that he applied for.

3        What she didn't deny was they did claim that that was one

4    of the reasons why he was not hired, and the depositions would

5    have been a lot better had he denied -- had Mr. Hollenbeck

6    denied, for example, that that was why, and then we could point

7    to that particular line and say but yet on this day, didn't you

8    transfer the file with the guidance that he is, in fact,

9    applying for a driver trainee position, and -- and -- and I

10   think he would have stood there in stunned silence, and that

11   would be an incredible video moment in front of a jury, and you

12   can't -- the Court -- and we don't believe should deny that

13   opportunity to us.

14       MS. CULHANE:  Judge, what we've said in this case is

15   that both of these drivers would have been required to go

16   through Werner's student driver program and Werner did not

17   believe that it could safely train the drivers in the student

18   driver program because there's no way for them to keep their

19   eyes on the road while simultaneously communicating with their

20   driver trainer.  That's what we've said about why we didn't

21   hire these drivers.

22       And so the audit trail data doesn't speak to that and it's

23   not going to provide additional information about the decision.

24   I mean, that's what we've said in this lawsuit.  That's --

25   that's Werner's position.

1          THE COURT:  Okay.

2          MR. DOTY:  That's the position --

3          MS. CULHANE:  It's about safety.  And I don't

4     understand how the audit trail data speaks to that issue.

5          MR. DOTY:  That's the position now, Your Honor, but

6     Mr. East [*sic*], that's not why he was not hired.  He was not

7     hired because they said they couldn't train him.  He was not

8     hired because they said he applied for the wrong job and he

9     went to the wrong school, end -- end of argument.  That is

10    their position.

11         The second issue, whether they're willing to hire deaf

12    drivers, go to the injunctive element of the EEOC's claim which

13    we think is important but that's not relevant to Mr. Deuschle's

14    harm and Mr. Deuschle's discrimination.

15         And the audit trail data specifically shows a -- a point

16    that runs absolutely counter to what they claim throughout the

17    entire lawsuit.

18         THE COURT:  Well, and here's the issue.  I mean,

19    obviously, the defendant cannot dictate what questions and how

20    the plaintiff wants to get their evidence or proves their case,

21    and the problem that we have here is there is information that

22    had the plaintiffs had it at the time of the deposition, they

23    would have questioned on it.

24         So I will -- I'm going to allow the 30(b)(6) on those

25    topics, on 6, 7, 8, 39 and 40, as well as on the RCD documents

1    that we talked about which is in number 5 but I want to be

2    clear.  I --  This is not reopening all of -- so all of

3    questioning obviously in this case.

4        It -- it --  So what I would foresee is that this is not

5    going to be very lengthy because it has to deal with the audit

6    trail data and what that data shows in relationship to either

7    what -- what they've already previously testified to 'cause

8    what I'm hearing is they've testified to this and now we've got

9    this audit trail data and it's showing something different or

10   you have a question in regards to what's on the audit trail.

11       I guess what I'm trying to say is it needs to focus on

12   that 'cause it is not this Court's intention to reopen a

13   deposition to talk about anything and everything in relation to

14   6, 7 and 8.  It has to be in relationship to the audit trail

15   data.

16       Understand?  Makes sense?

17           MR. DOTY:  Yes, Your Honor.

18           THE COURT:  Okay.  All right.  So then 7 has to do

19   with extending the motion to compel deadline to October 24th

20   which I will tell you makes sense due to the other orders of

21   the Court today.

22       So I guess the question I have is in requiring Werner to

23   do searches of these other items and the databases but I think

24   we need to know what the databases are to determine what needs

25   to be searched, how long -- how long do you think it would take

Werner to put together the databases and what they are?

MR. CRAINER: Judge, I'm -- Brandon Crainer here.
I'm not sure how long that would take. I -- I know there's 400
databases and it's not clear from the title so I -- I would
have to confer with our IT people.

THE COURT: Well -- and that's fine. What -- what I
will do is I'm going to extend the motion to compel till
October 24th but will extend that further if -- obviously I
want this done by Werner in quick order 'cause this case needs
to keep moving, but obviously if there's a -- a issue, then you
can let the Court know and I can extend that date if we need to
do that further.

MS. CULHANE: Judge, can I just --

THE COURT: Yeah.

MS. CULHANE: -- can I just speak real quickly on
that issue?

THE COURT: On which issue?

MS. CULHANE: This is Liz -- I'm sorry, on the
October 24th date.

