IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WERNER ENTERPRISES, INC.,<br><br>Defendant;<br>and<br><br>ANDREW DEUSCHLE,<br><br>Plaintiff Intervenor,<br><br>v.<br><br>WERNER ENTERPRISES, INC.,<br><br>Defendant. | **CASE NO: 8:18CV329**<br><br><br><br>**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DRIVERS MANAGEMENT, LLC and WERNER ENTERPRISES, INC.,<br><br>Defendants. | **CASE NO: 8:18CV462**<br><br><br><br>**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**I.   INTRODUCTION**

This is an employment discrimination case in which Plaintiff Equal Employment Opportunity Commission ("EEOC") and Intervenor Andrew Deuschle (collectively, "Plaintiffs") allege that Werner violated the Americans with Disability Act ("ADA") by failing to hire Deuschle and Victor Robinson, both of whom are totally deaf, as placement drivers in Werner's placement driver program for new and inexperienced truck drivers. Plaintiff EEOC also alleges that Werner asked an unlawful disability-related inquiry on an old

version of its employment application and enforced an alleged facially unlawful hiring guideline. As further detailed below, Werner is entitled to summary judgment on all claims by Plaintiffs.

As an initial matter, the undisputed evidence confirms, as a matter of law, that Deuschle and Robinson were not qualified for the placement driver position. As a motor carrier, Werner is subject to the Federal Motor Carrier Safety Regulations ("FMCSRs"), including a regulation dictating that Werner cannot hire an individual to operate a commercial motor vehicle unless the applicant meets a certain hearing standard. 49 C.F.R. § 391.41(b)(11) (the "Hearing Standard"). It is undisputed that Deuschle and Robinson cannot meet that Hearing Standard. Plaintiffs contend that because they obtained a "hearing exemption" from the Federal Motor Carrier Safety Administration ("FMCSA"), Werner was obligated by the ADA to hire them despite their inability to meet the Hearing Standard. Contrary to Plaintiffs' position, both Congress and the Supreme Court have made clear that federal safety rules, such as the FMCSRs applicable to interstate motor carriers, "limit application of the ADA as a matter of law." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 573-74, 119 S. Ct. 2162 (1999) (citing S. Rep. No. 101-116, pp. 27-28 (1990)). In Kirkingburg, the Supreme Court concluded an employer did not violate the ADA by refusing to hire a driver who was unable to meet the FMCSR vision standard, although he obtained an exemption from the FMCSA. As the Kirkinburg Court explained, the regulations are binding on motor carriers and the employer was entitled to insist that applicants satisfy all regulatory requirements. Consistent with this authority, Plaintiffs were not qualified for the placement driver position because Plaintiffs cannot meet the Hearing Standard.

The undisputed evidence also confirms there were no reasonable accommodations that would have allowed Deuschle and Robinson to safely complete the observed over-the-road driving portion of Werner's placement driver program, during which new and inexperienced drivers ride and drive with more experienced driver trainers and receive real-time instructions as driving events occur. Specifically, Werner was unable to identify any means by which Deuschle and Robinson could communicate with their driver trainers, while operating commercial motor vehicles weighing up to 80,000 pounds on public roadways, without diverting their eyes from the road. Neither Plaintiffs nor their experts have proposed any such accommodations. Because all accommodations proposed by

Plaintiffs would have fundamentally altered the training program or required the drivers to divert their eyes from the road, thereby creating the potential for distracted driving and catastrophic loss, the undisputed evidence confirms, as a matter of law, that Deuschle and Robinson could not safely complete the placement driver program, an essential function, with or without reasonable accommodations.

For the same reasons, Werner reasonably determined Plaintiffs presented a direct threat to the safety of themselves, their trainers, and the motoring public. Although the EEOC and Intervenor would have this Court second-guess Werner's business judgment, Werner has an obligation to do everything in its power to ensure the safety of its drivers and the motoring public. In the end, it is Werner–and not the EEOC–that would be exposed to substantial liability if Plaintiffs' proposed accommodations, which Werner deemed unsafe, did not work as Plaintiffs anticipated and resulted in catastrophic loss. For these reasons, Werner is entitled to summary judgment on Plaintiffs' claims that Werner violated the ADA by failing to hire Deuschle and Robinson as placement drivers.

Plaintiff EEOC's other claims similarly fail. The alleged unlawful inquiry claim at issue in the EEOC's Count II pertains to a question on a job application form that has not been used since 2013. Any claims relating to the content of that form are clearly time-barred and there is no evidence the alleged violation is likely to recur and, thus, no basis for injunctive relief. The old hiring guideline upon which the EEOC predicates the alleged "facial violation" at issue in Count III is, on its face, entirely lawful and consistent with federal regulations applicable to motor carriers and with the ADA.

For these reasons, further detailed below, Werner requests an Order granting summary judgment in its favor on all claims alleged by Plaintiff and Intervenor.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Werner provides the following statement of material facts with respect to which Werner contends there is no genuine dispute.

### A.    Defendant Werner Enterprises

1.    Werner is a motor carrier engaged in transporting truckload shipments of commodities in interstate and intrastate commerce throughout the United States. (Ex. 2, Handbook at 000086).

2.      Werner's policies prohibit employment discrimination based on disability, among other protected categories, and it is Werner's policy and practice to offer reasonable accommodations to applicants and employees. (Ex. 2, Handbook at 000102).

3.      Werner also employs a "Safety First" philosophy by emphasizing safety first and establishing policies to protect drivers and the motoring public in compliance with the FMCSRs. (Id.).

4.      Drivers may apply for employment with Werner through various methods, including by submitting an application electronically, either through Werner's website or through a third-party website using an general application submitted to multiple carriers. (Ex. 3, Deposition of Scott Hollenbeck ("Hollenbeck Depo.") 50:1-4, 59:16-17, 68:13-24).

5.      After an application is screened, applicants who appear to meet all necessary hiring criteria receive an invitation to attend Werner's new driver orientation, where they must complete a full DOT-compliant application. (Hollenbeck Depo. 78:14-20, 84:22-85:21).

6.      The DOT-compliant application includes all information that Werner is required by the FMCSRs to maintain on file regarding driver employees and is more comprehensive than the shorter application forms completed earlier in the hiring process. (Hollenbeck Depo. 84:22-85:21, 87:23-88:6).

7.      Prior to 2013, the DOT-compliant application used at orientation included the question "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" (Hollenbeck Depo. 300:1-5, 304:5-8).

8.      That question was removed from the application in 2013. (Hollenbeck Depo. 304:11-17; Ex. 4, Supplemental Answers to Interrogatories, No. 24).

9.      However, when the EEOC requested a copy of a DOT-compliant application during its investigation into the Charge underlying this matter, Scott Hollenbeck, Werner's former Director of Compliance, inadvertently provided an outdated, pre-2013 version, which was no longer in use as of the date it was provided to the EEOC. (Hollenbeck Depo. 300:16-301:15; Ex. 4, No. 24).

10.      Werner discovered that mistake before this lawsuit was filed. To ensure that the old form would not accidentally be used or distributed again, Werner removed all copies of the pre-2013 application from its office and warehouse and instructed driving

schools to destroy any pre-2013 versions of Werner's application. (Hollenbeck Depo. 301:16-302:11, 307:9-308:24; Ex. 4, No. 24).

11.     The EEOC has not identified any individuals who were "chilled" from applying to Werner due to the contents of the pre-2013 application but, nonetheless, continues to seek injunctive relief related to the pre-2013 application. (Ex. 5, EEOC's Answers to Interrogatories, No. 16; Filing 112, p. 8 at B).

## B.     Federal Safety Standards

12.     As a motor carrier, Werner and its drivers are subject to the FMCSRs, promulgated by the DOT, which establish minimum qualifications for drivers of commercial motor vehicles ("CMVs") and minimum safety standards for interstate motor carriers employing over-the-road truck drivers. See 49 C.F.R. Parts 390, 391, 392, and 395.

13.     Although the FMCSRs set the minimum standards, the FMCSRs also specifically authorize motor carriers to adopt "more stringent requirements relating to safety of operation and employee safety and health." 49 C.F.R. § 390.3(d).

14.     Among other things, the FMCSRs establish certain physical qualifications for CMV drivers, including the Hearing Standard:

> A person is physically qualified to drive a commercial motor vehicle if that person --. . . (11) First perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5—1951.

49 C.F.R. § 391.41(b)(11); 35 FR 6458, 6463 (April 22, 1970); 36 FR 12857 (July 3, 1971).

15.     Werner is required by federal law to ensure that all applicants for commercial driving positions meet all physical qualifications set forth in 49 C.F.R. § 391.41. 49 C.F.R. § 391.11.

## C.     The FMCSA Exemption for Deaf Drivers

16.     Although the FMCSRs dictate that all drivers operating CMVs in interstate commerce must meet the Hearing Standard, the FMCSA has created a process by which certain individuals may apply for a waiver that exempts them from the Hearing Standard. 49 C.F.R. § 391.41(a)(3)(ii); 78 FR 7479 (Feb. 1, 2013).

