**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>WERNER ENTERPRISES, INC.,<br><br>               Defendant;<br>and<br><br>ANDREW DEUSCHLE,<br><br>               Plaintiff Intervenor,<br><br>   v.<br><br>WERNER ENTERPRISES, INC.,<br><br>               Defendant. | **CASE NO: 8:18-CV-329** |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

## I.     Introduction

Andrew Deuschle is deaf. He attended truck driving school in August and September of 2014, and he received his CDL (commercial driver's license) at the end of his schooling. To receive a CDL as a deaf driver, Deuschle had to apply and be approved for an exemption from the standard hearing requirements, under the hearing-exemption program operated by the U.S. Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA). Deuschle received the exemption, and he otherwise satisfied all the same requirements for a CDL as hearing drivers.

1

After completing truck driver training school, Deuschle applied for a truck-driver position with a major trucking company, C.R. England. After satisfactorily completing its training curriculum and working for C.R. England for several months, he applied for a position at Werner Enterprises, Inc., in order to make more money.

Werner rejected Deuschle. It has given shifting explanations over time, but it now claims it did so because he delayed in giving information about his prior truck-driving employment, and Werner could not confirm that he had an FMCSA hearing exemption permitting him to drive. There is no contemporaneous evidence supporting that, and in fact the evidence is directly to the contrary.

Regardless, Werner also contends that even if there were no paperwork issues, it still would not have hired Deuschle, for one reason – it claims deaf drivers cannot safely complete the over-the-road portion of Werner's new-driver training. Werner is wrong. Deuschle successfully completed over-the-road training while earning his CDL. And other trucking companies routinely train deaf drivers in their new-driver training programs, which Deuschle completed both before his application to Werner (at C.R. England), and subsequently at Crete trucking. He worked for Crete for a couple years, and subsequently for other trucking companies, and was, at all times, a successful employee.

The fact is that multiple accommodation options can be, and are, regularly used in the industry to safely and effectively accommodate deaf drivers in the over-the-road portion of new-hire training. Defendant's position also conflicts with the Department of Transportation's grant of hearing exemptions for qualified deaf drivers.

Thus, a central issue is whether Deuschle could have performed the essential functions of the job with or without reasonable accommodation. Defendant admits Deuschle is disabled under

the ADA. Even then, the only essential function that Defendant has ever said that Deuschle could not perform is the behind-the-wheel portion of Defendant's new-driver training.

Pursuant to Fed. R. Civ. P. 56(a) and (g), and NECivR 56.1, Plaintiffs seek partial summary judgment, including an order that Plaintiffs have established as a matter of law that Deuschle was disabled within the meaning of the ADA, that he was qualified to perform the job he sought with or without an accommodation, and that Defendant subjected him to an adverse action. Plaintiffs also seek summary judgment dismissing Defendant's affirmative defenses of direct threat, business necessity, and undue hardship, and conditions precedent.

## II.    Statement of Undisputed Material Facts

Pursuant to Fed. R. Civ. P. 56 and NECivR 56.1(a), Plaintiffs as Movants submit the following Statement of Undisputed Material Facts ("SOUMF"), about which Plaintiffs contend there is no genuine issue to be tried.

**Andrew Deuschle's Disability**

1.    Plaintiff-Intervenor Andrew Deuschle has been deaf since infancy. Deposition of Andrew Deuschle (Ex. 2), 12:11–16.

2.    At the time that Deuschle applied for the truck-driver position at Werner, he had a disability as defined by the ADA. Joint Stipulation, ECF No. 241, Cases: 8:18-cv-00329-JMG-SMB and 8:18-cv-00462-JMG-SMB (Sept. 22, 2022), accepted by Text Order.

3.    At the time of his application, Deuschle had graduated from a Werner-approved driving school. Deposition of Scott Hollenbeck (Ex. 3), 57:18–23; Deposition of Dale Hunt (Ex. 4) 28:10–19; Ex. 2 19:2–9; Emails, Werner 000064 (Ex. 5).

4.      At the time of his application, Deuschle had a valid CDL. Declaration of Andrew

Deuschle (Ex. 6) at ¶6; Deuschle CDL, Werner 000333 (Ex. 7).

**Deuschle's Hearing Exemption and CDL School**

5.      Deuschle sought a FMCSA hearing exemption in 2014 so that he could attend

Amarillo College Truck Driving Academy. Ex. 6 at ¶7.

6.      The FMCSA hearing exemption was granted to Deuschle on or about June 27, 2014.

*Id.* at ¶7.

7.      Deuschle's FMCSA hearing exemption was valid at the time of his application for a

job at Werner. *Id.*

8.      Deuschle attended truck driving school at Amarillo College's Truck Driving

Academy ("Amarillo College") from August 25 to September 29, 2014. *Id*. at ¶4.

9.      Amarillo College was a Werner-approved school where at all relevant times Werner

recruited drivers. Ex. 3 at 255:25–256:1; Deposition of Donny Gibbs (Ex. 8), 28:14–

16.

10.     Part of Deuschle's schooling in Amarillo included driving over the road with trainers

observing. Ex. 2 at 24:23–25.

11.     While at Amarillo College and before obtaining his commercial driver's license,

Deuschle drove between 90 and 100 hours over the road with a trainer in the cab with

him. Ex. 6 at ¶4.

12.     The Amarillo College trainer and Dueschle communicated well through simple hand

gestures, and no safety incidents occurred involving Deuschle. *Id.* at ¶5.

13.     The way Deuschle communicated with his Amarillo College trainer while driving over the road during training school did not distract me from driving or otherwise cause me to drive in an unsafe way. *Id.*

14.     Deuschle received his Commercial Driver's License ("CDL") from the state of Texas in September 2014. *Id.* at ¶6.

15.     Deuschle and his instructor would also communicate plans ahead of getting in the truck. Ex. 2 at 27:10–19.

16.     At Amarillo College, sign-language interpreters would sometimes ride along. *Id.* at 24:7–9.

17.     If Deuschle had more complex questions, those would be addressed with the interpreter once stopped. *Id.* at 28:12–18.

**Deuschle's Employment at C.R. England before Werner**

18.     C.R. England trucking company hired Deuschle as a truck-driver in October 2014. *Id.* at 54:10–12.

19.     Deuschle completed C.R. England's driver-training program. Ex. 2 at 55:3–5.

20.     As part of the C.R. England training program, Deuschle had to drive with a trainer for several weeks before driving on his own or in a team. *Id.* at 56:2–5.

21.     During training and while Deuschle was driving, the C.R. England trainer would communicate using simple gestures or hand signs. *Id.* at 58:8–11.

22.     Deuschle successfully completed the over-the-road training with C.R. England and began driving as a team driver for C.R. England. *Id.* at 59:6–9.

23.     C.R. England is part of the safety benchmarking group that Werner participates in. Deposition of Jaime Maus (Ex. 9), 22:24–23:4, 23:12–15.

5

24.  Deuschle worked for C.R. England trucking company beginning in November of 2014. Ex. 2 at 54:9–12; Driver Certification Card, Werner 000052 (Ex. 10).

25.  Deuschle left C.R. England in March of 2015. Ex. 2 at 62:4–8.

26.  Deuschle left C.R. England because he was seeking more money. *Id.* at 61:25–62:3.

27.  Before Deuschle applied to Werner, while going through new-driver training with C.R. England, he communicated well with his trainer during the over-the-road portion of the training. Ex. 6 at ¶11.

28.  After Deuschle was hired by C.R. England in October 2014, he went through roughly three weeks of over-the-road training. *Id.*

29.  Deuschle communicated with his C.R. England trainer using hand gestures, and the communication did not distract him from driving or otherwise cause him to drive in an unsafe way. *Id.*

**Deuschle's 2015 Application at Werner and Qualifications**

30.  Deuschle applied for a co-driver position at Werner, which required at least 30 days, but less than 6 months, of prior truck-driving experience with another carrier. Ex. 3 at 66:10–67:4.

31.  Deuschle applied to Werner Enterprises, Inc., on or about March 30, 2015. Ex. 6 at ¶2.

32.  At the time of his application with Werner, Deuschle informed Werner that he had more than 30 days, but less than 6 months, of prior truck-driving experience with another carrier, C.R. England. Ex. 5.

33.  Deuschle provided information about his past truck-driving experience on the same day that the Werner recruiter asked about it. *Id.*

6

34.    Werner routinely used a service to run employment history reports to confirm prior work history. Ex. 3 at 144:24–145:5; 159:20–160:9; 166:21–167:12.

35.    Werner never relied solely on input from the applicant about past employment. *Id.* 160:21–161:16.

36.    Deuschle was required to have a CDL and DOT Medical Card for the C.R. England job, both of which he had. Ex. 10; Medical Exam Certificate, Werner 000053 (Ex. 11).

