IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUAL OPPORTUNITY EMPLOYMENT COMMISSION, | |
| Plaintiff, | |
| and | |
| ANDREW DEUSCHLE, | |
| Intervenor Plaintiff | 8:18-CV-329 |
| vs. | 8:18-CV-462 |
| WERNER ENTERPRISES, INC., | |
| Defendant. | MEMORANDUM AND ORDER |
| EQUAL OPPORTUNITY EMPLOYMENT COMMISSION, | |
| Plaintiff, | |
| vs. | |
| DRIVERS MANAGEMENT, LLC and WERNER ENTERPRISES, INC., | |
| Defendants. | |

The plaintiff in these two consolidated cases,[1] the Equal Opportunity Employment Commission (EEOC), is representing the interests of two

_____

[1] Unless otherwise noted, all citations are to the record in the lead case, no. 8:18-cv-329.

prospective commercial truck drivers—Andrew Deuschle and Victor Robinson—who are hearing-impaired. The defendants, Werner Enterprises and its subsidiary, Drivers Management (collectively, Werner) declined to hire Deuschle and Robinson because, Werner says, they couldn't safely complete Werner's training program. The EEOC says Werner violated the Americans with Disabilities Act. The Court finds that there are genuine issues of material facts precluding summary judgment on that claim, and—although the Court will dispense with certain discrete issues—the Court will deny the parties' cross-motions for summary judgment as to the EEOC's primary failure-to-hire disability discrimination claim.

## I. BACKGROUND

Werner is a motor carrier transporting goods throughout the United States. Filing 264 at 3.[2] Werner requires recent truck driving school graduates and relatively inexperienced applicants to complete its "placement driver program," which Werner says is "designed to enhance safe driving skills, assist new drivers in transitioning to the industry, provide support, and set trainees up for success while promoting highway safety." Filing 264 at 6-7.

That program includes an over-the-road driving component, during which the applicant—or, "placement driver"—is observed by a trainer while driving, who provides instructions on safety procedures and driving techniques. Filing 264 at 7. The placement driver and trainer are, Werner says,

---

[2] Pursuant to NECivR 56.1, a party moving for summary judgment must provide a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must provide a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1)(B).

expected to communicate regarding "such topics as emergencies and tutorials about defensive driving, as various driving events occur." Filing 264 at 7. Placement drivers begin by driving in safe environments, gradually progressing to more challenging traffic, terrain, and times of day or night. Filing 264 at 7-8. Werner claims its training is "very different" from a trucking school, and the ability of deaf applicants to complete Werner's training is at the heart of this case.

Both Deuschle and Robinson are deaf, but had completed truck driving school and obtained their commercial driver's licenses. Filing 269 at 4-5;[3] No. 8:18-cv-462 filing 249 at 3-5. Deuschle applied to Werner in 2015, and Robinson applied in 2016. Filing 264 at 9, 13. Deuschle had been driving for another company for a few months, but Robinson was inexperienced aside from his driving school. Filing 264 at 9, 13. Both men were granted exemptions from Federal Motor Carrier Safety Administration (FMCSA) physical qualification standards concerning hearing for interstate drivers. *See* 80 Fed. Reg. 18,924-01 (Apr. 8, 2015); 20 Fed. Reg. 22,768 (Apr. 23, 2015).

Werner ultimately rejected both Deuschle and Robinson. Filing 264 at 12-13; filing 269 at 10. Robinson, specifically, was not hired because Werner

---

[3] Werner objects that Deuschle applied to Werner on March 30, 2015, but didn't actually get his CDL until two days later. Filing 274 at 3. Absent any evidence that discrepancy—or any other timing issues raised in Werner's briefs, *see* filing 274 at 3-20—actually played a part in Werner's employment decision, the Court is unpersuaded by such *post hoc* flyspecking. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir. 2007). And as the Court reads Werner's brief (filing 264), Werner isn't trying at this point to establish a basis for failing to hire Deuschle other than his alleged inability to safely complete its training program. *See* filing 269 at 23. Both parties, in fact, appear to be contesting a lot of facts that in the end don't seem to figure into their actual arguments. The Court has tried to focus on the facts that are legally relevant to the issues and arguments actually presented.

was purportedly unable to identify any way for him to complete Werner's over-the-road training, because there was no way for his instructor to communicate with him without requiring him to take his eyes off the road. Filing 264 at 12. And Werner admits that, regardless of any other factors, it would have rejected Deuschle for the same reason. Filing 269 at 23.