THE COURT: Sure.

MS. CULHANE: Judge, this is Liz Culhane.

THE COURT: Yeah.

MS. CULHANE: Yeah, I just wanted to just raise two
issues. First, the EEOC's position statement states that at
the last hearing the Court extended only their deadline for

1   discovery but that's not correct.

2        The Court extended both parties' deadlines for the

3   discovery deadline, the deposition deadline and the motion to

4   compel deadline, and the reason the Court did so is you

5   recognized that because they are going to delay other fact

6   depositions until they complete what they believe is the

7   additional document search that both parties may have issues

8   that come up during the later fact depositions that require

9   additional discovery.

10       And -- and --

11            THE COURT:  Right.

12            MS. CULHANE:  -- we already had that discussion back

13  in April.  And so from our perspective this request to extend

14  one party's deadline, it should be a mutual deadline because I

15  think they're still asking the same thing.  I mean, they want

16  to delay all the fact depositions until -- there -- there's

17  other fact witnesses --

18            THE COURT:  Sure.

19            MS. CULHANE:  -- that they want to delay till they

20  finish this new 30(b)(6).  That's one point.

21       The only other thing I would ask, Judge, is that we are in

22  a two-week trial in October, including through the week of

23  October 24th --

24            THE COURT:  Okay.

25            MS. CULHANE:  -- so if the Court is inclined to grant

1    that extension, we would ask you to push it out another month

2    because we're going to have a couple weeks in there where we're

3    not going to be able to be doing depositions in this case and I

4    note that he's asked for an extension of the discovery deadline

5    to be on that date as well.

6         My concern is we're going to get a flurry of requests

7    to -- for depositions in this case during the last two weeks of

8    the discovery deadline which is what happened last time.  In

9    May I think they noticed eight depositions to occur over a

10   12-day period right up to the last date.

11        I wouldn't be able to do that if the Court puts the

12   deadline on October 24th because we are in a two-week trial in

13   another case.  So I would just ask the Court to consider

14   putting it toward the end of November to account for that trial

15   schedule issue and to make the deadlines mutual for the same

16   reasons you did last time.

17             THE COURT:  Any objection to that, Mr. Doty?

18             MR. DOTY:  I don't object, Your Honor, to the, you

19   know, further, you know, extension out a month.  I think that's

20   great 'cause I -- I don't want to be pushing against their

21   trial.  I mean, I think our -- my understanding from the

22   April one was we didn't want -- and I don't believe the Court

23   wanted -- Werner to benefit from something that was caused by

24   them but I do understand that the depositions that we're going

25   to be doing, both parties should go out until that date.

THE COURT:  All right.  So I'll -- I will extend everything to November 30th.

MS. CULHANE:  Thank you, Judge.

THE COURT:  So, yeah, the discovery deadlines will be extended until then, including the motion to compel deadline.

So -- all right.  So that takes care of the EEOC's issues.

So moving then to the -- Werner's two issues, first, the subpoena of Dr. Tricia Lynn which -- and I guess I need to clarify because Werner's submission indicates that they limited the request for information from that doctor as to Robinson's treatment for high blood pressure only, and the EEOC's submission seems to indicate that it was not limited unless I read that wrong.

MS. CULHANE:  This is Liz --

MR. CRAINER:  Judge, allow me --

MS. CULHANE:  Go ahead, Brandon.

THE COURT:  Yes.

MR. CRAINER:  I'm sorry.  I'm sorry.  This is -- this is Brandon Crainer on for Dr. Wright.  Our -- our subpoena -- and I don't have it in front of me, unfortunately, but I -- I believe our subpoena was -- was asking for all of his treatment records but, again, I don't have that in front of me but -- so here -- here -- here's the thing, though, about the subpoena to Dr. Wright and the reason why we're seeking it and -- and the reason why we think we should be allowed to serve the subpoena.

1    So Mr. Robinson testified under oath that his high blood

2    pressure worsened due to his interactions with Werner.

3    THE COURT:  Right.

4    MR. CRAINER:  That was alleged in the complaint by

5    the EEOC and that was also asserted in an interrogatory answer.

6    When we requested the medical records relating to his -- his --

7    his treatment there, after some discussion they stated they

8    would withdraw that claim so in their opinion and their view,

9    the -- the records are no longer relevant.

10   I don't necessarily know what they mean by withdrawing the

11   claim because there was no specific claim as to -- to blood

12   pressure.  He gave that testimony when we asked him under oath

13   to describe the damages that he suffered as a result of his

14   interactions with Werner, but withdrawing it and ignoring the

15   testimony is -- is certainly not sufficient.