17.     The FMSCA is authorized to grant exemptions from the FMCSR requirements if the Secretary of Transportation concludes the exemption "would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." 49 U.S.C. § 31315 & 31136(e).

18.     Where an exemption is requested, the driver-applicant must provide, **at minimum**, the following information for each exemption request:

   a. The provisions from which the person requests exemption.

   b. The time period during which the requested exemption would apply.

   c. An analysis of the safety impacts the requested exemption may cause.

   d. The specific countermeasures the person would undertake to ensure an equivalent or greater level of safety than would be achieved absent the requested exemption.

49 U.S.C. § 31315(b)(5).

19.     The FMCSA must also establish "terms and conditions for each exemption to ensure that it will likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption" and must "monitor the implementation of the exemption to ensure compliance with its terms and conditions." 49 U.S.C. § 31315(b)(8).

20.     In February 2013, the FMCSA began issuing exemptions from the Hearing Standard ("FMCSA Hearing Exemption") to certain deaf or hard-of-hearing individuals, allowing them to obtain a Commercial Driver's License ("CDL"), despite their inability to meet the Hearing Standard. 78 FR 7479. Notably, however, the FMCSA conceded that it had not identified any studies addressing the relationship between hearing loss and crash risk among CMV drivers. Id.

21.     The FMCSA also acknowledged "there could be potential consequences of a driver being hearing impaired and/or deaf while operating a CMV under some scenarios," but nonetheless began issuing Hearing Exemptions. 78 FR 7479, 7480.

   **D.    Werner's Placement Driver Program**

22.     Werner requires all recent graduates of truck driving school and any other applicant who lacks a certain amount of prior truck driving experience to successfully complete Werner's placement driver program (formerly the "student driver program")

before they can drive solo for Werner. (Filing 226-2,[1] Deposition of Jaime Maus ("Maus Depo.") 98:7-25; 123:12-19; Handbook at 000280-000294).

23.     During the 2015-16 timeframe, when Deuschle and Robinson applied, Werner required all applicants with less than 6 months of verifiable driving experience with a reputable carrier that had a safe driving record to complete the placement driver program. (Maus Depo. 123:12-19).

24.     The placement driver program is designed to enhance safe driving skills, assist new drivers in transitioning to the industry, provide support, and set trainees up for success while promoting highway safety. (Handbook at 000283-000284).

25.     In the placement driver program, "placement" drivers (formerly "student drivers") are paired with a more experienced "driver trainer" for approximately 275 hours. (Handbook at 000283-284, 291; Maus Depo. 98:7-15, 250:5-9).

26.     During the observed over-the-road driving portion of that program, the placement driver is observed by his trainer while driving and receives instructions on subjects such as safety procedures and proper driving techniques. (Maus Depo. 118:9-24, 184:16-185:6; Filing 246-12, Answers to Interrogatories, No. 5, November 26, 2019; Handbook at 000291).

27.     While completing that portion of the program, the placement driver and trainer are expected to communicate in real time regarding such topics as emergencies and tutorials about defensive driving, as various driving events occur. (Maus Depo. 118:14-19). The observation time allows trainers to help the placement driver fine-tune safe driving practices. (Handbook at 000292-000293).

28.     Because many placement drivers have little or no prior experience driving a loaded CMV on public roadways, they gradually progress to more complex driving tasks during the placement driver program, beginning with "interstate, light city traffic, rural two lanes, evenings until midnight" driving; progressing to "moderate/heavy traffic, rural two-lanes, mountains and night driving;" and finally driving "in all environments, all times of the day and night." (Handbook at 000293).

29.     Werner's placement drivers and their trainers drive throughout the contiguous United States, so they frequently encounter driving scenarios different from

---

[1] References to filing numbers are to Lead Case 8:18-CV-329, unless otherwise indicated.

those covered by Robinson and Deuschle in CDL school, ranging from mountain driving to city driving and various inclement weather scenarios, all while hauling actual customer loads, which "requires real-time instruction." (Maus Depo. 118:20-24; Handbook at 000291; Filing 251-2, Adams Report, p. 2; Ex. 6, Deposition of Victor Robinson ("Robinson Depo.") 41:11-20, 42:5-13; Ex. 7, Deposition of Andrew Deuschle ("Deuschle Depo.") 24:23-25:4, 32:5-13).

30.     Because the placement drivers in Werner's training program deliver regular loads to customers throughout the country, they encounter "uncontrollable and constantly-changing weather and traffic conditions," including various traffic and road conditions, mountain grades, metropolitan areas, and variations in whether the CMV is fully loaded, partially loaded, or empty, which impacts the amount of time and distance required to safely stop the CMV. (Adams Report, p. 2; Handbook at 000291-000293).

31.     Due to these constantly-changing driving conditions, Werner's placement driver program is very different from the on-road training at a CDL school, which drivers attend in order to get their CDL, before applying to work for a trucking company. (Adams Report, pp. 2-3; Robinson Depo. 41:11-20, 42:5-13; Deuschle Depo. 24:23-25:4, 32:5-13). In CDL school, a trainee and a trainer are generally operating the CMV in a more controlled environment, covering routes that are pre-assigned by the school or known and chosen by the driver trainer. (Id.).

32.     As a result of these factors and because the placement driver may have little or no prior experience in handling some or all of those driving conditions, Werner believes it is critically important that the placement driver and driver trainer have the ability for constant, immediate, effective two-way communications. (Adams Report, p. 2; Maus Depo. 118:14-24).

**E.     Victor Robinson**

33.     Robinson is a deaf driver who applied for an FMCSA Hearing Exemption. (Robinson Depo. 128:2-19).

34.     Robinson was not required to interview with the FMCSA as part of his application for a Hearing Exemption; in fact, no one from the FMCSA ever contacted Robinson before he received the Hearing Exemption. (Robinson Depo. 128:2-5, 12-15).

35.     Robinson submitted certain information about his driving record and a copy of his driver's license and also completed a form with basic contact information, indicating

8

he was "asking for an exemption from the hearing standard in CFR 49 391.41." (Robinson Depo. 128:6-11; Ex. 9, Robinson FMCSA File, p. 19).

36.      Notably, Robinson was never asked by the FMCSA to describe the safety impacts of the exemption or how he would ensure that he could achieve a level of safety equivalent to, or greater than, the level of safety that would be obtained by complying with the regulation. (See generally Robinson FMCSA File).

37.      Robinson applied to Werner in 2016, and informed Werner that he had a Hearing Exemption. (Hollenbeck Depo. 213:1-6, 270:18-21; Maus Depo. 73:9-12, 96:24-97:3).

38.      As of that date, Robinson had obtained his CDL but he had no professional driving experience. (Robinson Depo. 24:23-25:7, 45:13-17).

39.      Robinson did not complete the pre-2013 version of Werner's DOT-compliant application. (Robinson Depo. 123:8-16 & Exhibit 2). The application Robinson completed did **not** contain the question "Is there any reason you might be unable to perform the functions of the job for which you have applied?" (Robinson Depo. 123:8-16 & Exhibit 2).

40.      Robinson's CDL training included driver training consisting of "actual practice moving the vehicle," "short distances around the yard, outside the yard, but close by, and then back," and what Robinson called a "full day on the road." (Robinson Depo. 41:11-20). However, when Robinson drove for a full day during CDL training, he only drove distances of 15-50 miles and did not plan his own trips; rather, his instructor told him where to go. (Robinson Depo. 42:5-13).

41.      Because Robinson had less than 6 months of commercial driving experience when he applied to Werner, Werner determined Robinson would need to complete Werner's placement driver program. (Hollenbeck Depo. 234:4-12; Maus Depo. 172:1-23; 98:2-15, 123:12-19; Ex. 10, Job Description (requiring previous driving experience, unless applying as a student driver)).

42.      Because Robinson is deaf, any real-time communications in the cab of the truck between Robinson and his trainer would necessarily have to be non-verbal communications, such as sign language or written signs. (Filing 246-10, Answers to Interrogatories, No. 28, December 9, 2019).

43.      Werner was legitimately concerned that these forms of communication, which would require a deaf placement driver and the trainer to take their eyes off the road

in order to communicate while driving, posed a threat to the safety of Robinson, potential trainers, and the public. (Filing 246-10, Answers to Interrogatories, No. 28, December 9, 2019). For example, if a trainer observed a hazard on the roadway and needed to immediately instruct Robinson on how to address that situation, Werner was concerned that communication could not necessarily be done safely and effectively through sign language, flash cards, or other non-verbal communications, because Robinson and his trainer would have to look away from the road–and the hazard–to communicate. (Id.).

44.     Werner was legitimately concerned that this could result in distracted driving, which may cause a driver to be delayed in seeing and recognizing a traffic danger and may also cause injury, death, or property damage. (Filing 246-10, at Answer No. 28, December 9, 2019).

45.     To address these concerns, Werner researched methods by which hearing impaired drivers could be safely trained in an over-the-road program. (Maus Depo. 16:14-25).