37.    Deueschle had also been approved for the FMCA's "hearing exemption." Ex. 6 at ¶7; FMSCA Hearing Exemption Letter, Werner 000057 (Ex. 12).

38.    By published notices in the Federal Register, Plaintiff-Intervenor Andrew Deuschle was repeatedly approved by name for the FMCSA hearing exemption. 79 Fed. Reg. 29496 (May 22, 2014); 80 Fed, Reg. 22768 (Apr. 23, 2015); 81 Fed. Reg. 50593 (Aug. 1, 2016); 83 Fed. Reg. 34648 (July 20, 2018).

39.    Werner's Vice President for Safety and Compliance and Terminal Management is Jamie Maus and she had held that position since 2013. Ex. 9 at 53:8–12; 55:8–10.

40.    Ms. Maus became aware of the FMCSA's hearing exemption program when it was first issued. *Id.* at 38:12–15.

41.    Ms. Maus was also aware that hearing exemption holders were listed in the Federal Register. *Id.* at 38:25–39:4.

42.    Ms. Maus receives the Federal Register publication every day. *Id.* 38:19–22.

43.    Most of Werner's safety department also receives team the Federal Register daily. Ex. 9 at 39:5–7.

44.  When Deuschle applied to work for Werner, he told the Werner recruiter about his exemption. Preapproval, Werner 000049 (Ex. 13), Email from Deuschle to Gibbs, Werner 000061 (Ex. 14).

45.  Deuschle provided Werner with Werner 000057, which provides written confirmation from the DOT of his hearing exemption. Ex. 12.

46.  Werner "preapproved" Deuschle's application. Ex. 3 at 213:24–214:7; Deposition of Chad Rivedal (Ex. 15), 39:11–21; Deposition of Ben Pile (Ex. 16 – CONFIDENTIAL), 76:2–8; Application preapproval, Werner 000393 (Ex. 17); Audit trail, Werner 008353 (Ex. 18).

47.  Werner preapproved Deuschle as either an "experienced" driver or as an "advanced placement" driver (aka "co-driver"). Ex. 16 76:10–77:6.

48.  Preapproval meant that the application appeared to meet Werner's hiring minimum hiring guidelines regarding driving record, accidents, drug and alcohol test results, DUIs, graduation from an approved school, acceptable references, the number of moving violations in the last five years, license suspensions, previous employer and reasons for leaving, and criminal convictions. Ex. 3 at 118:8–119:1; 120:25–121:8. *See also* Deposition of Morgan Baker-Maloy (Ex. 19), 42:25–43:6; Ex. 4 at 92:5–13.

49.  Deuschle had already met the DOT's medical and safety requirements and he had a valid DOT medical certificate signed off on by C.R. England. Exs. 10 and 11.

50.  Deuschle had also passed all medical, background, driving record, and drug and alcohol screens to work at C.R. England. Ex. 6 at ¶¶16–18.

51.  Deuschle confirmed to Werner that he had a clean driving and safety record. Ex. 5.

52.  When Deuschle applied to Werner in March 2015, he had almost 5 months of over-the-road driving experience as a co-driver with C.R. England, from November 2014 to February 2015. Ex. 6 at ¶8.

53.  Deuschle was notified that his application had been preapproved over the phone—through Video Relay, a free service for Deaf people—by Werner recruiter Donny Gibbs. *Id.* at ¶9.

54.  Throughout Deuschle's employment at C.R. England, Crete Carrier, and RUAN, he never had a single safety incident. *Id.* at ¶10.

55.  Deuschle has never had his driver's license or CDL revoked. *Id.*

**Deuschle's Physical and Professional Capabilities at the Time of His Werner Application**

56.  The job description in Werner 000041 was applicable to the Werner position that Deuschle sought, Ex. 3 at 128:18–129:11; Ex. 9 at 128:22–129:9, except that the one-year requirement under "Qualifications" had changed to six months for solo driver, and 30 days for co-driver. Ex. 3 at 129:15–130:18.

57.  Werner's job description for the Werner position that Deuschle sought makes no mention of its new-driver training program, over-the-road training, or oral communication between student and trainer. Job Description, Werner 000041 (Ex. 20).

58.  Werner's job description listed six "Major Duties": (1) Transport and deliver freight over long distances in a safe, efficient, timely and legal manner; (2) Hook and unhook trailers; secure freight; install and remove tire chains as required by weather, tarp and un-tarp freight if operating flatbeds; (3) Load and unload trailers and perform frequent lifting, pulling, pushing and carrying freight; (4) Complete all necessary

paperwork and maintain records required under State and Federal laws and regulations; (5) Ensure that all operations are in compliance with State and Federal laws and Regulations; and (6) Represent the Company and Trucking Industry in a professional manner. *Id.*

59.    At the time Werner rejected Deuschle's application, he could transport and deliver freight over the road over long distances in a safe, efficient, timely, and legal manner. Before his 2015 application to Werner, he transported and delivered freight for C.R. England for almost 5 months. After his application to Werner was rejected, he transported and delivered freight for Crete Carrier for almost 2.5 years; he did the same for RUAN for a period of years. Throughout his employment at all three companies, he never had a single incident or complaint about the safety, efficiency, timeliness, or legality of his driving. He drove roughly 254,800 miles combined during his employment with C.R. England, Crete Carrier, and RUAN. Ex. 6 at ¶29.

60.    At the time Werner rejected Deuschle's application, he could install and remove tire chains, hook and unhook trailers, and secure freight. At Amarillo College, he learned and practiced using tire chains, hooking and unhooking trailers, and using harnesses and buckles to secure freight in a trailer. He also did these tasks routinely at C.R. England and Crete Carrier both before and after his 2015 application to Werner. *Id.* at ¶27.

61.    At the time Werner rejected Deuschle's application, he could load and unload full trailers of freight weighing up to 50,000 lbs. During his time at Amarillo College, he was extensively trained on safely loading and unloading trailers with and without

mechanical aid. There, he learned and practiced things like loading an empty trailer with boxes and using a forklift to lift freight up to 30 feet. *Id.* at ¶26.

62.    At the time Werner rejected Deuschle's application, he could complete all necessary paperwork and maintain records, as required under state and federal laws and regulations. He commonly completed paperwork and records in his roles at C.R. England, Crete Carrier, and RUAN. *Id.* at ¶30.

63.    At the time Werner rejected Deuschle's application, he could ensure that all of his operations were in compliance with state and federal laws and regulations. He commonly had to do this in his roles at C.R. England, Crete Carrier, and RUAN. Ex. 6 at ¶31.

64.    At the time Werner rejected Deuschle's application, he could represent the company and the trucking industry in a professional manner. Throughout his employment with C.R. England, Crete Carrier, and RUAN, he did that, and he never received any complaints about his level of professionalism. *Id.* at ¶32.

65.    Werner's job description listed eleven "Qualifications": (1) Valid Commercial Driver's License; (2) 1 year previous tractor/trailer driving experience (unless applying as a student driver); (3) Knowledge of all applicable DOT Regulations and Motor Carrier Safety Regulations; (4) Meet all medical and standards required by the DOT and pass required drug/alcohol test; (5) Able to be away from home for extended periods of time, available for round-the-clock trips and able to remain alert while driving for periods of up to 11 hours; (6) Able to squat, crouch and reach as needed to handle freight, able to enter and exit the vehicle's cab numerous times each day; (7) Able to push freight up to 1,000 lbs. on a dolly or cart and able to move

freight up to 125 lbs. with or without mechanical aid; (8) Able to frequently carry freight from 1 to 125 lbs.; (9) Able to load and unload full trailers of freight weighing up to 50,000; (10) Able to install and remove tire chains, hook and unhook trailers, secure freight; (11) For flatbeds, able to handle special equipment including chains, straps, tarps, tiedowns, etc. Ex. 20.

66.     Following the completion of driving school, Deuschle knew and understood applicable Department of Transportation ("DOT") and Motor Carrier Safety Regulations. Ex. 6 at ¶ 14.

67.     The CDL test, which Deuschle took in September 2014, tested his knowledge of applicable Department of Transportation ("DOT") and Motor Carrier Safety Regulations. *Id.*

68.     Deuschle applied his knowledge of DOT and safety regulations in his roles at C.R. England, Crete Carrier, and RUAN. *Id.*

69.     When Deuschle was hired at each of the three trucking companies that he worked for, he completed safety courses and was retested on DOT and safety regulations. He never had any issues completing the courses or passing the tests. *Id.* at ¶ 15.

70.     Additionally, the three trucking companies that Deuschle worked for conducted mandatory reviews of all applicable safety regulations roughly every six months, which he would return to the shop for. Ex. 6 at ¶15.