After administrative proceedings, the EEOC brought these cases on Deuschle and Robinson's behalf. The primary claim is failure to hire, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA). Filing 112 at 6. The EEOC also alleges a claim for unlawful inquiry on a job application, premised on the alleged presence of a "disability-related question" on Werner's application for employment. Filing 112 at 6-7. And the EEOC alleges a claim for illegal classification, based on a "deaf recruitment policy" Werner allegedly adopted. Filing 112 at 7.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not

those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g). And after giving notice and a reasonable time to respond, the Court may take other actions dictated by its findings—it may grant summary judgment for a nonmovant, grant the motion on grounds not raised by a party, or consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *See* Fed. R. Civ. P. 56(f).

## III. DISCUSSION

The parties have filed a host of motions, but they mirror one another: Each party wants to exclude the other's experts, and each party wants judgment as a matter of law on some or all of the issues. The Court will start with the questions presented by the summary judgment motions, as providing the most comprehensive entry into the issues.

To frame the discussion, however, it's helpful to review the basic elements of the EEOC's claim: The Americans with Disabilities Act (ADA) prohibits covered employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Prohibited discrimination under the ADA includes intentional discrimination against a qualified individual in hiring and job application procedures," *id.*, and "limiting, segregating, or classifying a job applicant" in an adverse way because of his disability, § 12112(b)(1). *See Cook v. George's, Inc.*, 952 F.3d 935, 939 (8th Cir. 2020).

### 1. QUALIFIED INDIVIDUAL WITH A DISABILITY

First, Werner denies that the drivers were qualified individuals. A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions" of a job. § 12111(8). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1).

### (a) Federal Regulations

Werner's primary argument is that it was entitled to rely on regulations promulgated by the Department of Transportation establishing standards for the physical qualification of commercial motor vehicle drivers. Filing 264 at 17-21. Werner points to *Albertson's, Inc. v. Kirkingburg*, in which the Supreme Court held that a vision-impaired driver wasn't a qualified individual with a disability because he didn't satisfy those standards—even through the vision standard had been waived for the plaintiff in that case pursuant to an "experimental" program. 527 U.S. 555, 577 (1999). Werner's argument is that the same is true in this case—that the plaintiffs aren't "qualified" because they

don't meet the baseline physical standard, and that Werner doesn't have to accept their exemptions. Filing 264 at 17-21.

But the key to the Supreme Court's holding in *Albertson's* was that the validity of the regulations which established physical standards *at the time* was "unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations." *Id*. at 570.[4] The Court explained that the waiver program was merely an attempt to gather data relevant to potential regulatory changes, and that an employer wasn't obliged to participate in the experiment instead of choosing "to abide by the otherwise clearly applicable, unamended substantive regulatory standard despite the Government's willingness to waive it experimentally and without any finding of its being inappropriate." *Albertson's*, 527 U.S. at 577.

Perhaps the most important word there is "unamended," because the regulations at issue *now* are different. Today, 49 C.F.R. § 391.11(b)(4) provides that a person is qualified to drive a commercial motor vehicle if he "[i]s physically qualified to drive a commercial motor vehicle in accordance with subpart E—Physical Qualifications and Examinations of [49 C.F.R. § pt. 391]." But a person is physically qualified if he meets the physical qualification standards *or* "obtained from [the FMCSA] a medical variance from the physical qualification standards." 49 C.F.R. § 391.41(a)(3)(i)-(ii).

In other words, unlike in *Albertson's*, a driver with a medical variance now *is* "physically qualified" to drive a commercial motor vehicle for purposes of 49 C.F.R. § 391.11. Werner's response is to collaterally attack 49 U.S.C. § 391.41, arguing that the hearing exemption program is empirically unfounded.

---

[4] In fact, the regulations at that time did provide individualized waivers for persons with impaired limbs or digits, but those weren't pertinent in that case. *See* 49 C.F.R. § 391.41(b)(1)-(2) (1998) (citing 49 C.F.R. § 391.49).

Filing 294 at 19-21. But as the EEOC notes, the hearing exemption program isn't experimental—for better or worse, the FMCSA has determined, after notice and comment, that granting exemptions "for these drivers to operate property-carrying CMVs will provide a level of safety that is equivalent to or greater than the level of safety maintained without the exemptions." *See* 80 Fed. Reg. 18,924-01 (Apr. 8, 2015); 20 Fed. Reg. 22,768 (Apr. 23, 2015).