16   Now after we've received that testimony under oath and are

17   following and -- and checking on it, the EEOC responded, look,

18   we just won't have him testify about it so there you go, don't

19   need the records.  And incredibly in a footnote that Mr. Doty

20   put in his position statement was that truthfulness is a

21   collateral matter and -- and we most certainly disagree with

22   that.  Truthfulness is -- is at the heart of -- of -- of the

23   case and Mr. Robinson's testimony.

24   The jury, as you know, will be instructed to consider the

25   credibility of the witness in -- in ruling on the EEOC's

1    claims.  So in our view, the records from Dr. Wright are

2    directly relevant to what Mr. Robinson did under oath, that his

3    high blood pressure condition worsened as a result of his

4    interaction with Werner, and we should be investigated

5    to permit -- we should be permitted to investigate those

6    allegations.

7        If the records tend to show it -- tend to show that his

8    testimony on that point is untrue, then that goes directly to

9    the heart of this lawsuit because it calls into question his

10   testimony about his alleged damages.  So that is why we are

11   seeking the subpoena to Dr. Wright.

12            THE COURT:  But you're willing to limit that just to

13   his high blood pressure, correct?

14            MR. CRAINER:  Yes.  Yes.

15            THE COURT:  Okay.

16            MR. CRAINER:  Yes, Judge.

17            THE COURT:  All right.  Mr. Doty.

18            MS. BERWICK:  Your Honor, this is Meredith Berwick.

19   I've been handling this issue --

20            THE COURT:  Yes.

21            MS. BERWICK:  -- with Mr. Crainer.

22        So that is a new position of Defendant's that they would

23   limit it to high blood pressure, and, again, we reassert our

24   offer to withdraw the claim related to his high blood pressure.

25   If he does not present evidence related to his high blood

1    pressure, then it is a collateral matter to the case.

2        They're not claiming that -- you know, that it was an

3    issue with his application.  You know, for instance, when he

4    went in for his DOT physical or the FMCSA information, that was

5    collected.  They're only claiming that he's a liar because he

6    has a damage that he presented and now when his privacy, you

7    know, is at issue in order to prove that damage, he would

8    prefer to maintain his privacy and his medical records, you

9    know, similar -- I've had clients who, you know, claimed they

10   lost their car but then when it, you know, turned out they were

11   going to have to give up some of their financial information to

12   the other side as part of that, they have chosen to withdraw

13   the claim, and the defendant hasn't pursued it.

14       And ordinarily defendants are happy when we say, you know,

15   here's a damage that we thought we had but we're not going to

16   pursue it any further in the interests of our client's privacy.

17   If they had anything else regarding his veracity in the medical

18   records that they've already received through the employers,

19   they -- they would have pointed it out.

20       So I'm still perplexed as to why the plaintiff's removal

21   of this claim of damages regarding his high blood pressure

22   would not resolve this issue.

23           MR. CRAINER:  Judge, and -- and what I'll say is just

24   a quick response to that.  This goes directly to his

25   credibility.  Truthfulness is not a collateral matter here so

1    I -- I would say that we -- we should have the -- the subpoena

2    issued so that we could obtain that as to high blood pressure

3    records in -- in order that -- that are relevant to his claim

4    of damages.

5            THE COURT:  All right.  As to that issue, because he

6    has testified under oath to that issue, I am going to allow the

7    subpoena for medical records relating to his blood pressure

8    only.

9            MR. CRAINER:  Thank you, Your Honor.

10           THE COURT:  All right.  Move --

11           MS. BERWICK:  Okay.

12           THE COURT:  Sorry.  Did somebody want to say

13   something?

14           MS. BERWICK:  Oh, no.

15           THE COURT:  All right.

16           MS. BERWICK:  Just thank you, Your Honor.

17           THE COURT:  All right.  And then moving on to B,

18   which is the authorization for release of the Aspire Indian --

19   Indiana Health records, and as I understand it, there was a

20   subpoena which nobody objected to and then under state law

21   there needs to be a release and that there were conversations

22   between the parties and that EEOC was trying to get -- get

23   Mr. Robinson to sign the release, that did not happen, and I

24   don't know that there was anything else argued or talked about

25   in regards to that, but obviously this has now been brought to

1   the Court's attention, and what I mean by that is the

2   plaintiffs indicate that they do have a concern with the

3   release because it is saying it should go until 60 days after

4   termination of their services versus the litigation.