46.     Jaime Maus ("Maus"), Werner's Vice President of Safety and Compliance and Terminal Management, contacted several resources, including the American Trucking Association ("ATA"), the Nebraska Department of Transportation ("NDOT"), and the FMCSA, to investigate whether those organizations had done research or could provide guidance regarding safe methods for training deaf commercial drivers during the observed over-the-road driving portion of Werner's placement driver program. (See Maus Depo. pp. 16-36).

47.     Maus spoke with an individual at NDOT who completes road tests for hearing impaired individuals, and he informed Maus that he was uncomfortable with the evaluation process for hearing impaired drivers. (Maus Depo. 18:15-19:12). He also advised Maus that the process required the evaluator to communicate with the driver about next steps *while pulled over on the side of the road*. (Id.). The NDOT representative informed Maus that he did not believe this was a safe parking location for such communications. (Id.).

48.     The NDOT representative was unable to suggest any other means by which a trainer could communicate with a totally deaf student driver, while on the road, other than pulling over to the side of the road. (Maus Depo. 20:1-4).

49.     Maus also spoke with an ATA representative, who informed Maus that ATA was not aware of any motor carriers who trained individuals with hearing impairments. (Maus Depo. 21:10-17). The ATA was also unaware of any research regarding the training of deaf commercial drivers. (Maus Depo. 21:25-22:3).

50.     Maus also spoke with an FMCSA representative, who directed Maus to the Federal Register but had no additional research or advice regarding the means by which a completely deaf individual could communicate with a trainer during the observed over-the-road driving portion of Werner's placement driver program, without diverting his or her eyes from the road. (Maus Depo. 31:12-18, 32:20-33:16). In fact, the FMCSA did not direct Maus to *any* literature regarding the training of deaf commercial drivers and Maus was unable to identify any such research. (Maus Depo. 34:21-35:3).

51.     Maus also communicated with a benchmarking group of 12 motor carriers, none of which employed hearing impaired drivers at the time Robinson applied in 2016. (Maus Depo. 22:16-23:4, 23:12-17, 24:21-26:8).[2]

52.     Through her research and discussions, Maus learned of a study conducted in or around 2005, involving deaf drivers of passenger vehicles. (Maus Depo. 17:1-14, 31:12-32:10). The study did not address CMVs or training deaf individuals to operate CMVs and did not suggest any methods in which such training could be completed safely while driving over the road. (Maus Depo. 17:1-14, 31:12-32:10).

53.     After conducting this research, Maus participated in a 30-minute phone call with Robinson (through an interpreter relay service), while Werner was in the process of reviewing his application. (Maus Depo. 103:18-108:17). The purpose of that call was to investigate potential accommodations that might enable Robinson to safely communicate with a trainer while operating a CMV during the observed over-the-road driving portion of Werner's placement driver program. (Id.).

54.     Maus testified that Robinson proposed potential accommodations of having his trainer write notes on a white board or instruct him via hand signals or having an

---

[2]  After Werner declined to hire Deuschle and Robinson, another carrier in the benchmarking group began hiring hearing impaired drivers and trained those drivers by using white boards in the cab or an iPad or GoPro mounted in the cab for an interpreter. (Maus Depo. 22:16-23:4, 23:12-17, 24:21-26:8).

interpreter in the cab. (Maus Depo. 105:1-107:8). Robinson also informed Maus that "if it's a real emergency, then I would pull off the road." (Robinson Depo. 53:24-54:3).

55.    Robinson did not propose any other potential accommodations during the call. (Maus Depo. 105:1-107:8; Robinson Depo. 53:8-54:3).

56.    In Maus's view, the various accommodations proposed by Robinson "would not limit distracted driving on our roadways and *could create a potential serious injury or catastrophic loss*." (Maus Depo. 108:3-9) (emphasis added). This is because there are instances while a student is driving when "we have [a] split second [to] tell somebody what they need to do in order to make sure that the vehicle does not lose control." (Maus Depo. 190:12-16).

57.    Ultimately, with safety in mind as her paramount concern, Maus was unable to identify any viable means by which Robinson could effectively and safely drive and simultaneously communicate with his trainer in an emergency situation, when every second counts. (Maus Depo. 104:24-108:17; Filing 246-11, Answers to Interrogatories, April 24, 2019, No. 2). As a result, Maus concluded there was no safe means by which Robinson could complete the over-the-road driving portion of Werner's placement driver program. Id.

58.    Maus confirmed Werner's decision not to hire Robinson "boiled down to the over-the-road instruction in the cab when he was driving," and her inability to ensure he could safely communicate with his trainer "when he was driving behind the wheel," and not on his ability to complete any other functions of the placement driver program. (Maus Depo. 109:20-110:20, 111:24-112:5, 119:23-120:15).

59.    Specifically, Maus testified as follows:

Q.    Am I correct in stating that the reason you decided not to hire Mr. Robinson is that you had not identified a way for Mr. Robinson to safely complete the over-the-road driving portion of Werner's student driver program?

A.    That is correct.

Q.    Okay. There was no other reason you decided not to hire Mr. Robinson?

A.    That was it.

Q.    Was there any qualification of the driver position that you believe Mr. Robinson didn't meet?

A.  No, it was strictly the accommodations for the over-the-road portion of our driving training program.

Q.  Was there any other part of Werner's student driver training program that you thought Mr. Robinson couldn't complete?

A.  No.

Q.  Was there any other part of being a driver for Werner besides the student driver training program that you thought Mr. Robinson couldn't complete?

A.  No, and all of that would be based on how he performed during a student training program.

(Maus Depo. 119:23-120:21).

**F.   Intervenor Andrew Deuschle**

60.   Deuschle is also a deaf driver who applied for a Hearing Exemption. (Desuchle Depo.12:11-12, 95:20-23).

61.   Like Robinson, no one from the FMCSA ever contacted Deuschle about his application before he received his FMCSA Hearing Exemption. (Desuchle Depo. 95:20-23).

62.   As part of the application process, Deuschle provided a copy of his driver's license and completed a form asking him to describe the safety impacts of the exemption and how he would ensure that he could achieve a level of safety equivalent to, or greater than, the level of safety that would be obtained by complying with the regulation. (Deuschle Depo. 95:7-19; Ex. 8, Deuschle FMCSA File, at p. 20). Curiously, however, Deuschle did not provide any information or substantive response to those questions, stating simply: "N/A." (Id.).

63.   Deuschle applied to Werner in 2015[3] and informed Werner that he had a Hearing Exemption. (Hollenbeck Depo. 213:1-6, 270:18-21; Maus Depo. 73:9-12, 96:24-97:3).

64.   When Deuschle applied to Werner in 2015, he had five months of driving experience with another trucking company. (Deuschle Depo. 55:21-23).

65.   However, Deuschle did not list any professional driving experience on his resume or applications. (Deuschle Depo. 65:21-66:5, 69:5-70:11 & Exhibits 2 & 3).

---

[3] Although Deuschle applied to Werner twice (first in October 2014 and again in March 2015), his claim in this lawsuit centers around his March 2015 application.

66. Because he was not ultimately hired and did not attend orientation, Deuschle did not ever complete the pre-2013 version of Werner's DOT-compliant application, which is generally completed at orientation. (Hollenbeck Depo. 84:22-85:14; see also Deuschle Depo. Ex. 2).

67. Because Deuschle had less than 6 months of commercial driving experience when he applied to Werner, he would have been required to complete Werner's placement driver program. (Hollenbeck Depo. 234:4-12; Maus Depo. 172:1-23; 98:2-15, 123:12-19).

68. Werner did not hire Deuschle for a number of reasons, including because Deuschle did not promptly respond to a Werner recruiter's inquiry regarding his application, so his assigned recruiter could not timely verify whether he had prior truck driving experience, and he did not provide Werner with a copy of his Hearing Exemption. (Filing 246-10, Answers to Interrogatories, No. 28, December 9, 2019; Hollenbeck Depo. 228:6-13).

69. However, even if the other disqualifying reasons had not been present, Werner would not have hired Deuschle for the same reason it did not hire Robinson: because Deuschle had limited experience, he would have been required to successfully complete the placement driver program, including the observed over-the-road driving portion, and Werner has not identified any means by which a totally deaf placement driver such as Deuschle could safely communicate with a trainer while driving without diverting their eyes from the road. (Id.; Maus Depo. 105:10-13).

G.   **Werner's Training Document regarding FMCSA Waiver Process**

70. In 2018, Werner's recruiting department created an internal training document for recruiters, describing procedures for handling applications from drivers who inform Werner that they have a Hearing Exemption or hearing issue. (Maus Depo. 213:21-214:1; Exhibit 11).

71. The training document directed recruiters to complete a phone application with the applicant and send the application to management, who would determine next steps. (Exhibit 11). The training document directed recruiters not to preapprove the application or complete a formal application update until management decided whether it would be feasible to move forward with the applicant, at which time the recruiter should

run background reports, verify work history, and send the application to a manager to complete the hiring process. (Id.).

72.     The purpose for involving management in the process for drivers with Hearing Exemptions is to ensure the applicant meets the hiring criteria and to discuss any necessary accommodations. (Maus Depo. 215:2-6).