71.     Before applying to Werner, Deuschle met all medical and safety standards during his time with C.R. England. *Id.* at ¶16.

72.     At the time Werner rejected his application, Deuschle all medical and safety standards required by the DOT. *Id.* at ¶16.

12

73.   Deuschle met all of the DOT-required medical and safety standards during his
subsequent employment at Crete Carrier and RUAN. *Id.* at ¶16.

74.   At C.R. England, Crete Carrier, and RUAN, when Deuschle was hired by each
company, he was required to undergo a physical examination in compliance with
DOT standards. Each of these examinations was paid for by his employer at the time
and conducted by a doctor that was designated by that employer. At each exam, the
doctor conducted a physical examination of his body, an eye exam, and a
drug/alcohol test. He passed all three exams with no issues. Ex. 6 at ¶ 7.

75.   At the time Werner rejected Deuschle's application, he could have passed all
drug/alcohol tests. Before applying to Werner, he was tested twice during his
employment with C.R. England. The first test was a blood test, conducted at his
mandatory medical exam shortly after he was hired. He passed that test with no
issues. The second time, he was randomly selected for a routine urine analysis. He
also passed that test with no issues. *Id.* at ¶18.

76.   Since Werner's rejection of his application, Deuschle has also passed drug/alcohol
tests at Crete Carrier and RUAN. He was tested upon hiring by each company at his
mandatory medical exam, and passed both tests with no issues. *Id.* at ¶19.

77.   At the time Werner rejected his application, Deuschle could be away from home for
extended periods of time, available for round-the-clock trips, and remain alert while
driving for periods of up to 11 hours. *Id.* at ¶20.

78.   Before Werner rejected Deuschle's application, during his employment with C.R.
England from November 2014 to March 2015, he routinely drove more than 50 hours
a week. He co-drove for C.R. England as the overnight driver in a team of two. They

13

drove continuously for 20–23 days straight by taking turns driving and sleeping. He remained alert while driving no matter the time of day or night, and no safety incidents occurred. He was away from home for about three weeks at a time. When a trip was over, he usually had no more than 2 or 3 days at home before leaving for another three-week period. *Id.* at ¶21.

79.     After Werner rejected Deuschle's application, during his employment with Crete Carrier from June 2015 to November 2017, he was a solo driver and usually drove during the day. He usually drove 10 hours and rested at night, except on the few occasions where he drove overnight (on request from his employer). He remained alert while driving no matter the time of day, and no safety incidents occurred. He was usually away from home for several days at a time during this period. *Id.* at ¶22.

80.     After Werner rejected Deuschle's application, during his employment with RUAN from June 2018 to July 2020, he often drove more than 50 hours a week. He remained alert while driving no matter the time of day, and no safety incidents occurred. *Id.* at ¶ 3.

81.     At the time Werner rejected Deuschle's application, he was able to push freight up to 1,000 lbs. on a dolly or cart. He was also able to lift and move freight from 1 to 125 lbs., with or without mechanical aid. At Amarillo College, he was trained to use pushcarts, dollies, hydraulic lifts, and forklifts, and received his forklift-certification from Amarillo College. He also used these skills when necessary at C.R. England and Crete Carrier both before and after his 2015 application to Werner. Ex. 6 at ¶25.

82.     At the time Werner rejected Deuschle's application, he could handle special equipment including chains, straps, tarps, and tiedowns for flatbeds and did so

14

routinely at C.R. England and Crete Carrier both before and after his 2015 application to Werner. *Id.* at ¶28.

83.   At the time Werner rejected Deuschle's application, he was able to work in severe weather conditions—both heat and cold. During his time with C.R. England, he drove all over the country, through all sorts of weather. For example, on one trip he drove through Utah, Colorado, Virginia, Texas, and Nebraska. *Id.* at ¶33.

84.   After Deuschle's application was rejected by Werner, he worked in severe weather conditions while driving for Crete Carrier from June 2015 to November 2017. On one trip, for example, he drove from New Mexico to Maine. Throughout his time driving trucks, he has driven through 47 U.S. states. *Id.* at ¶34.

85.   At the time Werner rejected Deuschle's application, he was able to communicate with customers and other individuals encountered while traveling over the road, such as law enforcement personnel. He had already done so routinely while at C.R. England, by passing notes back and forth, either written on paper or texted on a cell phone. After Werner rejected his application, and during his employment with Crete Carrier and RUAN, he continued to routinely use the same methods to communicate with customers and other individuals encountered on the road. Ex. 6 at ¶24.

86.   At the time Werner rejected Deuschle's application, he was able to perform all the listed duties and requirements in Werner's job description, either with no accommodation or with simple, unobtrusive accommodations. *Id.* at ¶3.

87.   Werner admits that a truck-driver with a hearing exemption can do each of the physical requirements listed in its job description. Ex. 9 at 160:20–162:4.

15

**Werner does not dispute that FMCSA Hearing Exemption holders can be trained to pass their CDL written and road tests.**

88.   Werner does not dispute that, other than the observed over-the-road driving portion of Werner's placement driver program, FMCSA Hearing Exemption holders are capable of completing functions associated with the normal day-to-day operations of an over-the-road driver. Def. Brief in Support of Mot. to Exclude Expert Testimony, p. 8, ¶23 (ECF No. 247). *See also* Ex. 9 at 164:10–13.

89.   Werner has no factual basis for believing Deuschle is unable to do the essential functions of the job he applied for, other than the observed over-the-road driving portion of Werner's placement driver program. Ex. 9 at 157:5–11.

90.   Werner's Vice President for Safety Maus made no notes of her efforts to assess the safety of training deaf drivers, did not reach out to anyone in writing, and did not note any such inquiries in Werner's application system. *Id.* at 18:3–14.

91.   She could not give the name of anyone she spoke to about this at the state DOT, Maus Depo 18:15–19:5, a Trucking Association, *Id.* at 20:13–22:10, or at the FMCSA main number. *Id.* at 32:20–33:16.

92.   Maus's inquiries did not reveal any objective evidence about training deaf truck drivers. *Id.* at 16:14–33:3.

93.   Maus also held one telephonic conversation with Victor Robinson, and he explained to her how he had been accommodated in truck-driving school, and talked about possible situations that may arise while driving with a trainer in the cab. *Id.* at 107:21–25. At the end of the conversation, Maus rejected Robinson for employment. *Id.*

16

94.     Werner's proffered expert Adams has no experience with deaf people, deaf drivers, or the accommodations at issue. Deposition of William Adams (Ex. 21), 60:15–63:22; 101:21–24.

95.     Werner's proffered expert Adams does not even believe deaf drivers should be accommodated in truck-driving school. Expert Report of William Adams (*Frilando*) (Ex. 24).

96.     In order to earn their CDLs, deaf drivers must pass the tests and meet the same criteria as hearing drivers. Expert Report of Don Olds (Ex. 22), 4–5.

97.     The only difference is they are exempt from the DOT's hearing requirement, and the DOT/FMCSA provides qualified deaf drivers with a hearing exemption. *Id.*

98.     Maus could identify no evidence that deaf truck drivers less safe than hearing drivers, either generally, or during training. Ex. 9 at 16:3–17:14; 34:21–35:12.

99.     The objective evidence is that deaf truck drivers are no less safe than hearing drivers. Expert Report of Dr. Steven Arndt Report (Ex. 23), 30–37.

**Deuschle's Subsequent Employment and Training by Crete Carrier**

100.     Deuschle met all the screening requirements when he was hired by Crete Carrier. Ex. 6 at ¶¶16–17, 19.

101.     Deuschle was hired by Crete Carrier trucking company in May 2015. Ex. 2 at 80:14–17.

102.     Deuschle completed Crete's driver training program. *Id.* at 82:17–21.

103.     Deuschle had to drive while observed by a Crete trainer for roughly three weeks before driving on his own. *Id.* at 82:22–24.

104.   During the observed behind-the-wheel training, the Crete trainer would communicate using simple gestures or hand signs, and on occasion with short, written signs. *Id.* at 83:9–17; 84:7–12.

105.   Deuschle successfully completed Crete's over-the-road training and began solo driving for Crete. *Id.* at 82:15–16.

106.   Crete Carrier allows deaf drivers and trainers to work out the methods of communication that best suit them. Deposition of Crete Carriers (Ex. 25), 29:11–24.