Werner isn't opting out of an experimental program waiving federal safety regulations, as in *Albertson's*. Rather, Werner is trying to opt out of an established program operating *within* federal safety regulations. If Werner wants to challenge the wisdom of the current federal regulatory regime, there are procedures for that. But the regulations as they stand provide Werner with no safe harbor for disability discrimination. Perhaps Werner is permitted to set a higher bar than federal regulations do, but that's a separate question.

(b) Essential Functions

Next, Werner argues that neither Deuschle nor Robinson could perform the essential functions of the "Placement Driver" position. Filing 264 at 21.[5] Evidence to consider in determining whether functions are "essential" may include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs. *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013).

---

[5] This is a good place to recall that the issue here isn't whether Deuschle and Robinson could have been safe truck drivers. Rather, Werner's argument is focused on the ability to complete its training program, which is why "Placement Driver" is the relevant position here.

Werner argues at length that its placement driver training program is essential. Filing 264 at 22-23. The Court doesn't understand the EEOC to be meaningfully disputing that. *See* filing 276 at 27-30. Rather, the EEOC's position is that deaf drivers could complete that program with reasonable accommodations. *See id*. Werner, on the other hand, insists that "a driver must be able to engage in real-time communication with a trainer while driving" and that the driver must be able "to receive directions and instruction from his or her trainer during the over-the-road driving portion of the placement driver program without taking his or her eyes off the road." Filing 264 at 24.

Perhaps...but the Court isn't persuaded that Werner has demonstrated that *as a matter of law*. Werner dismisses suggestions such as sign language or other non-verbal communication as unreasonable. Filing 264 at 26-27. There is no precise test for what constitutes a reasonable accommodation. *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007). But an accommodation isn't reasonable if it requires an employer to reallocate or eliminate the essential functions of a job. *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 671 (8th Cir. 2019). And an employer need not provide an accommodation that demonstrably would impose an undue hardship on the employer's business. *See Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016).

Werner's argument seems to rely on the idea that a placement driver can't avert his eyes from the road for even a moment. But while the Court agrees that the familiar maxim, "Keep your eyes on the road," has obvious value, there are any number of common occurrences that necessarily divert a driver's eyes elsewhere. The speedometer. Side mirrors. A map.

Clearly, a driver isn't required to maintain a thousand-yard stare on the road ahead at every moment. So, how long can a driver look away, and at what,

without unreasonably compromising safety? Werner hasn't persuaded the Court that as a matter of law, there's no reasonable way to safely communicate with a deaf driver even if the driver has to glance away from the road.

Werner poses hypothetical situations in which "catastrophic harm" could result from, for instance, "avoid[ing] an imminent potential jackknife scenario during an inclement weather situation . . . using only hand signals to guide an inexperienced driver who may have little or no prior experience operating a loaded commercial motor vehicle under those conditions." Filing 264 at 26-27. It's a fair question, though, whether an inexperienced driver under those conditions would fare much better with verbal instructions. It's also a fair question whether accommodating a disability can be "unreasonable" even if it's weighed against a possible worst-case scenario. But most importantly, it's a *jury* question whether an accommodation is reasonable. *See Convergys*, 491 F.3d at 796.

But that also means that the EEOC doesn't get summary judgment on this issue either. The EEOC points to the fact that hearing-impaired drivers can do the job of an over-the-road driver for Werner, as that job was described to applicants. *See* filing 269 at 27-28. But as previously noted, Werner's argument depends on its training program, not the driver's eventual job. And as also previously noted, in determining what functions of a job are "essential," the Court must consider not only the job description, but a number of other factors including the employer's judgment on that point and the possible consequences of not requiring the applicant to perform the function. *See Knutson*, 711 F.3d at 914. The Court is unwilling to say that Werner's policies are unreasonable as a matter of law.

2. AFFIRMATIVE DEFENSES

Werner raised several affirmative defenses. Filing 121 at 6-8. Both parties want summary judgment on some of them, and the EEOC wants the Court to dismiss others.

(a) Qualifications Standards Defenses

Both parties want summary judgment as to Werner's "direct threat" and "business necessity" defenses. Filing 264 at 27-31; filing 269 at 33-40. Those defenses rely on the same statutory language: It is a defense to a charge of disability discrimination

> that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation. . . .

§ 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." § 12113(b).