5           And I -- so I don't know if the EEOC has -- or, excuse me,

6   if Werner has any issue with limiting the release to when this

7   litigation is either -- is decided either based on -- on motion

8   or a trial till there's a resolution limiting it to that, and

9   if -- and if so, if that solves the issue.

10          MS. CULHANE:  Your Honor --

11          MR. CRAINER:  Judge, yes -- so -- I'm sorry.  Real --

12  real quick, Judge, on the -- on the subpoena to Aspire.  We

13  just want a release that's going to allow us to get the

14  records.  We did just receive an email at the last minute from

15  counsel --

16          MS. CULHANE:  Last month or --

17          MR. CRAINER:  -- yesterday with -- with the

18  release --

19          THE COURT:  Okay.

20          MR. CRAINER:  -- that they suggested changing.  The

21  issue why we brought this forward and -- and the issue that I

22  took with their position statement is that they're starting to

23  raise objections and trying to limit what the subpoena is

24  seeking when they never even had any objections --

25          THE COURT:  Right.

1          MR. CRAINER:  -- at the outset.

2      Back in April counsel said, look, we have no objection

3  and -- and now after the fact they're -- they're trying to

4  limit what we're going to obtain.  It's kind of like the -- the

5  same issue that we had last time when we were seeking to

6  subpoena the FMCSA.

7          MS. CULHANE:  Right.

8          MS. BERWICK:  Your Honor, if I may, what Brandon

9  isn't telling you is that the release I sent last night does

10 not limit the documents sent in any regard.

11         MR. CRAINER:  No.  And -- and --

12         MS. BERWICK:  It just stated --

13         MR. CRAINER:  -- and I -- I --

14         MS. BERWICK:  -- (indiscernible).

15         MR. CRAINER:  -- I was certainly getting there,

16 Judge, so thank you.

17     But what I'm saying is that we're -- we will take the

18 release however we can get it.  What I would ask, though, is

19 that -- as I've stated in our letter to the Court -- just that

20 it be signed within five days and provided within seven days

21 thereafter so that we can have it as soon as possible and that

22 we can -- that we can issue it.

23         THE COURT:  Okay.  So are you fine with the release

24 as you have it now?

25         MS. BERWICK:  With the copy of the release --

1          MR. CRAINER:  I don't --

2          MS. BERWICK:  -- that I sent them last night, we are

3     okay with that.

4          THE COURT:  Right.  But I'm asking Mr. Crainer if

5     he's okay with it.

6          MS. BERWICK:  Sorry.

7          MR. CRAINER:  Other -- other than the fact it's not

8     signed but yes, yes.  I'm fine.

9          THE COURT:  Okay.

10          MR. CRAINER:  I don't think there's any -- anything

11     else that needs to be changed.  It needs to be signed.

12          THE COURT:  All right.  So, Miss Berwick, can you get

13     that signed by Mr. Robinson within five days and back to

14     counsel within seven days?

15          MS. BERWICK:  Yeah, that shouldn't be a problem.  Can

16     the defendants -- can it be ordered that the defendants provide

17     us the documents they receive within, say, ten days of

18     receiving them?

19          THE COURT:  Any objection?

20          MR. CRAINER:  That's fine, Judge.

21          THE COURT:  Okay.  All right.  Defendant will within

22     ten days provide records to Plaintiff.

23          Okay.  All right.  I think that takes care of all of the

24     issues today.  So I will enter an order based on what we talked

25     about today.

1        Is there anything else, Mr. Doty, from you today?

2              MR. DOTY:  No, Your Honor.  Thank you.

3              THE COURT:  Anything else on beha- -- Mr. East, on

4    behalf of the intervenor?

5              MR. EAST:  No, Your Honor.  Thank you.

6              THE COURT:  All right.  Anything further from Werner

7    Enterprises?

8              MR. CRAINER:  No, Your Honor.  Thank you.

9              THE COURT:  All right.  Thank you, everybody.  I'll

10   go off the record.

11       (Adjourned at 2:33 p.m.)

12

13                        * * * * * * *

14

15       I, Rogene S. Schroder, certify that the foregoing is a

16   correct transcription to the best of my ability from the

17   digital recording of the proceedings held in the above-entitled

18   matter.

19       */s/Rogene S. Schroder*              October 22, 2021
            Transcriber                        Date
20

21

22

23

24

25