73.     Werner stipulated as part of this litigation that it would not use that training document while this lawsuit is pending. (Filing 98 and 99).

74.     Werner has hired multiple experienced deaf drivers who have FMCSA Exemptions and the requisite experience to drive solo without completing the placement driver program, after concluding, based on an individualized assessment, that those individuals could safely perform the essential functions of the job. (Marsh Depo. 26:11-16, 28:11-12; 217:19-218:22, 219:5-7, 220:13-18; Marsh Depo. 64:13-65:9).


IV.     **SUMMARY OF THE ARGUMENT**

The EEOC filed these consolidated cases in July, 2018, and September, 2018, alleging that (1) Werner violated the ADA by declining to hire Deuschle and Robinson because they are deaf (Count I); and (2) Werner's pre-2013 application form contained an unlawful question (Count II). (Filing 1, Complaint; Filing 1, Case No. 8:18-cv-00462, Complaint). Deuschle later intervened and alleged that Werner failed to hire him in violation of the ADA. (Filing 17, Case No. 8:18-cv-00329, Complaint in Intervention, ¶¶33-37). In February 2020, the EEOC moved to amend its Complaint to add a claim that Werner violated the ADA by adopting a "facially discriminatory [hiring] policy" in 2018. (Filing 112, Amended Complaint).

Plaintiffs' claims of disability discrimination are entirely without merit because Werner's policies and applications are lawful, and the hiring decisions at issue in this lawsuit relied on guidance and information received from the FMCSA, the ATA, the NDOT, a benchmarking group of 12 motor carriers in the industry, and Robinson himself. (Maus Depo. pp. 16-36, 105:1-107:8).

Werner is entitled to summary judgment on the EEOC's Count I and Intervenor's claim because the undisputed evidence confirms Deuschle and Robinson do not meet the Hearing Standard. As a result, they are not "qualified individuals" under the ADA. In addition, the undisputed evidence submitted with this Motion confirms that Deuschle and

Robinson could not perform the essential function of safely completing Werner's driver training program by communicating contemporaneously while driving and there is no reasonable accommodation that would enable Deuschle and Robinson to communicate with their driver trainers while driving over-the-road, without diverting their eyes from the road. Moreover, Werner's training requirements are job-related and consistent with business necessity as a matter of law and Deuschle and Robinson would present a direct threat to safety if allowed to participate in the over-the-road driving portion of Werner's placement driver program.

With respect to Count II, summary judgment is proper because there is no genuine dispute that the application at issue in Count II was revised in 2013 to remove the allegedly unlawful inquiry. Because any alleged ADA violation occurred well beyond the statute of limitations and there is no danger that the issue may recur, injunctive relief is not appropriate.

Werner is also entitled to summary judgment on Count III because Werner's training document does not illegally classify applicants on the basis of disability, as Plaintiffs incorrectly allege. The training document, when viewed in light of the applicable FMCSRs and ADA regulations, is consistent with Werner's obligation to ensure that all drivers meet the FMCSR requirements and does not classify applicants due to a disability. For these reasons, further detailed below, the Court should grant Werner's motion for summary judgment.

## V.    ARGUMENT

### A.    Applicable Legal Standards.

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Garrison v. ConAgra Foods Packaged Foods, LLC, 833 F.3d 881, 884 (8th Cir. 2016). In deciding a motion for summary judgment, the facts must be "viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." Toulan-Zekpa v. Wal-Mart Stores, Inc., No. 8:17CV233, 2018 U.S. Dist. LEXIS 142284, at *7 (D. Neb. Aug. 21, 2018) (quoting Wagner v. Gallup, Inc., 788 F.3d 877, 882 (8th Cir. 2015)). However, the Court "is not required to accept unreasonable inferences or sheer speculation as fact." Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009) (quotation omitted).

16

Moreover, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the applicable law." Hammer v. City of Osage Beach, Mo., 318 F.3d 832, 837 (8th Cir. 2003). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" and summary judgment should be granted. Whitney v. Guys, Inc., 826 F.3d 1074, 1076 (8th Cir. 2016) (quotation omitted).

Werner is entitled to make its own judgment about necessary job qualifications under the ADA. Quick v. City of Fort Wayne, No. 1:15-CV-056 JD, 2016 U.S. Dist. LEXIS 131868, at *10 (N.D. Ind. Sep. 27, 2016) (internal citations omitted) (recognizing an employer is "permitted to determine the job responsibilities of its employees and [a court] will not 'second-guess that judgment so long as the employer's reasons are not pretextual.'"); Tate v. Farmland Indus., Inc., 268 F.3d 989, 993 (10th Cir. 2001) ("Provided that any necessary job specification is job-related, uniformly-enforced, and consistent with business necessity, the employer has the right to establish what a job is and what is required to perform it.").

**B.    Plaintiffs are not "qualified individuals" under the ADA as a matter of law because they do not meet the Hearing Standard.**

Because Plaintiffs were not "qualified individuals" under the ADA, they cannot establish their discrimination claims alleged in Count I and Intervenor's claim. A prerequisite to establishing a *prima facie* case of disability discrimination is to establish the applicant is a "qualified individual." 42 U.S.C. § 12112(a); Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537, 543 (8th Cir. 2018). In order to be a "qualified individual," an employee must (1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation. 29 C.F.R. § 1630.2 (defining qualified individual); McNeil v. Union Pac. R.R. Co., 936 F.3d 786, 789 (8th Cir. 2019) (to be qualified, the individual must be able to perform the essential functions of the position); 42 U.S.C. § 12111(8).

1.    Deuschle and Robinson are not "qualified individuals" because they do not meet the Hearing Standard.

It is undisputed that Deuschle and Robinson do not meet the Hearing Standard required of interstate drivers of CMVs under 49 C.F.R. § 391.41(b)(11). As a matter of law, their admitted inability to meet that standard precludes Plaintiffs from establishing that

Deuschle and Robinson are "qualified individuals" under the ADA and defeats Plaintiffs' claims. Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 571, 119 S. Ct. 2162 (1999), superseded by statute on other grounds ("*[W]e think it was error to read the regulations establishing the waiver program as modifying the content of the basic visual acuity standard in a way that disentitled an employer like Albertsons to insist on it.*") (emphasis added); see also Witchet v. Union Pac. R.R. Co., No. 8:18CV187, 2020 U.S. Dist. LEXIS 260843, at *18-19 (D. Neb. Feb. 21, 2020) (citing 42 U.S.C. § 12114(c)(5); Wyatt v. J.B. Hunt Transp., Inc., No. 4:08CV01501JMM, 2009 U.S. Dist. LEXIS 19944, at *3 (E.D. Ark. Mar. 12, 2009), aff'd, 366 F. App'x 718 (8th Cir. 2010) (unpublished per curiam) (under the ADA, an employer may "require a transportation industry employee to comply with standards established by DOT regulations").

"When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." Kirkingburg, 527 U.S. at 573-74 (citing S. Rep. No. 101-116, pp. 27-28 (1990)). In fact, the Senate Labor and Human Resources Committee Report on the ADA stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] '*must* be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability' under title I of this legislation." Id. at 573-74 (citing S. Rep. No. 101-116, pp. 27-28 (1990)) (emphasis added). Consistent with these authorities, Deuschle and Robinson are not qualified individuals because they do not meet the Hearing Standard.

> 2. The fact that Deuschle and Robinson obtained a Hearing Exemption does not establish that they are "qualified individuals" under the ADA.

Deuschle and Robinson are not "qualified individuals," merely by virtue of the fact that they have obtained a Hearing Exemption, as Plaintiffs will likely argue. To the contrary, in Kirkingburg, the Supreme Court concluded an employer did not violate the ADA by refusing to hire a driver who had an exemption from the FMCSA vision standard. 527 U.S. at 558. The Supreme Court noted that standard was "made binding on [the employer] by § 391.11," which prohibits a motor carrier from permitting a person to drive a CMV unless that person "'among other things, meet[s] the physical qualification standards set forth in § 391.41.'" Kirkingburg, 527 U.S. at 570. The Kirkingburg Court reasoned that

although the plaintiff had obtained an exemption from the standard, **"[t]he validity of these regulations is unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations**." Id. (emphasis added). As a result, the employer was entitled to insist than applicants satisfy the regulatory standard. Id. at 571.

The Kirkinburg Court also found it noteworthy that the FMCSA acknowledged, before issuing the vision waiver at issue in that case, that a study it commissioned had merely "illuminate[d] **the *lack of empirical data*** to establish a link between vision disorders ***and commercial motor vehicle safety***," and "failed to provide a sufficient foundation on which to propose a satisfactory vision standard for drivers of [CMVs] in interstate commerce.'" Kirkingburg, 527 U.S. at 575 (internal citations omitted) (emphasis added). Because the FMCSA had no evidentiary basis to support the waivers, the Kirkinburg Court reasoned there was "not only no change in the unconditional acuity standards, but no indication even that the FMCSA then had a basis in fact to believe anything more lenient would be consistent with public safety as a general matter." Kirkingburg, 527 U.S. at 576.