107.   Crete is a very reputable company as far as its training. Ex. 3 at 315:6–10.

108.   After Werner rejected Deuschle's 2015 application, he was hired by Crete Carrier in June 2015. Ex. 6 at ¶12.

109.   Deuschle went through three weeks of over-the-road training at Crete. *Id.*

110.   In April 2018, when Deuschle was hired by RUAN, he went through three days of local training before driving solo. *Id.*

111.   During both sets of training, at Crete and RUAN, Deuschle communicated with his trainers using hand gestures. *Id.*

112.   The methods of communication during training at Crete and RUAN did not distract Deuschle from driving or otherwise cause him to drive in an unsafe way. *Id.*

113.   Since Werner rejected Deuschle's application, he has several years of over-the-road driving experience, with Crete Carrier and RUAN. He worked as a solo driver for Crete Carrier for almost 2.5 years, from June 2015 to November 30, 2017. *Id.*at ¶13. And he worked as a solo driver for RUAN from June 2018 to July 2020. *Id.*

**How Other Companies and Trainers Train Deaf Drivers**

114. Covenant Transport trucking company requires over-the-road training for its new CDL holders, and it has successfully accommodated deaf drivers during its new driver training. Covenant Depo 14:12–15:8.

115. Covenant trainers communicate with deaf drivers during over-the-road training by using simple signs and gestures. Deposition of Covenant (Ex. 26), 19:13–20:5.

116. Covenant used simple signs and gestures to train Victor Robinson. Deposition of Victor Robinson (Ex. 27), 69:10–20.

117. Western Express trucking company requires over-the-road training for its new CDL holders, and it has successfully accommodated deaf drivers during its new driver training. Deposition of Western Express (Ex. 28), 15:23–16:6.

118. Western Express considered the safety of communications during an emergency, and accommodated its deaf drivers, first by Western Express trainers communicate with deaf behind-the-wheel drivers through color-coded cards, and later via hand signals like the military uses. *Id.* at 16:14–17:14; 21:12–22:6.

119. Swift Transportation trucking company requires over-the-road training for new CDL holders, and it has successfully accommodated deaf drivers during the training. Deposition of Swift (Ex. 29), 9:17–22.

120. Swift Transportation trainers communicate with deaf trainees using hand signals, white boards, apps, and pen and paper; while the student is behind the wheel, the trainers use hand movements, hand signals, and possibly flash cards. *Id.* at 13:21–14:19.

121. All of Swift's communication accommodations with its deaf trainees meet the company's criteria for safety. *Id.* at 15:9–13.

19

122.   Other approved truck-driving schools also require on-the-road training as part of the curriculum. Ex. 22 at 7–11.

123.   On average, the on-the-road portion of CDL training school is eight days, sixty-four hours—all of it in-person and with a trainer. *Id.* at 9.

124.   Regardless of whether a new driver attends a driving school, a CDL applicant must hold a commercial-learners permit (CLP) for a specified amount of time before taking the CDL exam. *Id.* at 6.

125.   Don Olds, who began to train deaf drivers in 2013, uses short-duration, one-handed signals which he discusses with deaf students through an interpreter before their behind-the-wheel over-the-road driving. *Id.* at 10.

126.   Don Olds has also effectively used small red, yellow, and green flags with simple instructions like "go," "stop," and "caution" on them to communicate with students, which he explains through an interpreter before on-the-road driving. *Id.*

127.   Both hand signals and colored flags can be seen by deaf drivers in their peripheral vision. *Id.* at 11.

128.   Trainers can also use spiral-bound flashcards tabbed for easy use to communicate with deaf drivers while they are behind the wheel. *Id.*

129.   Short-hand signals, colored flags, and spiral-bound flashcards are all safe and effective ways to communicate with deaf drivers that do not require a driver to take their eyes of the road for any longer than it takes to check a mirror, read a road sign, check the radio, check the time, or glance at a GPS or map. *Id.*

130.   Hand signals may be preferable to verbal commands for any student drivers because they are less likely to be misunderstood or not heard. *Id.* at 10.

20

**Scientific Support for Reasonable Accommodations During Training**

131.   Dr. Steven Arndt—a Ph.D. industrial engineer with a specialty in human factors—has observed and recommends the use of hand signals while training deaf drivers. Ex. 24 at 53.

132.   Electronic displays are another possible way for trainers to communicate with deaf drivers, with signals, signs, and visual commands displayed on an iPad or similar device mounted on the dash in front of the driver. *Id.* at 55–65.

133.   A heads-up display is another possible way for trainers to communicate with deaf drivers, with a simple projector displaying visual ques and symbols directly onto the windshield in a manner that does not obstruct the view. *Id.* at 66–67.

**Conditions Precedent and Exhaustion**

134.   On or about September 22, 2015, Deuschle filed a Charge of Discrimination with the EEOC. Charge of Discrimination (Ex. 30); Declaration of Natascha DeGuire (Ex. 31), ¶3.

135.   Deuschle's charge was filed within 180 days after Werner did not hire Deuschle following his March 29, 2015 application for employment. Defendant's Answer to Complaint in Intervention, ¶9, ECF No. 22.

136.   On July 25, 2017, the EEOC issued a Letter of Determination finding reasonable cause to believe that Defendant had discriminated against Deuschle in violation of the Americans with Disabilities Act of 1990, as amended (ADA). Letter of Determination (Ex. 32), Ex. 31 at ¶5; Defendant's Answer to EEOC's Amended Complaint, ¶8, ECF No. 121.

137.    The Letter of Determination invited Defendant to participate in informal methods of conciliation with the Commission. Ex. 32; Ex. 31 at ¶5.

138.    The EEOC engaged in communications with Defendant to provide Defendant the opportunity to remedy the discriminatory practices described in the Letter of Determination.  Ex. 31 at ¶6. Defendant's Answer to EEOC's Amended Complaint, ¶10, ECF No. 121.

139.    Defendant did not enter into a conciliation agreement with the EEOC. Defendant's Answer to EEOC's Amended Complaint, ¶ 11, ECF No. 121; Ex. 31 at ¶7.

140.    On March 2, 2018 the EEOC issued Defendant a Notice of Failure of Conciliation because it could not secure an acceptable conciliation agreement from Defendant. Notice of Failure of Conciliation (Ex. 33), Ex. 31 ¶7; Defendant's Answer to EEOC's Amended Complaint, ¶12, ECF No. 121.

141.    On July 11, 2018, the EEOC filed this lawsuit against Defendant. ECF No. 1. The Complaint alleged that Defendant violated the ADA when it failed to hire Deuschle. ECF No. 121 at ¶¶31–40.

142.    On August 27, 2018, Plaintiff Intervenor Deuschle filed a timely and unopposed motion for leave to file his Complaint in Intervention. ECF No. 17.

143.    The Motion was unopposed and by Text Order the Court granted it, allowing the intervention. ECF No. 18.

**Treatment of Other Deaf Drivers**

144.    Werner did not hire Victor Robinson because Robinson is deaf. Robinson Depo. 51:23–52:14; Defendant's Second Supplemental Answers to EEOC's First Interrogatories (Ex. 34), Nos. 5; Defendant's Supplemental Answers to EEOC's

Second Interrogatories (Ex. 35), No. 27. Ex. 9 at 109:20–110:20; 111:24–112:5;

119:23–120:15.

145.    The only reason Werner did not hire Robinson is because Werner did not believe it

could accommodate him during the over-the-road portion of its new-driver training;

specifically, Werner did not believe there was a safe way for him to communicate

with a trainer while Robinson was driving. Ex. 9 at 109:20–110:20; Ex. 25 at No. 27.

146.    Werner admits that it would not have hired Deuschle, even if there were no other

disqualifying factors, for the reason that it did not hire Robinson. Def. Brief in

Support of Mot. to Exclude Expert Testimony, p. 8, ¶22 (Doc 247), citing Ex. 35 at

No. 28; Ex. 9 at 163:9–165:8.

147.    Werner's "undue burden" defense is based on concern about safety issues. Ex. 9,

163:9–164:1

## III.   Legal Standard for Summary Judgment

Summary judgment "is appropriate when the evidence viewed in the light most favorable

to the nonmoving party, demonstrates that there are no genuine issues of material fact and that the

moving party is entitled to judgment as a matter of law." *Hanger v. Lake Cnty.*, 390 F.3d 579, 582

(8th Cir. 2004). On a motion for summary judgment, "district courts should not 'treat

[employment] discrimination [cases] differently from other ultimate questions of fact.'"

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).

"A party may move for summary judgment, on a claim or defense or part of a claim or

defense. Fed.R.Civ.P. 56(a)." *Edelstein v. Optimus Corp.*, No. 8:10CV61, 2011 WL 6180413, at

\*3 (D. Neb. Dec. 13, 2011). "Upon doing so, the Court may 'enter an order stating any material

fact—including an item of damages or other relief—that is not genuinely in dispute,' and thereby

treat such a fact 'as established in the case.' Fed. R. Civ. P. 56(g)." *United States v. Univ. of Nebraska at Kearney*, 940 F. Supp. 2d 974, 977 (D. Neb. 2013).

A party opposing a properly supported motion for summary judgment may not rest on the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-248.