*(i) Direct Threat*

"Direct threat" is an affirmative defense on which the employer bears the burden of proof. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007). It requires "an individualized direct threat analysis that relies on the best current medical or other objective evidence in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded

- 11 -

fear." *Id.* (quotations omitted); *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); 29 C.F.R. § 1630.2(r). Factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Wal-Mart*, 477 F.3d at 571; 29 C.F.R. § 1630.2(r).

Werner's argument is largely coextensive with its challenge to the EEOC's *prima facie* claim: Werner says that a deaf placement driver couldn't possibly be coached to respond to a sudden accident or emergency, meaning that the driver would be a "direct threat" to himself or others. Filing 264 at 27-30. But Werner misapprehends the nature of the "direct threat" defense, which demands a "particularized enquiry" into the risks posed or faced by the employee. *Chevron*, 536 U.S. at 86. "An individualized assessment is required to establish that defense as a matter of law." *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 660 (D. Neb. 2022). Werner's assessment of Deuschle and Robinson wasn't bespoke—it was off-the-rack. Accordingly, the Court agrees with the EEOC that Werner's "direct threat" defense isn't applicable here.

### *(ii) Business Necessity*

Rather, Werner's argument is better framed as a "business necessity" defense: that Werner's qualification standards or other selection criteria, which screen out hearing-impaired placement drivers, are "job-related for the position in question" and "consistent with business necessity." *See Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020) (citing § 12112(b)(6)).

An employer urging a business necessity defense must validate the criteria in question for job-relatedness to the specific skills and physical requirements of the sought-after position. *Id.* To show "job-relatedness," an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential

functions of the job. *Id*. And for a safety-based qualification standard, in evaluating whether the risks addressed by the qualification standard constitute a business necessity, the Court takes into account the magnitude of possible harm as well as the probability of occurrence. *See id*.

As a result, on the facts of this case, Werner's "business necessity" defense is largely coextensive with the EEOC's *prima facie* case. The difference would presumably be that the plaintiff's obligation is to prove that the *plaintiff* can perform the essential functions of the job, while the defendant's burden would be to show that its one-size-fits-all standard is still justified as a fair criterion to more broadly measure an applicant's fitness. But here, the Court doesn't understand either party to argue that Deuschle or Robinson are somehow more or less qualified than any other placement driver who meets the other basic criteria, such as driving school, a CDL, and a hearing exemption. Deuschle and Robinson aren't unique, in other words—the issue here is whether a deaf driver with the proper credentials can complete Werner's training program with a reasonable accommodation, and Deuschle and Robinson are just the plaintiffs representing that category of applicants.

On that understanding, the Court will deny summary judgment on this affirmative defense for the same reasons it denied summary judgment on the EEOC's *prima facie* case: There are genuine issues of material fact about the essential functions of the job, and whether the accommodations sought by Deuschle and Robinson to perform that job are reasonable.[6]

---

[6] Whether the jury should be instructed on both the *prima facie* case and the affirmative defense, given their overlapping nature, is a separate question that the Court will take up in the context of trial. It's not immediately obvious why Werner would *want* an affirmative defense instruction, given that it would essentially pose the same questions as the *prima facie* case, except Werner would have the burden of proof.

(b) Undue Hardship

Werner alleges that any accommodation "would cause an undue burden requiring a fundamental alteration in the nature of Werner's services, programs, or activities or undue financial or administrative burdens." Filing 121 at 8. The EEOC wants the Court to dismiss that defense. Filing 269 at 40-41. Werner responds, conclusorily, that the EEOC's proposed accommodations "would fundamentally alter the nature of the business operation" by "prevent[ing] a trainer from providing instantaneous safety training." Filing 274 at 33.[7]

But the "undue hardship" rubric isn't particularly applicable to that argument. Generally, it's a plaintiff's initial burden to show that an accommodation for a disability seems reasonable on its face, *i.e.* ordinarily or in the run of cases. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). "Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 402. "Undue hardship" means "significant difficulty or expense incurred," considering several factors, including:

(i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the

---

[7] Fundamental alteration is merely a particular type of undue hardship. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).

number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2).

Werner's argument here does not raise—and, actually, expressly disclaims—any reliance on a financial burden. Filing 274 at 33. Instead, Werner only asserts that "instantaneous safety training" is fundamental to its business. But Werner is a trucking company. It carries goods in interstate commerce. The Court is not persuaded that providing training with non-verbal instead of verbal cues would "fundamentally alter" the nature of Werner's business. *Cf. PGA Tour, Inc. v. Martin*, 532 U.S. 661, 686-91 (2001). And Werner has other, more pertinent legal grounds to present its factual argument about safety concerns and the need for verbal interaction. Accordingly, the Court will dismiss this affirmative defense.