Here, as in Kirkingburg, the Hearing Standard remains in place, has the force of law, and contains no qualifying language about individual determinations. 49 C.F.R. § 391.41(b)(11). As a result, and as a matter of law, Plaintiffs cannot establish that Deuschle and Robinson were qualified individuals because it is undisputed that they do not meet the Hearing Standard. 49 C.F.R. § 391.11; Kirkingburg, 527 U.S. at 571 (the regulations establishing the exemption program did not modify the basic standards in a way that disentitled an employer to insist on it); see also id. at 580 (Thomas, J. concurring). Although Kirkingburg involved an exemption from the FMCSR vision standard, the Court specifically recognized that motor carriers are obligated by federal regulations to ensure that drivers meet ***all*** qualifications in 49 C.F.R. § 391.41, including vision and hearing standards. Kirkingburg, 527 U.S. at 570.

Moreover, in this case, as in Kirkinburg, the FMCSA had no evidentiary basis upon which to conclude that a more lenient hearing standard would be consistent with public safety as a general matter. See 78 FR 7479. To the contrary, before issuing the Hearing Exemptions, the FMCSA candidly acknowledged there were ***no studies*** addressing the relationship between hearing loss and crash risk among CMV drivers. 78 FR 7479 (citing

2008 Evidence Report) (emphasis added) (Exhibit 12, 2008 Evidence Report). While the FMCSA concluded studies of the "private driver license holder population" did not support a contention that individuals with hearing impairment are at increased risk for crash, the August 2008 Evidence Report–from which this conclusion was ostensibly derived– quantified the strength of this conclusion as only "minimally acceptable." (Ex. 12, 2008 Evidence Report, p. 3). More importantly, the Report concluded that "[w]hether hearing loss… is a risk factor for crash among CMV drivers **cannot be determined at the present time**." (Id. at p. 3) (emphasis added).

The FMCSA did not provide any explanation for why a "minimally acceptable" conclusion regarding private driver license holders was a sufficient basis for departing from the Hearing Standard for drivers of CMVs. The Hearing Standard was originally adopted to reflect the conclusion that "'drivers of modern, more complex vehicles' must be able to 'withstand the **increased physical and mental demands** that their occupation now imposes.'" 35 Fed. Reg. 6458 (April 22, 1970) (emphasis added). Although the FMCSA's predecessor agency "made a considered determination" about the physical requirements needed for safe operation of CMVs in interstate commerce, an "area [in which] the risks involved are so well known and so serious as to dictate the utmost caution" when it established the Hearing Standard, the FMCSA made no such "considered determination" when it departed from the Hearing Standard by relying solely on a study regarding operators of private vehicles. Kirkingburg, 527 U.S. at 573 (citing 35 Fed. Reg. 17419 (Nov. 13, 1970); 35 FR 17419 (Nov. 30, 1970) (refusing to alter most physical qualification standards in § 391.41 when faced with complaints that they were "unduly stringent").

Like the vision exemption in Kirkingburg, the regulatory record underlying the FMCSA Hearing Exemption program makes plain that the exemption program "did **not purport to modify the substantive content of the general [] regulation in any way**." Compare Kirkingburg, 527 U.S. at 576 (emphasis added) with 78 FR 7479, 7482 (declining to initiate the rulemaking process to modify the Hearing Standard). Rather, the FMCSA specifically acknowledged "**there could be potential consequences of a driver being hearing impaired and/or deaf while operating a CMV under some scenarios**," before concluding, with no further explanation and in direct contravention of the previous

statement, that "drivers covered by the exemptions do not pose a risk to public safety." 78 FR 7479 (emphasis added).

The evidentiary record supporting the Hearing Exemptions was functionally indistinguishable from the evidentiary record underlying the vision exemptions in Kirkingburg: ***there was none,*** and, therefore, "no indication that the [FMCSA] had a basis in fact to believe anything more lenient would be consistent with public safety as a general matter." Compare Kirkingburg, 527 U.S. at 575 with 78 FR 7479 & Ex. 12, 2008 Evidence Report (concluding that whether hearing loss is a risk factor for crash among CMV drivers could not be determined).

The FMCSA's flawed Hearing Exemption procedure is further confirmed by the lack of any meaningful review undertaken by the FMCSA before issuing Hearing Exemptions to Deuschle and Robinson. Before issuing an exemption, federal regulations dictate that the FMCSA **must** require the requesting party to provide an analysis of the safety impacts the requested exemption may cause and the specific countermeasures that individual would undertake to ensure an equivalent or greater level of safety than would be achieved absent the requested exemption. 49 U.S.C. § 31315(b)(5). However, the FMCSA **never** required such information from Robinson or Deuschle. (Robinson FMCSA File; Deuschle FMCSA File). Deuschle simply stated "N/A" in response to these questions and both Deuschle and Robinson were only required to provide basic contact information and their driver's license or driving record. (Robinson FMCSA File; Deuschle FMCSA File, p. 20). Despite the dearth of information provided regarding those critical safety questions, the FMCSA did not contact either Deuschle or Robinson for additional information before issuing their Hearing Exemptions. (Desuchle Depo. 95:20-23; Robinson Depo. 128:2-5, 12-15). As a matter of law, Deuschle and Robinson are not "qualified individuals" under the ADA merely by virtue of having obtained a Hearing Exemption from the FMCSA.

**C.      Plaintiffs' Count I also fails because Plaintiffs cannot perform the essential functions of the Placement Driver Position, with or without an accommodation.**

Although this Court need not reach the following issues with regard to Counts I of Plaintiffs' Complaints and Intervenor's claim because, as explained above, Plaintiffs cannot establish that Deuschle and Robinson are "qualified individuals," these claims also fail for additional reasons. Notwithstanding the fact that Werner has the right to require

that drivers meet all physical requirements of the FMCSRs, <u>Kirkingburg</u>, 527 U.S. at 571, Werner considered Deuschle's and Robinson's employment applications and assessed whether they could safely complete the essential functions of the Placement Driver Position, with or without an accommodation. As further detailed below, the undisputed evidence confirms, as a matter of law, that Deuschle and Robinson could not safely complete the essential functions of the job, with or without a reasonable accommodation.

    1.    <u>Successful completion of Werner's placement driver program is an essential function of the job for all new or inexperienced drivers</u>.

Werner considers the placement driver program an essential function because the program is necessary to its "Safety First" philosophy and to developing drivers "who are constantly aware of safety and who make safety their top value." (Handbook at 000102, 000284). 29 C.F.R. § 1630.2(n)(3). There can be no reasonable dispute that Werner regards successful completion of the placement driver program as an essential function of the job for new or inexperienced drivers. The term "essential functions" means "the fundamental job duties" of the employment position. 29 C.F.R. § 1630.2(n). Evidence of whether a particular function is essential includes, among other factors, the employer's judgment as to which functions are essential and the work experience of past incumbents in the job. 29 C.F.R. § 1630.2(n)(3). Of these, the "employer's judgment about an essential job function is considered highly probative." <u>Knutson v. Schwan's Home Serv., Inc.</u>, 711 F.3d 911, 914 (8th Cir. 2013); 42 U.S.C.S. § 12111(8). For this reason, an employer is generally "permitted to determine the job responsibilities of its employees and [a court] will not 'second-guess that judgment so long as the employer's reasons are not pretextual.'" <u>Quick v. City of Fort Wayne</u>, No. 1:15-CV-056 JD, 2016 U.S. Dist. LEXIS 131868, at *10 (N.D. Ind. Sep. 27, 2016) (internal citations omitted).

Federal courts have held that a preliminary training or certification constitutes an essential function under the ADA. <u>Quick</u>, 2016 U.S. Dist. LEXIS 131868, at *12 (preliminary academy training was an essential function for police officer); <u>Robert v. Carter</u>, 819 F. Supp. 2d 832, 845 (S.D. Ind. 2011) (TASER training was essential function for civil deputy process server); <u>Hennagir v. Utah Dep't of Corr.</u>, 587 F.3d 1255, 1259 & 1262-64 (10th Cir. 2009) (Peace Officer Standards and Training certification was essential function for physician's assistant); <u>see</u> <u>also</u> <u>Howard v. UPS</u>, 101 F. Supp. 3d 343, 354

(S.D.N.Y. 2015) (completion of a 6-day training course was a standing rule applicable to all applicants for the driver position).

In this case, it is undisputed that in 2015 and 2016, when Deuchle and Robinson applied to drive for Werner, Werner required *all* drivers with less than 6 months of experience with another motor carrier to complete Werner's placement driver program. (Maus Depo. 123:12-19; 172:20-173:5, 176:13-23; Hollenbeck Depo. 70:12-16, 80:15-81:2; Handbook at 000280-000294). Werner's job description specifically states that a driver must have previous experience unless the driver is applying as a student driver. (Ex. 10, Job Description). Successful completion of Werner's placement driver program through real-time communication over-the-road is also job-related and consistent with a business necessity, as explained in more detail below. 42 U.S.C. § 12112(b)(6); 42 U.S.C. § 12113(a).