## IV.   Argument

Plaintiffs seek partial summary judgment, including an order that they have established as a matter of law that Deuschle was disabled within the meaning of the ADA, that he was qualified to perform the job he sought with or without an accommodation, and that Defendant subjected him to an adverse action. Plaintiffs also seek summary judgment dismissing Defendant's affirmative defenses of direct threat, business necessity, undue hardship, and conditions precedent.

### A.   Plaintiffs are entitled to judgment as a matter of law on the prima facie elements of their disability claim.

In cases in which no direct evidence exists, the elements of the plaintiff's prima facie case are that "he has an ADA-qualifying disability; that he is qualified to perform the essential functions of his position, with or without a reasonable accommodation; and [that] he suffered an adverse action due to his disability." *EEOC. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007) (internal quotes omitted). Deuschle has been deaf since infancy, SOUMF ¶1, and the parties have stipulated that at the time he applied for the truck-driver position at Werner, he had a disability as defined by the ADA. ECF No. 262.

1. **Plaintiffs are entitled to judgment as a matter of law that Deuschle was "qualified" for the truck-driving position he sought.**

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Determining if someone is a "qualified individual" requires a two-step analysis. First, whether "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position." 29 C.F.R. § 1630(m). Second, whether the individual "with or without reasonable accommodation, can perform the essential functions of such position." *Id.*; *Willnerd v. First Nat. Neb., Inc.*, 558 F.3d 770, 781 (8th Cir. 2008) ("Analyzing whether a person is a qualified individual is a two-step process[.]"). Plaintiffs seek partial summary judgment as to the issue of "qualified" because the evidence establishes this element as a matter of law.

a. **Deuschle possessed the requisite skill, experience, education, and other job-related requirements of the position.**

At the time of his application, Deuschle had graduated from a Werner-approved driving school, SOUMF ¶3, and he had a valid CDL. SOUMF ¶4. He had also worked for C.R. England beginning in November of 2014, SOUMF ¶24, and he left that company in March of 2015, SOUMF ¶25, seeking more money. SOUMF ¶26.

Deuschle applied for a co-driver position at Werner, which required at least thirty days, but less than six months, of prior truck-driving experience with another carrier. SOUMF ¶30. He had such experience, as he informed Werner. SOUMF ¶32. Werner's own documents show that Deuschle provided information about his past truck-driving experience *on the same day* that the Werner recruiter asked about it. *Id.*; SOUMF ¶33. And anyway, Werner routinely used a service

25

to run an employment history report to confirm prior work history. SOUMF ¶34. In fact, Werner testified that it never relied on input from the applicant on past employment. SOUMF ¶35.

Deuschle was required to have a CDL and DOT Medical Card for the C.R. England job, both of which he had. SOUMF ¶36. Deuschle had also been approved for the FMCSA's "hearing exemption." Under 49 U.S.C. §§ 31136(e) and 31315, the FMCSA may grant 2-year exemptions from the safety regulations' hearing requirement if it finds "such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." *Qualification of Drivers; Application for Exemptions; National Association of the Deaf*, 78 Fed. Reg. 7479 (FMCSA Feb. 1, 2013).[1] These regulations were adopted because "the Agency concluded that granting exemptions for these CMV drivers will provide a level of safety that is equivalent to or greater than the level of safety maintained without the exemptions." *Id*. The Agency's decision was based on a scientific review of the safety literature involving deaf drivers; over 100 hours of interviews with individuals who are deaf and hard of hearing; an individualized review of each applicant, including their medical status and their driving records (many of which included experience driving commercial trucks). *Id*. As a result, exemption holders receive a much more rigorous safety screening than do other commercial truck-drivers. Moreover, follow-up studies and crash-data confirmed that exemption holders "do not pose a risk to public safety" and they "achieve[] a level of safety that is equivalent to or greater than the

---

[1] Note that although these exemptions are sometimes referred to as a deaf "waiver," the proper name for this program is a hearing "exemption." It is not a waiver under 49 U.S.C. § 31315(a), which lasts 3 months or less and is for unique events. Nor is it a "pilot program" under § 31315(c), designed to evaluate new safety alternatives, Instead, it is an exemption program under § 31315(b), approving multi-year commercial driving for a class of individuals that the agency has already found "would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption."

level that would be achieved absent such exemption." 82 Fed. Reg. 61809 (FMCSA Dec. 29, 2017).

Werner "preapproved" Deuschle's application. SOUMF ¶46. He was preapproved as either an "experienced" driver or an "advanced placement" driver (aka "co-driver"). SOUMF ¶47. Preapproval meant that the application appeared to meet Werner's hiring minimum hiring guidelines regarding driving record, accidents, drug and alcohol test results, DUIs, graduation from an approved school, acceptable references, the number of moving violations in the last five years, license suspensions, previous employer and reasons for leaving, and criminal convictions. SOUMF ¶48. As one Werner recruiter described it, preapproval "looks like everything's getting in order to hire the person." *Id.*; see Ex. 4 at 92:5–13. Deuschle had already met the DOT's medical and safety requirements. He had a valid DOT medical certificate, signed off on by C.R. England. SOUMF ¶49. He had also passed all medical, background, driving record, and drug and alcohol screens to work at C.R. England five months before applying to Werner, SOUMF ¶50; he had confirmed to Werner that he had a clean driving and safety record, SOUMF ¶51; and he again met all those same screening requirements when he was hired by Crete Carrier a few weeks after Werner rejected him. SOUMF ¶100.

### b. Deuschle could perform the essential functions of the job with or without reasonable accommodation.

Deuschle could also perform the essential functions of the job. "Essential functions are the 'fundamental job duties of the employment position.' 29 C.F.R. § 1630.2(n)(1). Werner's job description is one form of evidence of the essential functions of the position. *See Dropinski v. Douglas Co., Neb.*, 298 F.3d 704, 707 (8th Cir. 2002) (listing job descriptions as one form of evidence of essential functions). Werner's job description relevant to the position that Deuschle

27

applied listed six "Major Duties" and eleven "Qualifications." SOUMF ¶¶56, 58, and 65.[2] Deuschle had the documents, physical abilities, and experience necessary to complete every major duty and qualification listed. SOUMF ¶¶59–64, 66–86.

In fact, Werner admits that a truck-driver with a hearing exemption can do each of the physical requirements listed in its job description. SOUMF ¶87. In its own words, "Werner does not dispute that FMCSA Hearing Exemption holders can be trained to pass their CDL written and road tests. Werner also does not dispute that, other than the observed over-the-road driving portion of Werner's placement driver program, FMCSA Hearing Exemption holders are capable of completing functions associated with the normal day-to-day operations of an over-the-road driver[.]" Def. Brief in Support of Mot. to Exclude Expert Testimony, p. 8, ¶23 (ECF Doc 247). Finally, Werner admits to having absolutely no factual basis for believing Deuschle unable to do those tasks, or for challenging the evidence and testimony that he can. SOUMF ¶89 ("I have no idea.").

### c. Deuschle could safely communicate during behind-the-wheel training.

Werner admits that it did not hire another deaf applicant, Victor Robinson, because he was deaf. SOUMF ¶144. Werner also admits that it did not hire Robinson because it did not believe it could accommodate him during the over-the-road portion of its new-driver training; specifically, Werner did not believe there was a safe way for him to communicate with a trainer while Robinson was driving, because of his deafness. SOUMF ¶145. Finally, Werner admits that it would not have hired Deuschle, even if there were no other disqualifying factors, for the reason that it did not hire Robinson. SOUMF ¶146.

---

[2] Notably, Werner's job description makes no mention of its new-driver training program, over-the-road training, or oral communication between student and trainer.

28

Being able to perform safely the position is not part of being qualified, and "the question of whether Baker can perform his job safely, so as to be qualified for the position … goes to whether the Railroad can prevail on its direct threat defense." *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 659–60 (D. Neb. 2022). But even if relevant at this stage, the evidence shows that Deuschle, while behind the wheel, was in fact able to communicate with a trainer either with no accommodation, or with simple, unobtrusive ones. That is shown by his work history both before and after Werner refused to hire him, by the practices at other trucking companies, and by the expert testimony. Not only is safe over-the-road training possible for deaf drivers, it occurs routinely.

Deuschle communicated successfully and safely with his trainer during truck-driving school. He attended Amarillo College, a truck driving school from which Werner recruits. SOUMF ¶¶8–9. At Amarillo College, he had to drive over the road with trainers observing, and his training was accommodated with ASL interpreters, hand gestures, and extra planning ahead of time. SOUMF ¶¶10, 12, 15, 16 There was never a safety incident during his CDL training, and nothing about the accommodations were distracting or caused Deuschle to drive in an unsafe way. SOUMF ¶¶12–13.