(c) Conditions Precedent

The final affirmative defense at issue is Werner's allegation that the EEOC "failed to fulfill all conditions precedent before filing suit, including but not limited to, failing to fulfill in good faith its statutory obligation to conciliate before filing a lawsuit." Filing 121 at 8. The EEOC points out that its obligation to conciliate requires *only* that it must inform the employer about the specific allegation, describing both what the employer has done and which employees (or what class of employees) have suffered as a result, and try to engage the employer in some form of discussion (whether written or oral), so as to give the employer an opportunity to remedy the allegedly discriminatory practice. *Mach Mining, LLC v. E.E.O.C.*, 676 U.S. 480, 494 (2015).

The facts establishing the EEOC's efforts at conciliation are undisputed. Filing 260 at 21-22. Werner argues merely that the EEOC's account is focused on the failure-to-hire claim, not its unlawful inquiry or illegal classification claims. So, Werner says, the Court should deny the EEOC's motion to dismiss the defense, at least as to those claims. Filing 274 at 35. Rather unhelpfully, the EEOC's reply just asserts that Werner "admittedly waives" this defense as to the failure-to-hire, and "waives the same defense against the EEOC by failing to brief it adequately." Filing 282 at 2.

But the Court sees the problem as more fundamental: What is this defense? It's not a jury question—regarding whether the conciliation requirement was met, the U.S. Supreme Court has consigned fact-finding to the Court. *Mach Mining*, 575 U.S. at 494-95. And "[s]hould the court find in favor of the employer, the appropriate remedy is to order the EEOC to undertake the mandated efforts to obtain voluntary compliance." *Id*. at 495.

This is, in other words, not an issue to be raised at trial. And Werner isn't asking the Court, right now, to order the EEOC to conciliate anything.

- 16 -

The Court will deny the EEOC's motion to dismiss this defense. But whether the Court could be persuaded that the EEOC actually failed to conciliate any claims, and that Werner is entitled to any sort of relief—*if* Werner even moved for relief—is a completely separate question, and one the Court need not answer until it's asked.

### 3. UNLAWFUL INQUIRY

Werner contends that the EEOC's claim regarding Werner's employment application form—or, what Werner calls its "pre-2013 application form"—is time-barred because Werner stopped using that form in 2013, and moot because Werner doesn't intend to start using it again. Filing 264 at 31-33.[8]

The EEOC's first argument is based on the voluntary cessation doctrine: that a defendant cannot always moot a case simply by voluntarily ceasing its unlawful conduct after the plaintiff files suit. *See Prowse v. Payne*, 984 F.3d 700, 702 (8th Cir. 2021). Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends. *Id*. And a defendant faces a "heavy burden" to establish mootness by way of voluntary cessation. *Id*. at 703.

But the Court finds that burden to have been met here. It's been 10 years since the form was changed. Nor are there any circumstances suggesting the type of manipulative behavior the voluntary-cessation exception is meant to address. *See Let Them Play MN v. Walz*, 556 F. Supp. 3d 968, 978 (D. Minn.

---

[8] The allegedly unlawful question on the form was, "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" Filing 276 at 41, *see* filing 112-1. But the *substance* of the form, and its legality, aren't at issue.

2021). It seems reasonably clear that Werner hasn't just responded to litigation in an attempt to *create* mootness.

But that implicates the EEOC's other argument, which is that there are factual questions about whether Werner really stopped using the form at issue. The EEOC argues:

> Werner's claim that it has not made any unlawful disability-related inquiry through its employment application since July 2013 is not an undisputed fact. In February 2016, the EEOC asked Werner to provide "a blank copy of your employment application." Werner produced an application with the unlawful question. In September 2016, the EEOC asked Werner to provide "a copy of . . . all documents related to the recruiting process for the relevant time period" (defined as "January 1, 2014 to the present"). Werner again produced an application with the unlawful question. Self-serving contradictory testimony - offered years after these productions were made - creates a disputed fact, not an undisputed one.

Filing 276 at 41-42 (citations omitted).

But the Court is not persuaded that Werner's production of that form during discovery (or whatever sort of investigation was happening in 2016) is enough to generate an issue of material fact as to whether the form has been *used* since 2013—as opposed to the sort of "metaphysical doubt" that doesn't suffice to prevent summary judgment. *See* Torgerson, 643 F.3d at 1042. It doesn't appear to be disputed that neither Deuschle nor Robinson were asked to complete the questioned form. Filing 264 at 9, 14. Nor has the EEOC identified anyone else who's been asked, since 2013, to complete that form.