To the extent Deuschle and Robinson argue they were already qualified to drive for Werner merely by virtue of holding a CDL, this argument fails because Werner is entitled to make its own judgment about necessary job qualifications. Quick, 2016 U.S. Dist. LEXIS 131868, at *10; Tate, 268 F.3d at 993. Indeed, the FMCSRs specifically authorize Werner to adopt "more stringent requirements relating to safety of operation and employee safety and health." 49 C.F.R. § 390.3(d). Consistent with that express directive, Werner acted well within its rights by requiring every driver with less than 6 months of verifiable experience to complete the placement driver program before operating a CMV as a solo driver in interstate traffic and other hazardous conditions. (Maus Depo. 123:12-19; 172:20-173:5, 176:13-23). See, e.g., Tate, 268 F.3d at 995 ("Subject to DOT's minimum standards, Defendant as the employer has the prerogative of determining what is physically required of its CMV operators.") (citing 49 C.F.R. § 390.3(d)). (See Job Description).

For these reasons, there is no genuine issue of fact and, as a matter of law, successful completion of the placement driver program is an essential function of the job for inexperienced drivers. 29 C.F.R. § 1630.2(n); see, e.g., Quick, 2016 U.S. Dist. LEXIS 131868, at *12 (N.D. Ind. Sep. 27, 2016) (training was an essential function).

2.  <u>Successful completion of Werner's placement driver program requires the ability to communicate contemporaneously with a driver trainer while safely operating a commercial motor vehicle.</u>

In order to safely complete the placement driver program, an essential function, a driver must be able to engage in real-time communication with a trainer while driving. (Handbook at 000283-000284; Maus Depo. 118:14-24, 190:12-16). The placement driver program provides new drivers with the essential tools to successfully transition into the transportation industry and enhance safe driving skills. (Handbook at 000283-000284). Consistent with these goals, during the observed over-the-road driving portion of that program, the placement driver receives instructions on subjects such as safety procedures and proper driving techniques in real time, as various driving events occur. (Maus Depo. 118:14-19). This instruction period allows trainers to help the student fine-tune safe driving practices. (Handbook at 000292-000293). In addition, contemporaneous communication is necessary because there are instances while a student is driving when "we have [a] split second [to] tell somebody what they need to do in order to make sure that the vehicle does not lose control." (Maus Depo. 190:12-16). Werner's determination that it is essential for a placement driver to receive directions and instruction from his or her trainer during the over-the-road driving portion of the placement driver program without taking his or her eyes off the road is well within its legal right and obligation to ensure the safety of the driver, the trainer, and the motoring public. 49 C.F.R. § 390.3(d).

3. <u>Robinson and Deuschle are not "qualified individuals" because they cannot perform the essential functions of the job due to their inability to communicate with their trainers while keeping their eyes on the road.</u>

Plaintiffs are unable to successfully complete the placement driver program because they cannot communicate with their trainers contemporaneously while driving over the road about the matters necessary for successful training without diverting their eyes from the road. <u>See</u> <u>Barnhart v. Wal-Mart Stores, Inc.</u>, 206 F. App'x 890, 892 (11th Cir. 2006) (deaf individual not qualified for loss prevention job that required two-way communication via walkie-talkies and intercoms while maintaining consistent eye visual contact with suspected shoplifter).

Although Werner expects placement drivers and their trainers to engage in real-time instruction and communication while encountering various driving scenarios, Plaintiffs primarily communicate through American Sign Language ("ASL"). (Maus Depo. 118:20-24; Deuschle Depo. 12:20-25; Robinson Depo. 20:21-21:6). Communicating through ASL

while driving would require Deuschle and Robinson to take their hands off the wheel to sign and/or divert their eyes from the road during the over-the-road portion of the training to read or interpret sign language or other non-verbal communications from their trainers. These forms of communication could create a distracted driving scenario that is contrary to the requirement that freight be transported and delivered in a "safe, timely and legal manner." (Robinson Depo. 129:22-130:5; Job Description).

Courts have recognized that an employee's ability to engage in contemporaneous communications without diverting his eyes from a necessary subject may be an essential function of the job. See, e.g., Barnhart, 206 F. App'x at 892. In Barnhart, the plaintiff applied for a Loss Prevention Associate position, which required him to identify and apprehend shoplifters by "maintain[ing] constant and consistent visual contact with the suspected shoplifter" while communicating with other Wal-Mart personnel via walkie-talkies and an intercom system. However, because the plaintiff was hearing-impaired, he could not communicate through walkie-talkies and the intercom system, as required by the position. The Barnhart court reasoned that the plaintiff was not qualified under the ADA because he was unable to perform the required two-way communication while maintaining constant visual contact with a suspected shoplifter. Barnhart, 206 F. App'x at 892. The court rejected the plaintiff's argument that he could engage in instantaneous communication through the reasonable accommodation of a "Sidekick" to send and receive messages because, according to the court, the use of the Sidekick to communicate would require the plaintiff to break his constant observation of the suspect and divert his attention to the screen of the Sidekick in order to type or read a message. Id.

Here, as in Barnhart, Deuschle and Robinson must be able to keep their eyes and attention on the road while receiving real-time instruction from their trainers, including instructions regarding unforeseen driving conditions. (Maus Depo. 118:14-24). Because there is no dispute that Deuschle and Robinson are unable to communicate with their driver trainers without diverting their attention from the road to read or interpret signs from their trainers, they cannot perform the essential function of completing the placement driver program and are, therefore, not "qualified individuals" as a matter of law.

4.    There are no reasonable accommodations that would enable Deuschle and Robinson to perform the essential functions of the job.

25

Although Plaintiffs have previously suggested Deuschle and Robinson could complete the placement driver program by communicating through hand gestures or visual images or by pulling over to the side of the road to communicate with their trainers, these accommodations are not reasonable as a matter of law because they would not enable Plaintiffs to safely complete the training program and they would require a fundamental alteration in the nature of the training program.

Although there is no precise test for what constitutes a reasonable accommodation, case law confirms "an accommodation is unreasonable if it either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) (internal quotation marks and citation omitted). Consistent with this case law, Plaintiffs' requested accommodations would require a fundamental alteration to the placement driver program because their proposed accommodations would prevent a trainer from providing instantaneous safety training as circumstances develop over-the-road.

Although Plaintiffs argue they can communicate through pre-determined short gestures or commands while driving over the road, those gestures do not effectuate the type of communication necessary during training to fine-tune safety habits. (Handbook at 000292). For example, although Plaintiffs' expert witnesses opine that a trainer could use pre-determined visual cues to provide basic instructions to trainees, a pre-determined visual cue cannot provide detailed instructions to a trainee based on the road conditions at hand (such as, for instance, how to navigate dangerous road conditions ahead or avoid an imminent potential jackknife scenario during an inclement weather situation) using only hand signals to guide an inexperienced driver who may have little or no prior experience operating a loaded commercial motor vehicle under those conditions. (Filing 246-4, Olds Report; Filing 246-6 Arndt Report). Because Plaintiffs' requested accommodations would remove the benefit of contemporaneous minute-by-minute training for inexperienced drivers, Plaintiff's requested accommodations would fundamentally alter Werner's safety training and impede Werner's ability to determine whether a new or inexperienced driver has the necessary skills to advance to a solo driver. (Maus Depo. 118:14-24; Handbook at 000294).

Moreover, Plaintiffs' only proposed solution for addressing an unforeseen emergency is for the trainer to instruct the driver to stop and pull over immediately. This is

untenable. Not only would continuously pulling over prevent necessary contemporaneous dialogue to address the emergency at hand, it is not always possible for the driver of a commercial motor vehicle to pull over, particularly if there is an imminent emergency in the roadway ahead, and there are numerous restrictions addressing when and where a CMV may pull over. (Filing 251-2, Adams Report, pp. 2-3). See, e.g., Neb. Rev. Stat. § 60-6,164(2) (prohibiting a person from stopping or parking on a shoulder unless directed by a peace officer, the vehicle is disabled, or the driver is ill or incapacitated).

To the extent Plaintiffs suggest they should not have been required to complete the placement driver program at all, this argument has repeatedly been rejected. The Eighth Circuit has confirmed that "an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job." Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 916 (8th Cir. 2013) (citing EEOC v. Convergys, 491 F.3d 790, 795, 796 (8th Cir. 2007)).