Deuschle's experience with Amarillo College was far from unique. Like Amarillo College, state-approved trucking schools require over-the-road training as part of the curriculum. Ex. 22 at 7–11. "Individuals with DOT/FMCSA hearing exemptions can be safely and effectively taught to qualify to drive commercial motor vehicles." *Id.* at 7. On average, the over-the-road portion of CDL training school is eight days, sixty-four hours—all of it in-person and with a trainer. *Id.* at 9. And regardless of whether a new driver attends a driving school, a CDL

29

applicant must hold a commercial-learners permit (CLP) for a specified amount of time before taking the CDL exam. *Id.* at 6.

Beyond driving with a trainer during truck driving school, Deuschle also successfully completed over-the-road training at other companies, both before and after he applied to Werner. Several months before Werner's rejection, C.R. England trucking company hired Deuschle in October 2014, SOUMF ¶18, and he completed their driver training program. SOUMF ¶19. He then had to drive with a trainer for several weeks before driving on his own or in a team. SOUMF ¶20. While Deuschle was driving, the C.R. England trainer would communicate using simple gestures or hand signs. SOUMF ¶21. Deuschle successfully completed the over-the-road training with C.R. England and began driving as a team driver for C.R. England. SOUMF ¶22.

Shortly after Werner's refusal to hire him, Deuschle was hired by Crete Carrier, in May 2015. SOUMF ¶101. At that time, he completed Crete's driver training program. SOUMF ¶102. He then had to drive with a trainer for roughly three weeks before driving on his own. SOUMF ¶103. During that time, the Crete trainer would communicate using simple gestures or hand signs, and on occasion with short, written signs. SOUMF ¶104. Deuschle successfully completed that over-the-road training and began solo driving for Crete. SOUMF ¶105. In fact, Crete allows deaf drivers and trainers to work out the methods of communication that best suit them. SOUMF ¶106.

Deuschle's success at C.R. England and Crete Carrier should be unsurprising. These companies are not alone in their ability to accommodate deaf drivers during new-driver training. Covenant, Western Express, and Swift Transportation all have mandatory, over-the-road training for new CDL holders. All have also successfully accommodated deaf drivers during the training. SOUMF ¶¶114, 117, 119.

Each company also utilized a variety of simple yet effective accommodations. Covenant trainers communicate with deaf drivers during over-the-road training by using simple signs and gestures. SOUMF ¶115. Indeed, Covenant used those methods to successfully train Victor Robinson. SOUMF ¶116. Western Express expressly considered the safety of communications during an emergency and was still able to provide reasonable accommodations to its deaf drivers, first through color-coded cards, and later via hand signals like the military uses. SOUMF ¶118. Finally, Swift Transportation trainers communicate with deaf students using hand signals, white boards, apps, and pen and paper; while the student is behind the wheel, the trainers use hand movements, hand signals, and possibly flash cards. SOUMF ¶120. All of Swift's accommodations meet the company's criteria for safety. SOUMF ¶121. Moreover, C.R. England is part of the safety benchmarking group that Werner participates in, SOUMF ¶23, and Werner also acknowledges that Crete is a very reputable company as far as its training. SOUMF ¶107. The fact is that other trucking companies employ safe, effective, and simple accommodations to allow deaf drivers to complete new-driver training.

The methods these companies employ also track the methods recommended or used by Plaintiffs' experts. Don Olds, since beginning to train deaf drivers in 2013, uses short-duration, one-handed signals which he discusses with students through an interpreter before on-the-road driving. Ex. 22 at p.10. Olds has also effectively used small red, yellow, and green flags with simple instructions like "go," "stop," and "caution" on them. *Id.* Both the hand signals and flags can be seen by deaf drivers in their peripheral vision. *Id.* at 11. Trainers could also use spiral-bound flashcards that are tabbed for easy use. Ex. 22 at 11. These safe and effective methods of communication do not require a driver to take their eyes of the road for any longer than it takes to check a mirror, read a road sign, check the radio, check the time, or glance at a GPS or map.

31

*Id*. Indeed, "hand signals are preferable to verbal commands for all student drivers, because hand signals are clear versus words which are sometimes misunderstood or not heard." *Id.* at p.10.

Similarly, Dr. Steven Arndt—a Ph.D. industrial engineer with a specialty in human factors—observed and recommends the use of hand signals during driver training. SOUMF ¶131. He noted other possible accommodations, including electronic displays on devices or directly on the windshield. SOUMF ¶¶133-132.

> **2. Plaintiffs are entitled to judgment as a matter of law that Deuschle suffered an adverse action.**

>> **a. Defendant failed to reasonable accommodate Deuschle and refused to hire him because of his need for accommodation.**

"An employer commits unlawful discrimination under the ADA if the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (brackets in original), quoting 42 U.S.C. § 12112(b)(5)(A). A failure-to-accommodate claim "does not turn on the employer's intent or actual motive." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). Instead, such claims involve "the failure to fulfill an affirmative duty," and "if the employer fails to fulfill that duty, we do not care if he was motivated by the disability." *Id*. at 767. Even though there were reasonable accommodations available for Deuschle to perform the driver position, Defendant rejected him explicitly because of his deafness, and it did not want to accommodate him in in the over-the-road portion of their training program.

>> **b. Defendant discriminated against Deuschle by applying a "qualification standard" that screened out deaf applicants.**

"Discrimination also includes the use of 'qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability.' 42 U.S.C. § 12112(b)(6). Qualification standards include "medical, safety and other requirements established by [an employer] as requirements . . . to be eligible for the position held or desired." *Baker v. Union Pac. R.R. Co*., 580 F. Supp. 3d 647, 658 (D. Neb. 2022), quoting 29 C.F.R. § 1630.2(q). "There is a two-step analysis under this provision. The first step requires an examination of whether the defendant's qualification standards screen out or tend to screen out disabled individuals." *Baker*, 580 F. Supp. 3d at 658 (internal citations omitted). Defendant's requirement that a driver in over-the-road training must be able to hear oral communication during this training could be viewed as a qualification standard that necessarily screens out deaf drivers because they cannot hear the trainer.[3]

**B.  Plaintiffs are entitled to judgment as a matter of law on Werner's "direct threat" affirmative defense.**

Recognizing that there are times when an individual's disability may pose a health or safety risk in the workplace, Congress included a "direct threat" defense in the ADA. See 42 U.S.C. §§ 12111(3), 12113(b); see also 29 C.F.R. § 1630.2(r). But "in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear," an employer must rely on "the best current medical or other objective evidence" at the time it makes the employment decision if it wants to preserve a direct threat defense. *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (citations omitted); *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 658–59 (D. Neb. 2022). An employer's subjective belief – even if it is in good faith – will not satisfy the high threshold for the direct threat defense. *See Fahey v. Twin City*

---

[3] Qualifications standards may fall within the business necessity exception, which is an affirmative defense and therefore not relevant to this analysis. *See infra.* § IV.C.

*Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1073–74 (D.S.D. 2014) (citing *Bragdon v. Abbott*, 524 U.S. 624, 649–55 (1998)).

To succeed on the defense, the employer's contemporaneous individualized assessment must establish the disabled worker posed "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Wal-Mart*, 477 F.3d at 571 (quoting 42 U.S.C. § 12111(3)); *see also Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2022 WL 3446189, at *4 (D. Neb. Aug. 17, 2022) (discussing the employer's requirement to prove that a reasonable accommodation could not resolve any safety concern). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Wal-Mart*, 477 F.3d at 571 (internal quotes omitted). Direct threat analysis requires "an individual assessment of the individual's ability to perform safely the essential functions of the job". *Huntley v. Watts Elec. Co.*, No. 4:21-CV-3002, 2022 WL 2715957, at *6 (D. Neb. July 13, 2022).

Here, Werner pled that Deuschle "posed a direct threat to the health and safety of himself and/or others in that allowing him to operate a commercial motor vehicle creates a significant risk to the health and safety of others that cannot be eliminated by reasonable accommodations." Answer to Amended Complaint, ECF No. 121, ¶51. The only essential job function that Defendant alleges poses a threat is the behind-the-wheel portion of Werner's over-the-road training. But Werner's direct threat defense fails as a matter of law because it did not conduct any individualized assessment based on medical or other objective evidence at the time it rejected Deuschle for employment. Moreover, Defendant cannot show that under the four

34

relevant factors Deuschle posed a significant risk to the health or safety of himself or others that could not be eliminated by reasonable accommodation.