In other words, the evidence before the Court provides no genuine basis to dispute Werner's evidence that the form was changed in 2013, and nothing to undermine Werner's argument that 10 years of good behavior is enough to establish genuine cessation of its allegedly unlawful conduct. And, the Court notes, should that change, the EEOC is well equipped to act promptly in response. Accordingly, the Court will grant the defendant's motion for summary judgment as to this claim.

### 4. ILLEGAL CLASSIFICATION

That leaves the EEOC's illegal classification claim. The gist of that claim is that Werner's internal operating procedures—as reflected in a training document for recruiters—provided a different workflow for applications from hearing-impaired drivers: If the recruiter is "aware of an FMCSA waiver- or a hearing issue (IE: leaving a message on a relay service) do not Pre-Approve the application." Filing 112-2 at 1. Instead, the recruiter would send the completed application "to the manager basket," and management would decide whether or not to move forward. Filing 112-2 at 1. Werner insists that there's no genuine issue of fact regarding this claim because "the language of the training document is undisputed." Filing 264 at 33. The Court disagrees.

Disability discrimination includes "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." § 12112(b)(1). Werner argues that its procedure doesn't adversely affect hearing-impaired applicants, because referring the application to a manager is simply meant to ensure that the applicant meets driver qualification standards. Filing 264 at 33-34.

But that's not what the training document says. What the training document says is that an application from a hearing-impaired driver doesn't

get pre-approved—instead, it's referred to a manager and it may or may not return to the recruiter. Filing 112-2. Pre-approved applications get conditional offers of employment. Filing 276 at 19. But pursuant to the training document, hearing-impaired applicants don't. *See* filing 112-2. And as the EEOC notes, filing 276 at 43, Werner's argument that it's just checking to make sure hearing-impaired drivers meet Werner's standards isn't compelling, when the rest of Werner's brief is devoted to explaining why hearing-impaired drivers inherently *don't* meet its standards.

On the face of the training document, hearing-impaired applicants don't get the same pre-approval as any other qualified applicant—instead, they're sent off for some other approval process that isn't explained (and the result of which, at least for Deuschle and Robinson, seems to have been rejection). Perhaps that process *doesn't* adversely affect hearing-impaired applicants, as Werner argues. But the training document, standing alone, doesn't establish that. And evidence of how Werner actually treats hearing-impaired applicants is obviously disputed. Accordingly, the Court will deny Werner's motion for summary judgment as to this claim.

5. EXPERT WITNESSES

Both parties have expert witnesses. Each party has moved to exclude the other's experts pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). In exercising its gatekeeping function, the Court must make a preliminary assessment of whether the reasoning or

methodology underlying the proposed expert testimony is valid and of whether that reasoning or methodology properly can be applied to the facts in issue, focusing specifically on the methodology and not the conclusions. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000-01 (8th Cir. 2019). But "cases are legion that under *Daubert*, liberal admission is prevalent and courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id*. (cleaned up).

That said, few if any of the arguments raised in either side's motion actually take issue with an expert's methodology. Rather, they present more basic objections such as foundation, relevance, and unfair prejudice.

### (a) William C. Adams

First, the EEOC objects to the proffered testimony of William C. Adams, who opines

> to a reasonable degree of certainty that the training of a deaf student driver during the over-the-road portion of Werner's Student Driver Training Program would create unsafe conditions including the risk of injury or potential fatality to the student, the driver trainer, the motoring public and pedestrians in the vicinity of the [commercial motor vehicle], as well the potential for serious property damage.

Filing 251-2 at 1. The EEOC argues that even if Adams has extensive experience training truck drivers—which he claims, *see* filing 251-2 at 1—he doesn't have any education, knowledge, or experience training *deaf* truck drivers. Filing 250 at 3. So, the EEOC says, he lacks the necessary

qualifications to testify as an expert on the feasibility of training deaf truck drivers. Filing 250 at 3.