Plaintiffs have not identified any accommodation that would have allowed Deuschle and Robinson to communicate with their driver trainers while traveling over the road, without diverting their eyes from the road. In the absence of any workable accommodations, Werner was not required to experiment–and thereby risk catastrophic harm–by allowing Deuschle and Robinson to try to safely complete the placement driver program. See, e.g., E.E.O.C v. Stoughton Trailers, LLC, No. 08-CV-748, 2010 WL 2572813, at *12 (W.D. Wis. June 23, 2010) ("Given the hazards that existed… and the substantial harm that could have resulted from a failure to hear a warning signal, [Defendant] cannot be faulted for deciding not to 'try and see' if there was set of accommodations that would allow [Plaintiff] to work safely"); Peters v. City of Mauston, 311 F.3d 835, 846 (7th Cir. 2002) ("[T]he City need not incur additional liability to 'try and see' whether Peters can handle the job despite his permanent lifting restrictions."); see also Witchet, 2020 U.S. Dist. LEXIS 260843, at *25 (granting summary judgment in favor of employer in ADA claim because allowing the plaintiff to continue driving "could expose [the employer] to a risk of liability that it is unwilling to take, and could expose the public to a risk of injury. Though the risk may be small, the consequences are severe").

> 5.   Plaintiffs' requested accommodations would present a direct threat while driving over the road.

The accommodations proposed by Plaintiffs are also unreasonable because Deuschle and Robinson would pose a direct threat while operating a CMV during the observed over-the-road driving portion of Werner's placement driver program. If a plaintiff would pose a "direct threat" to himself or others by serving in a position, he is not a qualified individual. See 42 U.S.C. § 12111(3) (defining "direct threat" as a "significant risk to [] health or safety" that cannot be eliminated by reasonable accommodation); Echazabal, 536 U.S. at 78-79 (citing 29 C.F.R. §1630.15(b)(2)).

An employer's determination that an employee would pose a direct threat must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job and rely on the most current medical knowledge and/or on the best available objective evidence. The factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2; Donahue v. CONRAIL, 224 F.3d 226, 231 (3d Cir. 2000) (if an employee threatens grievous harm, then even a small risk thereof may be considered "significant").

Consistent with that authority, Maus conducted a thorough safety analysis and communicated with the FMCSA, NDOT, ATA, a benchmarking group of 12 motor carriers, and Robinson himself in order to identify some means by which to safely train Robinson during the over-the-road portion of the placement driver program. (Maus Depo. pp. 16-36, 104-105). Maus was aware of the Hearing Standard, which remained in place and had the force of law and she also learned there were no studies suggesting deaf drivers could be safely trained while operating CMVs on public roadways. (Id.). Based on the information she obtained through that investigation, Maus determined Robinson could not engage in necessary contemporaneous communications regarding driving conditions, including unforeseen emergency situations, without diverting his attention from the road. That risk would always be present during the observed, over-the-road portion of the program and creates a threat of significant harm to Robinson, his trainer, and the motoring public.

Although Plaintiffs may argue the likelihood of a sudden accident or emergency at any given moment is minimal, the potential for catastrophic loss if such an event occurred

while Deuschle and Robinson were operating a CMV with a loaded weight of 80,000 pounds provides ample support for Werner's hiring decision. <u>Anderson v. Norfolk S. Ry. Co.</u>, No. 21-1735, 2022 U.S. App. LEXIS 9604, at *9 (3d Cir. Apr. 11, 2022) (internal citation omitted); <u>see</u> <u>also</u> <u>Schneider,</u> 481 F.3d at 510 ("No doubt the risk that a person afflicted with [a syncope-causing disorder] will faint while driving [a truck] is small . . . . ***But [the employer] is entitled to determine how much risk is too great for it to be willing to take***.") (emphasis added). There can be no genuine dispute that the work of a commercial driver, which includes hauling tens of thousands of pounds of freight at highway speeds on public roadways, entails a significant risk of severe harm. <u>See</u> <u>Witchet</u>, 2020 U.S. Dist. LEXIS 260843, at *25 (recognizing the "magnitude of the risk and the severity of the harm" posed in the event of a sudden incapacitation of a CMV driver). (Maus Depo. 108:3-9). Moreover, even in the case of a driver who has gone long periods of time without experiencing a sudden emergency, the risk is "imminent" at all times because it remains possible that an emergency can occur at any moment. <u>Anderson</u>, 2022 U.S. App. LEXIS 9604, at *9; <u>Chandler v. City of Dallas</u>, 2 F.3d 1385, 1395 (5th Cir. 1993) (a driver with insulin dependent diabetes or with vision "that is impaired to the extent discussed in 49 C.F.R. § 391.41 presents a genuine substantial risk that he or she could be injured or could injure others").

Although Plaintiffs have repeatedly discounted Werner's safety concerns, other courts have recognized that an employer's concern regarding an employee's inability to safely operate a vehicle is a valid and non-discriminatory reason for declining to hire that individual. <u>Witchet</u>, 2020 U.S. Dist. LEXIS 260843, at *25 (granting summary judgment in favor of employer in ADA claim because allowing the plaintiff to continue driving "could expose [the employer] to a risk of liability that it is unwilling to take, and could expose the public to a risk of injury"); <u>Anderson</u>, 2022 U.S. App. LEXIS 9604, at *9; <u>Chandler</u> 2 F.3d at 1395. Not only does Deuschle's and Robinson's inability to safely communicate with their trainers potentially endanger them, their trainers, and the public, but Werner would be exposed to substantial and increased liability as a result. Indeed, as the Fifth Circuit noted, "[w]oe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident." <u>Chandler</u>, 2 F.3d at 1395 (citing <u>Collier v. City of Dallas</u>, 798 F.2d 1410, slip op. at 3 (5th Cir. 1986) (unpublished)); <u>see</u> <u>also</u> <u>Witchet</u>, 2020 U.S. Dist. LEXIS 260843, at *29; <u>Schneider</u>, 481

F.3d at 510 (internal citation omitted) (that another employer is willing to assume a risk does not compel the current employer to do likewise). Consistent with this case law, Werner did not violate the ADA by refusing to hire Deuschle and Robinson because Deuschle and Robinson would pose a direct threat while driving in the placement driver program. The Court should grant summary judgment to Werner on Plaintiffs' Counts I and Intervener's Count II.

**D.     Successful completion of Werner's placement driver program is also job-related and consistent with a business necessity.**

In addition to being an essential function of the truck driver position for inexperienced drivers, successful completion of Werner's placement driver program through real-time communication over-the-road is also job-related and consistent with a business necessity. 42 U.S.C. § 12112(b)(6); 42 U.S.C. § 12113(a). An employer may apply "qualification standards" for a position so long as those standards are "job-related and consistent with business necessity." 42 U.S.C. § 12113(a). An employer may also assert a defense to a claim of discrimination by showing its qualification standard, test, or other selection criteria is job-related for the position in question and is consistent with business necessity; and that satisfaction of its qualification standard, test, or other selection criteria cannot be accomplished by reasonable accommodation. See 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b), (c).

Here, Werner's requirement that inexperienced drivers complete a training program, including through communicating with their trainer without taking their eyes off the road, is job-related for the position of a truck driver and consistent with Werner's business necessity of ensuring the safety of its driver, trainers, and motoring public. EEOC v. J.B. Hunt Transp., Inc., 128 F. Supp.2d 117, 131 (N.D.N.Y. 2001); 42 U.S.C. § 12112(b)(6); 42 U.S.C. § 12113(a). It is also specifically authorized by the FMCSRs. 49 C.F.R. § 390.3(d). In J.B. Hunt, the court concluded a motor carrier did not violate the ADA by refusing to hire applicants who were taking medications on the motor carrier's Drug Review List, a list that identified the drugs prohibited by the motor carrier for safety reasons. In so holding, the court explained:

> There is no evidence to suggest that the [Drug Review List] was used by Hunt as anything other than a mechanism to screen applicants according to its own 'more stringent' safety criteria. The ADA merely prohibits use of employment qualification standards or other selection criteria which screen

> out 'an individual with a disability or a class of individuals with disabilities unless the standard test, or other selection criteria ... is shown to be job-related for the position in question and is consistent with business necessity.' 42 U.S.C. § 12112(b)(6). Indeed, the ADA provides that it 'may be a defense to a charge of discrimination' that a qualification standard is job-related and consistent with business necessity. No one could seriously dispute that a policy of screening applicants who will potentially operate vehicles weighing 80,000 pounds for use of medications which may impair his or her ability to drive is 'job-related.'

J. B. Hunt, 128 F. Supp. 2d at 131.

Consistent with that case law, no one can seriously dispute that requiring inexperienced drivers to complete training designed to enhance safe driving skills before "operat[ing] vehicles weighing 80,000 pounds" solo on public highways is job-related and consistent with Werner's business necessities as an interstate motor carrier. See J. B. Hunt, 128 F. Supp. 2d at 131. Because all drivers must transport and deliver freight in a safe and legal manner, Werner requires inexperienced drivers to complete additional training, over and above the training provided in CDL school, to ensure they have sufficient experience in all driving conditions before they are tasked with operating a CMV alone on public roadways. (Job Description; Maus Depo. 123:12-19). As a matter of law, successful completion of Werner's placement driver program is job-related and consistent with business necessity. See 42 U.S.C. § 12112(b)(6) & 12113(a); 49 C.F.R. § 390.3(d). For the reasons stated above, there is no reasonable accommodation that would enable Deuschle and Robinson to safely complete that program. Accordingly, Werner is entitled to summary judgment on Plaintiffs' Count I and Intervenor's Count II because Werner's placement driver program is job-related and consistent with business necessity and the undisputed evidence confirms Deuschle and Robinson were unable to safely complete that program, with or without reasonable accommodations.