1. **Defendant failed to conduct any individualized assessment of Deuschle based on medical or other objective evidence when it rejected him for employment.**

Defendant has no evidence to meet its burden of showing it conducted an individualized consideration of Robinson's abilities, based on contemporaneous medical or other objective evidence, at the time it rejected him. *See Wal-Mart*, 477 F.3d at 571. Defendant's minimal efforts to gather "evidence" relevant safety concerns regarding deaf truck drivers fell far short of the ADA's requirements. Werner's Vice President of Safety and Compliance and Terminal Management, Jaime Maus, claims that when Victor Robinson applied, she called a few third parties, including the Nebraska Department of Transportation, the American Trucking Association, and the FMCSA, to gather information. SOUMF ¶91. The Nebraska DOT representative explained to Maus how the state provides accommodations for deaf drivers to safely take road tests. SOUMF ¶91. The American Trucking Association representative told Maus they did not have any research or information about how deaf drivers are trained, and they did not know which or if any trucking companies trained hearing impaired individuals. SOUMF ¶91. The person Maus reached at the FMCSA told her they did not have any research regarding the safety of hearing impaired drivers and suggested she look at the Federal Register. SOUMF ¶91. Maus did not take any notes during these calls and she did not record her inquiries in Werner's application system. SOUMF ¶90. None of these phone calls provided Maus with the kind of reliable evidence that would have been required to conduct a legitimate individualized assessment of whether Deuschle's disability posed a significant risk.

Moreover, Defendant failed to conduct any individualized assessment of Deuschle at all, let alone one based on current medical or other objective evidence. Defendant may point to

35

testimony from its expert, William C. Adams, to try to show that Deuschle posed a significant

risk of harm, but Adams's opinions are irrelevant to the direct threat defense because his

opinions were not "current" at the time Werner rejected Robinson. *See Wal-Mart*, 477 F.3d at

571. Werner could have sought advice from Adams or a more knowledgeable "expert" before

rejecting Deuschle, but it chose not to. *See Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1248

(9th Cir. 1999) (finding that the direct threat analysis "necessarily requires the employer to

gather substantial information about the employee's work history and medical status and

disallows reliance on subjective evaluations by the employer") (internal quotations omitted).

Moreover, Adams's opinions are not objective. Adams does not believe deaf drivers should be

accommodated in truck driving school, SOUMF ¶95, a position at odds with both the U.S.

Department of Transportation and Werner's own arguments here. For these reasons, Adams's

opinions cannot be used to support Defendant's direct threat defense.

### 2. Defendant cannot prove Deuschle posed a significant risk of harm that could not be eliminated by reasonable accommodation.

Even if Defendant could show it conducted the required individualized assessment of

Robinson, it has not produced evidence to prove that Deuschle posed a significant risk of harm

that could not be eliminated by reasonable accommodation, particularly since Werner must prove

this "significant risk" in light of (1) the duration of risk, (2) the nature and severity of the

potential harm, (3) the likelihood that the potential harm would occur, and (4) the imminence of

the potential harm. *See Wal-Mart*, 477 F.3d at 571. Defendant has not produced any evidence

sufficient to prove Deuschle's participation in the behind-the-wheel portion of its training

program would have posed a significant risk in light of these factors. While training student

drivers to operate tractor-trailers on highways will always pose a risk of severe, life-threatening

36

harm, Defendant must prove Deuschle posed any "more of a threat" than other driver trainees. *See Wal-Mart*, 477 F.3d at 572.

There is no evidence Deuschle was likely to have an accident that would cause severe harm, or that the threat of harm would have been imminent. As a fully-licensed driver, Deuschle had the same education, underwent the same training, passed the same tests, and met the same criteria as hearing drivers. SOUMF ¶96. The only difference in Deuschle's credentials is that he has a lawful exemption, provided by the federal Department of Transportation, to the usual hearing requirement for truck drivers. SOUMF ¶97. Werner can point to no evidence that Deuschle was personally more likely to cause an accident or other safety incident than any hearing driver. In fact, other deaf drivers have been safely and successfully trained in other major interstate trucking companies' training programs and truck driving schools, including ones approved and owned by Defendant, since 2013, without any evidence of an increased risk of harm. SOUMF ¶99.

Maus claims the Nebraska DOT representative she spoke with said evaluating deaf drivers made him "uncomfortable" because they had to pull over to the side of the road to communicate next steps for the evaluation, SOUMF ¶91, but Defendant has not produced any evidence that pulling over to the side of the road during training poses a significant risk of severe harm. More importantly, Defendant has not produced any evidence that Deuschle would have needed to pull over to the side of the road during training and that if he had, he would have posed a significant risk of severe harm greater than any other hearing driver trainee. In the absence of such evidence, summary judgment should be granted in favor of the EEOC on Defendant's direct threat defense.

**C.  Plaintiffs are entitled to judgment as a matter of law on Werner's "business necessity" affirmative defense.**

Unlawful discrimination includes "using qualification standards … or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard … or selection criteria … is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). *See also* 29 C.F.R. §§ 1630.10(a) and 1630.15(b)(1). A qualification standard that screens out an individual with a disability violates the ADA, *unless* the employer can prove a valid "business necessity" defense. *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 994 (9th Cir. 2007) (en banc). Various physical and safety-related criteria, including the ability to hear, are examples of "qualification standards". 29 C.F.R. § 1630.2(q); 29 C.F.R. Pt. 1630 App., § 1630.10(a); *Baker v. Union Pac. R.R. Co*., 580 F. Supp. 3d 647, 658 (D. Neb. 2022). To establish such qualification standards are justified as a "business necessity", an employer must prove the standard "fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Harris v. Union Pacific R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020). "For a safety-based qualification standard, . . . the court should take into account the magnitude of possible harm as well as the probability of occurrence." *Id.* at 1036. The key, as with the direct threat defense, is an individualized assessment of the particular employee's abilities. *See id.* at 1036–38 (individualized assessment requirement of business necessity defense precludes class certification because employer must justify qualification standard separately for each worker).

The business necessity defense applies to general safety provisions, while the direct threat defense applies to an individual specific threat. *EEOC v. Murray, Inc*., 175 F. Supp. 2d 1053, 1065 n.14 (M.D. Tenn. 2001). But to establish a business necessity defense, proof of the general hazards of a particular position is insufficient; instead, the employer must prove the actual potential danger for individuals with the particular disability or limitation in performing

38

the job. *Id.* at 1065. The defense "cannot be based on unfounded fears or uninformed attitudes about the disability." *Verzeni v. Potter*, 109 F. App'x 485, 491 (3d Cir. 2004). And "[f]or a safety qualification to meet the business necessity defense, it must be based on current medical knowledge about the disability and on the real risks that the disability may present." *Id.* Thus, the facts relevant to the business necessity of a safety-related qualification standard are essentially the same as those relevant to the direct threat defense. *See Baker*, 580 F. Supp. 3d at 658 (discussing "business necessity" and "direct threat"); *see also Verzeni v. Potter*, 109 F. App'x at 488 (noting that "many of the same concerns [relevant to direct threat] . . . also arise in business necessity defense cases"). And, as with direct threat, even an employer's good faith actions will not save it if the employer is misinformed about the realities of the disability. *Verzeni*, 109 F. App'x at 491–92. The fact that the employer may have acted "responsibly and reasonably … does not satisfy the business necessity defense. There is no good faith defense to discrimination, and such discrimination does not have to be overt or hostile to be actionable." *Verzeni*, 109 F. App'x at 492–93.

Here, Werner has alleged a business necessity defense, apparently relying on an alleged safety-related qualification standard – that driver trainees be able to hear. This standard, by definition, excludes deaf individuals on the basis of their disability. But Werner cannot prove that – based on scientific knowledge available at the time – Deuschle's inability to hear posed risks of such magnitude and probability as to justify this qualification standard. And Werner did not conduct any individualized assessment of Deuschle and his abilities. Instead, Werner wants to rely on general hazards of the position and unsupported assumptions and stereotypes regarding Deuschle's ability to perform the essential functions of the position. Without more, Werner is

unable to prove the business necessity defense, and summary judgment should be granted in favor of the EEOC.

**D. Plaintiffs are entitled to judgment as a matter of law on Werner's "undue hardship" affirmative defense.**

Undue hardship is also an affirmative defense, *see* Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, § 9.42 note 10 (2021), as Defendant acknowledges in its Answer. "An employer commits unlawful discrimination under the ADA if the employer does not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (cleaned up; emphasis added), quoting 42 U.S.C. § 12112(b)(5)(A). It is the employer that "need[s] to show that the particular circumstances would create an undue hardship." *Huntley v. Watts Elec. Co.*, No. 4:21-CV-3002, 2022 WL 2715957, at *7 (D. Neb. July 13, 2022), citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 391 (2002).

Undue hardship "means an action requiring significant difficulty or expense," when considered in light of various statutory factors. Undue hardship "refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business." 29 C.F.R. Pt. 1630 App., § 1630.2(p).