The Court disagrees. The EEOC doesn't challenge Adams' expertise on the training of truck drivers generally, and the central issue in this case is whether the ordinary methods of training truck drivers can be safely adapted to accommodate hearing-impaired trainees. An expert may proceed as far as, but no further than, his specialized knowledge assists him in going. *Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 609 (8th Cir. 2020). But Adams' proffered expertise allows him to testify to what training a truck driver involves, what sorts of situations might arise, what sort of communication between trainer and trainee is required—and whether the accommodations suggested by the EEOC's experts are consistent with safe training practices.[9] The Court will deny the EEOC's motion.

### (b) Don Olds

The EEOC proffers the testimony of Don Olds, who trains hearing-impaired truck drivers. *See* filing 246-4. Olds proposes to opine that

A. because standards are the same for all drivers (i.e., age, CDL, and DOT/FMCSA medical examiners' certificate), drivers with a DOT/ FMCSA hearing exemption who meet those standards are just as qualified to drive a truck interstate as those drivers who are not required to get such an exemption;

---

[9] The EEOC also objects to Adams' proffered testimony in support of Werner's "direct threat" affirmative defense. Filing 250 at 6-9. Given the Court's disposition of that affirmative defense, the Court regards the EEOC's argument here as moot. If not, the EEOC can always object at trial.

B. drivers with a DOT/FMCSA hearing exemption can be safely and effectively taught to qualify to drive commercial motor vehicles interstate (i.e., pass their CDL written and road tests) by using sign language, hand signals, and other accommodations in a way that is safe for the student, instructor, and public;

C. drivers with a DOT/FMCSA hearing exemption can do all the essential functions of an interstate truck driver safely with or without accommodation; and

D. drivers with a DOT/FMCSA hearing exemption, regardless of their verifiable driver experience, can safely do all parts of Werner's new hire orientation, evaluation, and training, with or without accommodations.

Filing 246-4 at 5. Werner objects to any opinion from Olds *other* than whether a hearing-impaired driver can be safely accommodated in the over-the-road driving portion of its placement driver program. *See* filing 247 at 19.

Werner's argument is that because it doesn't dispute whether hearing-impaired drivers can operate trucks safely, the proffered opinion testimony is irrelevant. But the Court agrees with the EEOC that explaining how hearing-impaired drivers are evaluated, how they work, and the methods used to train them, may be relevant to helping the jury understand whether Werner's safety concerns are legitimate and any proposed accommodations are reasonable. *See* filing 254 at 4-6.

Werner also objects to testimony about what the parties call "the Blake case," in which a placement driver was involved in an accident. Filing 247 at 21. The parties disagree about who brought up that subject in the first place,

and what it purportedly illustrates. *See* filing 247 at 21-23; filing 254 at 8-9; filing 259 at 5-6.

This is a rabbit hole the Court declines to crawl into. It's not at all apparent to the Court that this will come up at trial, and if it does, whether it's best considered as an expert testimony issue or a more basic question of hearsay and foundation. In any event, the Court is ill-prepared to address it outside the context of trial evidence. If the matter arises at trial, Werner can object then.

Similarly, the Court declines to address, at this point, Werner's objections to Olds' rebuttal opinions. Filing 247 at 23. Very generally summarized, in his rebuttal report, Olds reviewed Adams' opinions and opined that Adams' opinions were flawed because of his inexperience with deaf drivers. Filing 246-5. Whether Olds would be permitted to say, for instance, that Adams statements reflect a "bias" against deaf drivers isn't a basis to exclude Olds' opinions wholesale, and the Court is not inclined at this point to blue-line Olds' expert report to find each and every instance in which he might have crossed a line. Werner can object at trial, based on what actually happens at trial.

Finally, Werner argues that Olds "should not be permitted to provide additional and undisclosed opinions and testimony 'in more detail' than the opinions disclosed in his expert report." Filing 247 at 24. This, too, is something the Court can't address at this point. The EEOC represents that Olds' testimony at trial "will be confined to the opinions and bases for them expressed in his report." Filing 254 at 9. The Court has no reason to believe otherwise, and in any event can't properly opine on any opinion testimony it hasn't seen yet. The Court will deny Werner's motion to limit Olds' testimony.

(c) Dr. Steven Arndt

Werner also objects to the opinions of Dr. Steven Arndt, who says that there "are multiple communication methods and channels that would reasonably accommodate Mr. Robinson and Mr. Deuschle, allowing them to safely complete Werner's on-the-road training portion of its Student Driver Training Program." Filing 246-6 at 5. Arndt's opinion is based on his expertise in psychology, industrial engineering, and "human factors"—"the application of psychology, human factors, human perception, human decision making and human attention, human appreciation of risk, knowledge gained through experience, and training, to assess the environment, the task to be accomplished, the capabilities and limitations of tools available, and the organizational system in place." Filing 246-6 at 6.