**E.**     **Plaintiffs' Count II is time-barred because the allegedly unlawful inquiry was removed from Werner's application form in 2013, and there is no threat of recurrence as required to justify injunctive relief.**

In its Count II, Plaintiff EEOC claims Werner's pre-2013 application form contained an impermissible "disability-related question," in alleged violation of 42 U.S.C. § 12112(d) by asking "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" (Filing 112, ¶¶38-

31

39). This claim fails as a matter of law because Werner removed that question from its application in 2013, well outside the statute of limitations period.

Under the ADA, an administrative charge must be filed with a federal, state, or local agency within 300 days after the alleged unlawful practice occurred. 42 U.S.C.§ 2000e-5(e)(1). Here, Werner revised its application form to remove the allegedly unlawful inquiry in 2013. (Hollenbeck Depo. 300:1-5, 304:5-8; Ex. 4, at No. 24). Deuschle filed his Charge in 2015, more than 300 days after the application form was revised. (Ex. 14, Deuschle Charge). Robinson filed his Charge in 2016, also beyond the 300-day statute of limitations. (Ex. 13, Robinson Charge). Moreover, neither Deuschle nor Robinson completed the pre-2013 application form, so they cannot show the requisite "tangible injury" required to establish a claim under §12112(d). Higgins v. Union Pac. R.R. Co., 303 F. Supp. 3d 945, 962 (D. Neb. 2018) (internal citation omitted); Griffin v. Steeltek, 160 F.3d 591, 595 (10th Cir. 1998).

Although the EEOC seeks injunctive relief on this claim, the EEOC is well aware that Werner removed the disputed question from its application before this litigation was filed. (Hollenbeck Depo. 304:11-17; Ex. 4, at No. 24). Werner inadvertently provided a copy of the pre-2013 application to the EEOC during its investigation because Werner's former Director of Compliance mistakenly grabbed a pre-2013 application form when assisting in-house counsel with the response. (Hollenbeck Depo. 301:3-15, 307:22-308:7). When Werner discovered that mistake, it ensured the pre-2013 form would not accidentally be used or distributed again by removing all copies of the pre-2013 application from its office and warehouse and instructing driving schools to destroy those applications. (Hollenbeck Depo. 301:16-302:11, 307:9-308:24; Ex. 4, at No. 24). In light of these undisputed facts, the EEOC cannot show the requisite "cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive," as necessary to justify injunctive relief. United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations."); Adler v. I & M Rail Link, LLC, 13 F. Supp. 2d 912, 936 (N.D. Iowa 1998) (denying injunctive relief where the plaintiff "alleged only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future."). This Court should decline the EEOC's request for injunctive relief pertaining to an application form

32

that was revised 9 years ago because the claim is time-barred and, as a matter of law, the EEOC cannot meet the standard for injunctive relief.

    **F.**    **Werner's training document for processing applications from FMCSA Exemption Holders did not violate the ADA.**

Werner is also entitled to summary judgment on the EEOC's Count III, regarding an old training document for recruiters which the EEOC contends is a "facial" violation of the ADA. There is no genuine issue of fact regarding Count III because the language of the training document is undisputed. Moreover, as a matter of law, Werner's guideline was lawful. Although the ADA prohibits employers from "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee ***because of the disability*** of such applicant or employee," the training document at issue does not unlawfully classify applicants because of their disability. 42 U.S.C. § 12112(b)(1) (emphasis added). (Exhibit 11).

As an initial matter, Plaintiffs allege Werner's training document "illegally "classif[ies]" job applicants because of disability or perceived disability," in ***facial*** violation of 42 U.S.C. § 12112 (b)(1). (Filing 112, Amended Complaint, ¶45) (emphasis added). To determine whether the training document amounts to a "facial" violation of 42 U.S.C. § 12112(b)(1), the Court only needs to examine the document and the relevant law. EEOC v. UPS Ground Freight, Inc., 344 F. Supp. 3d 1256, 1266 (D. Kan. 2018) (looking to agreement's terms to determine if it was facially discriminatory); Bowers v. NCAA, 563 F. Supp. 2d 508, 517 (D.N.J. 2008) (concluding Bylaws were not facially neutral by reviewing the Bylaws).

The language of the training document, when read in concert with the FMCSRs and ADA, does not "illegally classify" job applicants in a way that adversely affects their employment opportunities, as the EEOC incorrectly alleges. The training document merely stated that recruiters should send applications to a manager when the recruiter "becomes aware of a waiver- or a hearing issue," because those issues indicate an applicant does not meet the basic FMCSR requirements. See 49 C.F.R. § 391.41(b)(11) (hearing standard); 49 C.F.R. § 391.11(b)(2) (English language requirement). Werner is ***required*** by federal law to confirm that all drivers of CMVs from permitting a person to drive a CMV unless they are qualified to drive by, among other things, meeting all physical qualification standards in 49 C.F.R. § 391.41. See 49 C.F.R. § 391.11. Accordingly, Werner ***must***

confirm that every applicant meets those standards or has a valid exemption before that individual can be hired to operate a CMV, and Werner must also, where appropriate, assess whether a reasonable accommodation would enable the applicant to perform all essential job functions. See 49 C.F.R. § 391.11.

When Congress enacted the ADA, "it recognized that federal safety rules would limit application of the ADA as a matter of law." Kirkingburg, 527 U.S. at 573. Moreover, the Senate Labor and Human Resources Committee Report on the ADA specifically stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] '*must* **be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability' under title I of this legislation.**'" Kirkingburg, 527 U.S. at 573-74 (citing S. Rep. No. 101-116, pp. 27-28 (1990)) (emphasis added); see also 49 CFR § 391.11. Notably, the ADA recognizes a defense to liability where "a challenged action is required or necessitated by another Federal law or regulation," 29 CFR § 1630.15(e).

Here, although Werner's training document directed recruiters to send applications from individuals with an exemption to a manager for review, that procedure did not adversely affect the applicant's opportunities or status "because of the applicant's disability," as Plaintiffs incorrectly argue. Werner's request for manager review was made ***because of the driver qualification standards in the FMCSRs***, which Werner is obligated by law to ensure are met by all drivers. See 49 CFR § 391.11; 49 C.F.R. § 391.41(b)(11); 49 C.F.R. § 391.11(b)(2). (Hollenbeck Depo. 176:6-15; Maus Depo. 214:22-215:6). The procedure in the training document was, therefore, precisely the type of action "required or necessitated by another Federal law or regulation," which Congress deemed permissible when it enacted the ADA. 29 CFR § 1630.15(e); 49 CFR § 391.11; Kirkingburg, 527 U.S. at 573 (recognizing the federal safety rules "limit application of the ADA as a matter of law").

The EEOC's position in Count III is also inherently contradictory to the position Deuschle and Robinson took when they requested an exemption from the Hearing Standard. By requesting an exemption, Plaintiffs asked the FMCSA to treat them differently than other drivers by relaxing the basic standards of the FMCSRs for them. At the same time, in Count III, the EEOC argues Werner was precluded by law from treating Deuschle and Robinson any differently when it processed their applications, despite the

34

undisputed evidence that their qualifications differed from those of applicants who meet all basic FMCSR standards. The law does not support the EEOC's contradictory position that, on the one hand, Deuschle and Robinson should receive special treatment from the FMCSA in the form of an exemption from the basic Hearing Standard, while, on the other hand, Werner may not review their applications any differently than it would review the application of a driver who indisputably meets all FMCSR physical qualifications. Plaintiffs' position is flatly contrary to the FMCSRs, which Congress acknowledged would result in "limitations on the application of the ADA." Kirkingburg, 527 U.S. at 573. The Court should grant summary judgment for Werner on the EEOC's Count III because Werner's training document does not unlawfully classify job applications in a way that adversely affects the applicants' opportunities because of a disability, and Werner is required by federal law to ensure that applicants meet all FMCSR requirements.

## VI.  CONCLUSION

For these reasons, Werner requests an order granting summary judgment in its favor on all claims in the Complaints filed by Plaintiff EEOC and Intervenor Andrew Deuschle.

WERNER ENTERPRISES, INC. and
DRIVERS MANAGEMENT, LLC,
Defendants.

BY:  */s/ Elizabeth A. Culhane*
Patrick J. Barrett, #17246
Elizabeth A. Culhane, #23632
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663
(402) 341-6000
pbarrett@fraserstryker.com
eculhane@fraserstryker.com
ATTORNEYS FOR WERNER
ENTERPRISES, INC. and DRIVERS
MANAGEMENT, LLC

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the word limit in NECIVR 7.1 because it contains 12,984 words. The undersigned further certifies that the word-count function of Microsoft Word was applied to include all text, including the caption, headings, footnotes, and quotations.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was electronically filed, using the CM/ECF system, on this 23rd day of September 2022, which system sent notification of all parties' counsel of record.

/s/ Elizabeth A. Culhane

2447707v5