Defendant has no evidence of any such a hardship. Most of the statutory factors are financial, yet Werner is a huge corporation, and it has never suggested that the accommodations proposed would be too expensive. Nor could it. Instead, it contends only that the accommodations during the observed driving portion of its new-hire training would pose a safety risk. SOUMF ¶147. Such an argument is properly considered under the "direct threat"

40

affirmative defense, as explained above. But even if Defendant's argument is relevant to its "undue hardship" defense, there is no meaningful evidence in support. Defendant's safety arguments are based on no more than conclusory statements and gut reaction, and Plaintiffs are entitled to judgment as a matter of law on Defendant's undue hardship defense.

### E.  Plaintiffs are entitled to judgment as a matter of law on Werner's "conditions precedent" affirmative defense.

Werner pleads as an affirmative defense that the EEOC "failed to fulfill all conditions precedent before filing suit, including but not limited to, failing to fulfill in good faith its statutory obligation to conciliate before filing a lawsuit." Answer to Amended Complaint, ECF No. 126, ¶61. Summary judgment is appropriate on this defense because the undisputed facts establish that all conditions precedent to this suit, including the minimal procedural requirements related to conciliation, were fulfilled. Moreover, to the extent Werner alleges any "good faith" requirement related to the EEOC's conciliation procedures, or that procedural failures related to conciliation would provide a defense to this suit, its positions are unsupported by the law.

In *Mach Mining v. EEOC*, 575 U.S. 480, 491 (2015),[4] the Supreme Court unanimously held that the EEOC's only procedural requirements with regard to conciliation are to (1) inform the employer of the allegation; (2) identify which employees or class of employees have suffered; and (3) engage in discussion, giving the employer the opportunity to remedy the discriminatory practice. The Court rejected any "good faith" requirement related to conciliation. *Mach Mining*, 575 U.S. at 491–92; *see also EEOC v. Mach Mining, LLC*, 161 F. Supp. 3d 632,

---

[4] *Mach Mining* arose under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The ADA specifically incorporates the conciliation provisions of Title VII. *See* 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission…"). Therefore, the conciliation standards in *Mach Mining* are applicable to this case.

41

638 (S.D. Ill. 2016) ("[T]he scope of judicial review is narrow with regard to conciliation on

discrimination charges. It focuses on whether the EEOC endeavored to conciliate—not the extent

or means of conciliation."); *EEOC v. Dimensions Healthcare Sys.*, 188 F. Supp. 3d 517, 523 (D.

Md. 2016) ("Although conciliation efforts are a prerequisite to the EEOC's filing of a Title VII

lawsuit, the Supreme Court has confirmed that the obligation to conduct those efforts in good

faith is not a component of the requirement."); *EEOC v. Rosebud Restaurants, Inc*., No. 13-cv-

06656, 2015 WL 5852925, at *1 (N.D. Ill. Oct. 7, 2015) ("To the extent Defendants' responsive

pleading seeks to raise the absence of good faith as a defense, it is insufficient as a matter of

law"). A sworn statement from an EEOC official is generally sufficient to show these

requirements have been met. *Mach Mining*, 575 U.S. at 481–82.

Here, it is undisputed the parties met the procedural requirements identified by the

Supreme Court. The EEOC informed Werner of Deuschle's allegations when it served notice of

his Charge and, on July 25, 2017, when it issued a Letter of Determination regarding the

allegations in the Charge. SOUMF ¶¶134, 136. The Letter of Determination found reasonable

cause to believe that Defendant had discriminated against Deuschle in violation of the ADA.

SOUMF ¶136. The EEOC then engaged in communications with Defendant to provide

Defendant the opportunity to remedy the discriminatory practices described in the Letter of

Determination. SOUMF ¶139. Conciliation discussions failed, and on March 2, 2018, the EEOC

issued Defendant a Notice of Failure of Conciliation because it could not secure an acceptable

conciliation agreement from Defendant. SOUMF ¶140.

Defendant repeatedly denies that the EEOC engaged in good faith conciliation efforts.

And in Paragraph 13 of its Answer, in spite of its admissions to the fulfillment of each step of the

administrative process, Defendant denies that all conditions precedent to the institution of

EEOC's lawsuit have been fulfilled. However, it is undisputed that: (1) the EEOC sent a Letter of Determination to Defendant; (2) the EEOC engaged in communications with Defendant regarding conciliation; (3) the EEOC and Defendant were unable to reach a "conciliation agreement acceptable to the Commission"; and (4) the EEOC issued a Notice of Failure of Conciliation. SOUMF ¶¶136–140. Defendant's denial that the EEOC met "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled" is inconsistent with its admissions and the undisputed facts of this case which establish that the EEOC complied with its statutory obligation to conciliate the claims in this case prior to filing this lawsuit. 42 U.S.C. § 2000e-5(b); *see Mach Mining*, 575 U.S. at 491; *see also EEOC v. Mach Mining, LLC,* 161 F. Supp. 3d 632, 638 (S.D. Ill. Jan. 19, 2016) ("The Supreme Court has held that the EEOC has no procedural requirements with regard to conciliation beyond engaging in some form of discussion and there is no dispute that some form of discussion did occur in this matter.")

Werner repeatedly denies that the EEOC engaged in good faith conciliation efforts. ECF No. ¶¶10–12. But the EEOC is not subject to a good faith standard in its conciliation negotiations. *Mach Mining*, 575 U.S. at 491–92 (rejecting the argument that conciliation negotiations under Title VII are subject to the same good faith standard applicable to labor negotiations under NLRA); *see also EEOC v. Dimensions Healthcare Sys*., 188 F. Supp. 3d 517, 523 (D. Md. 2016) ("Although conciliation efforts are a prerequisite to the EEOC's filing of a Title VII lawsuit, the Supreme Court has confirmed that the obligation to conduct those efforts in good faith is not a component of the requirement."); *EEOC v. Rosebud Restaurants, Inc*., No. 13-cv-06656, 2015 WL 5852925, at *1 (N.D. Ill. Oct. 7, 2015). The EEOC's decision to accept or reject proposals during conciliations is within its sole discretion and outside judicial review, "because a court looks only to whether the EEOC attempted to confer about a charge, and not to

43

what happened (i.e., statements made or positions taken) during those discussions." *Mach Mining*, 575 U.S. at 494. Werner's challenge to the EEOC's "good faith" during the conciliation process, therefore, is legally irrelevant.

The uncontroverted facts establish that Plaintiffs satisfied all conditions precedent to bringing suit and is entitled to judgment as a matter of law on fulfilling all conditions precedent before filing suit, and there are no disputed questions of applicable fact that Plaintiffs satisfied the pre-suit requirements.

## V.    Conclusion

It is undisputed that Andrew Deuschle is disabled within the meaning of the ADA and that he is also a qualified individual, able to perform the essential functions of the job he sought with or without reasonable accommodation. Further, there are no material facts in dispute regarding Werner's direct threat, business necessity and undue hardship affirmative defenses or the satisfaction of conditions precedent. Plaintiffs therefore respectfully request that the Court enter an order granting summary judgment in favor of plaintiffs on Plaintiffs' prima facie elements that Deuschle was disabled within the meaning of the ADA, that he was qualified to perform the job he sought with or without an accommodation, and that Defendant subjected him to an adverse action, and on Defendant's direct threat, business necessity, and undue hardship, and conditions precedent affirmative defenses.

Respectfully submitted,

*/s/ Meredith S. Berwick*
Meredith Berwick, MO Bar #64389
Equal Employment Opportunity
 Commission
1222 Spruce Street, Room 8.100
St. Louis, MO 63103
Phone: 314-798-1909

44

Fax: 314-539-7895
meredith.berwick@eeoc.gov

Joshua M. Pierson, KS Bar #29095
Equal Employment Opportunity Commission
400 State Avenue, Suite 905
Kansas City, Kansas 66101
Phone: (913) 359-1807
Facsimile: (913) 551-6957
joshua.pierson@eeoc.gov
*Attorneys for Plaintiff*

*/s/ Brian East*
Brian East, TX Bar # 06360800
(Admitted Pro Hac Vice)
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758
Phone: 512-454-4816
Fax: 512-454-3999
beast@drtx.org

Lia Sifuentes Davis, TX Bar # 24071411
(Admitted Pro Hac Vice)
University of Texas School of Law
Civil Rights Clinic
727 East Dean Keaton Street
D1800
Austin, Texas 78705
Phone: 512-232-7222
Fax: 512-232-0800
lia.davis@law.utexas.edu
*Attorneys for Plaintiff-Intervenor Andrew Deuschle*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 12,546 words, which includes all text, including the caption, headings, footnotes, and quotations, as determined by Microsoft Word for Office 365 ProPlus.

45

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

*/s/ Meredith S. Berwick*