Werner objects to Arndt's testimony on several grounds. First, Werner claims that lay persons are "perfectly qualified to decide how effective or distracting various forms of communications may be to a driver operating a vehicle." Filing 247 at 25. The Court simply disagrees. True, courts must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 725 (8th Cir. 2015). But here, Arndt's opinion is grounded in an imposing review of scientific literature involving, among other things: human perception, the causes of motor vehicle accidents, and the efficacy of non-verbal communication methods. *See* filing 246-6 at 74-76. Or perhaps more basically: The Court found Arndt's reasoning to be illuminating, and believes that the jury would also find it helpful—without invading the jury's province.

Next, Werner argues that Arndt went outside the scope of his expertise when opining on ADA accommodations. Filing 247 at 28-29. But whether an

accommodation is reasonable is a question of fact, *see Convergys*, 491 F.3d at 796, and an opinion isn't objectionable just because it embraces an ultimate issue to be decided by the trier of fact, *see Scheerer v. Hardee's Food Sys., Inc.*, 148 F.3d 1036, 1038 (8th Cir. 1998) (citing Fed. R. Evid. 704(a)). And the Court agrees with the EEOC that the factual bases for Arndt's opinion were set forth in his report. To the extent that Werner claims Arndt's fact-gathering was inadequate, that's an appropriate subject for cross-examination.

Werner also complains about the relevance of Arndt's opinion regarding whether deaf drivers may safely operate vehicles in contexts other than Werner's over-the-road placement driver program, and any opinion regarding the "Blake case." Filing 247 at 32-33. The Court reads those as basically the same objections Werner asserted to most of Olds' opinions, and will overrule them at this point for the same reasons.

Finally, Werner claims that Arndt's opinions are cumulative of Olds', and should be excluded under Fed. R. Evid. 403. Filing 247 at 33-35. The Court simply disagrees. Olds and Arndt reached similar conclusions regarding the accommodations available for hearing-impaired drivers, but came to those conclusions in different ways: Olds from years of real-world experience in trucks, and Arndt from experience and education in science, engineering, and human behavior and perception. Their opinions reinforce one another, but they're not cumulative. The Court will deny Werner's motion to exclude Arndt's opinions.

### 6. MOTION FOR LEAVE TO SUBMIT ADDITIONAL AUTHORITY

Finally, Werner also filed a motion for leave to submit new authority with respect to the EEOC's motion for summary judgment—newly issued EEOC guidance that, Werner says, supports its argument. Filing 291. That

- 26 -

guidance provides the following illustration of what is or isn't a reasonable accommodation of a hearing disability:

> An employee with a hearing disability requests training to operate a forklift at a large hardware store. For safety reasons, the employer requires that forklift operators be able to communicate with a spotter employee while operating the machine. The employee and the employer contact the [Job Accommodation Network] JAN, which suggests that they explore whether the employee could be accommodated using a visual alert on a smartwatch, a vibrating pager with a light signal, or a smartphone or tablet on a dashboard mount to allow communication with the spotter. If the employer determines that there is a reasonable accommodation that does not pose an undue hardship, based on the facts of the specific work setting and tasks, it must provide the accommodation and allow the employee training on the forklift. If no reasonable accommodation can be provided absent undue hardship, the employer may deny the employee training on a forklift.

Filing 291-1 at 2.

The Court will grant Werner's request for leave, and considers its additional authority (filing 291-1) submitted *instanter*—for what it's worth. But the point made is anodyne: That an employer isn't required to accommodate a hearing-impaired employee if to do so would pose an undue hardship. That's well-established, and was discussed above. The question here is whether accommodating hearing-impaired placement drivers would be so

unsafe as to excuse Werner from providing accommodations—and the new guidance Werner offers doesn't answer that question.

## IV. CONCLUSION

As set forth more specifically above,

IT IS ORDERED:

1.    The defendant's motion to exclude (filing 244) is denied.

2.    The plaintiff's motion to exclude (filing 249) is denied.

3.    The defendant's motion for summary judgment (filing 263) is granted in part and denied in part.

4.    The plaintiff's motion for summary judgment (filing 268) is granted in part and denied in part.

5.    The defendants' motion for leave to submit new authority (filing 291) is granted.

Dated this 31st day of March, 2023.

BY THE COURT:

John M. Gerrard
Senior United States District Judge